# 12-2322-bk(L),
## 12-2933-bk(XAP)

# United States Court of Appeals
## for the
# Second Circuit

IN RE: LEHMAN BROTHERS HOLDING INC.

———————————————

LEHMAN BROTHERS HOLDING INC.,

*Debtor,*

BARCLAYS CAPITAL INC., BARCLAYS BANK PLC,

*Appellees/Cross-Appellants,*

– v. –

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.,

*Appellant/Cross-Appellee,*

– and –

SECURITIES AND EXCHANGE COMMISSION, SECURITIES INVESTOR PROTECTION CORPORATION, Statutory Intervenor pursuant to Securities Investor Protection Act, 15 U.S.C. 78eee(d),

*Intervenors.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## DEFERRED JOINT APPENDIX
### Volume VI of VII (Pages A-1365 to A-1610)

LEVINE LEE LLP
570 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 223-4400

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Appellant/Cross-Appellee James W. Giddens,*
*as Trustee for the SIPA Liquidation of Lehman Brothers Inc.*

*(For Further Appearances See Reverse Side of Cover)*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

– and –

5301 Wisconsin Avenue, N.W., Suite 800
Washington, DC 20015
(202) 237-2727

*Attorneys for Appellees/Cross-Appellants*
  *Barclays Capital Inc. and*
  *Barclays Bank PLC*

i

# Table of Contents

**Page**

S.D.N.Y. Docket Sheet..............................................................  A-1

### Barclays Capital Inc. Exhibits

BCI Exhibit 1 -
Asset Purchase Agreement between Lehman Brothers
Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and
Barclays Capital Inc., Dated September 16, 2008...............  A-13

BCI Exhibit 2 -
First Amendment to Asset Purchase Agreement,
Dated September 19, 2008 ....................................................  A-60

BCI Exhibit 3a -
Transfer and Assumption Agreement between Lehman
Brothers Inc., The Options Clearing Corporation, and
Barclays Capital Inc., Dated September 20, 2008...............  A-64

BCI Exhibit 5 -
Clarification Letter Agreement between Lehman Brothers
Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and
Barclays Capital Inc., Dated September 20, 2008...............  A-67

BCI Exhibit 6 -
Letter Agreement between The Depository Trust &
Clearing Corporation, Barclays Capital Inc., and James W.
Giddens as Trustee for the Liquidation of Lehman
Brothers, Inc. under the Securities Investor Protection Act,
Dated September 22, 2008 ....................................................  A-83

BCI Exhibit 7 -
Services and Settlement Agreement between JPMorgan
Chase Bank, N.A., Barclays Capital, Inc., James W.
Giddens, as Trustee in the Securities Investor Protection
Act ("SIPA") Liquidation of Lehman Brothers Inc., the
Securities Investor Protection Corporation, and Lehman
Brothers Holdings Inc., Dated September 22, 2008.............  A-89

BCI Exhibit 9 -
(Excerpt) Settlement Agreement between JPMorgan Chase
Bank, N.A., Barclays Capital Inc., and James W. Giddens,
as Trustee in the Securities Investor Protection Act
("SIPA") Liquidation of Lehman Brothers Inc.,
Dated December 5, 2008 .......................................................  A-98

ii

**Page**

BCI Exhibit 16 -
Order under 11 U.S.C. §§ 105(a), 363, and 365 and
Federal Rules of Bankruptcy Procedure 2002, 6004 and
6006 Authorizing and Approving (A) the Sale of
Purchased Assets Free and Clear of Liens and Other
Interests and (B) Assumption and Assignment of
Executory Contracts and Unexpired Leases,
Dated September 19, 2008 .................................................. A-102

BCI Exhibit 18 -
(Excerpt) Notice of Filing of Purchase Agreement
Approved by Order under 11 U.S.C. §§ 105(a), 363, and
365 and Federal Rules of Bankruptcy Procedure 2002,
6004 and 6006 Authorizing and Approving (A) the Sale
of Purchased Assets Free and Clear of Liens and Other
Interests and (B) Assumption and Assignment of
Executory Contracts and Unexpired Leases, Dated
September 22, 2008.................................................... A-126

BCI Exhibit 19 -
Joint Motion of the Debtors and Barclays Capital Inc.
for Entry of an Order Authorizing to File under Seal
Certain Schedules to the Asset Purchase Agreement,
Dated September 29, 2008 .................................................. A-129

BCI Exhibit 20 -
Schedule B of the Clarifying Letter Agreement, Dated
September 20, 2008, between Lehman Brothers Holdings
Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays
Capital Inc. .......................................................... A-139

BCI Exhibit 29 -
Motion under 11 U.S.C. §§ 105 and 363 and Fed. R.
Bankr. P. 9019(a) for Entry of an Order Approving
Settlement Agreement, Dated December 5, 2008 ................ A-216

BCI Exhibit 30 -
Declaration of Shari D. Leventhal in Support of Trustee's
Motion for Entry of an Order Approving a Settlement
Agreement, Dated December 5, 2008 ................................. A-228

iii

**Page**

BCI Exhibit 33 -
Answering Brief of Lehman Brothers Holdings Inc.,
*et al.* in Opposition to Bay Harbour Appeal,
Dated December 12, 2008....................................................... A-237

BCI Exhibit 34 -
Brief of Appellee James W. Giddens, as Trustee for
the SIPA Liquidation of Lehman Brothers Inc.,
Dated December 12, 2008....................................................... A-285

BCI Exhibit 36 -
Order Pursuant to SIPA Section 78 fff-2(f), 11 U.S.C.
Sections 105(a) and 363(b) and Fed. R. Bank. P. 9019(a)
Approving the Trustee's Implementation of the LBI
Liquidation Order to Complete the Account Transfers
from the Benefit of Customers, Including the Related
Limited Settlement Agreement Completing the PIM
Conversion for the Benefit of Private Investment
Management Customers, and Terminating the Account
Transfer Process, Dated December 14, 2009 ....................... A-308

BCI Exhibit 38 -
Declaration of Saul E. Burian in Support of Limited
Objection of Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., *et al.* to SIPA Trustee's
Motion under 11 U.S.C. §§ 105 and 363 and Fed. R.
Bankr. P. 9019(a) for Entry of an Order Approving
Settlement Agreement, Dated December 19, 2008 .............. A-316

BCI Exhibit 40 -
(Excerpts) First Application of Hughes Hubbard & Reed
LLP for Allowance of Interim Compensation for Services
Rendered and Reimbursement of Actual and Necessary
Expenses Incurred from September 13, 2008 through
January 31, 2009 ................................................................. A-320

BCI Exhibit 42 -
(Excerpts) Trustee's First Interim Report for the Period
September 19, 2008 through May 29, 2009 ......................... A-335

BCI Exhibit 48a -
(Excerpts) Hearing Transcript, Dated September 17, 2008,
Transcript Pages 62–69, Compressed Version.................... A-339

iv

**Page**

BCI Exhibit 49 -
Excerpts of Hearing Transcript,
Dated September 19, 2008 .................................................. A-343

(i) Transcript Pages 42–85 ................................................ A-345

(ii) Transcript Pages 90–105 ............................................ A-385

(iii) Transcript Pages 126–133 .......................................... A-401

(iv) Transcript Pages 154–169 .......................................... A-409

(v) Transcript Pages 186–189 ........................................... A-421

(vi) Transcript Pages 198–201 .......................................... A-425

(vii) Transcript Pages 238–257 ......................................... A-429

BCI Exhibit 49a -
Excerpts of Hearing Transcript, Dated September 19, 2008,
Compressed Version ............................................... A-449

(i) Transcript Pages 42–85 ................................................ A-451

(ii) Transcript Pages 90–105 ............................................ A-461

(iii) Transcript Pages 126–133 .......................................... A-465

(iv) Transcript Pages 154–169 .......................................... A-467

(v) Transcript Pages 186–189 ........................................... A-470

(vi) Transcript Pages 198–201 .......................................... A-471

(vii) Transcript Pages 238–257 ......................................... A-472

BCI Exhibit 109a -
Barclays Announcement, Dated September 17, 2008.......... A-477

BCI Exhibit 110 -
Investor Teleconference Transcript, Dated September 17,
2008 .................................................................. A-483

BCI Exhibit 133b -
Gross Acquisition Balance Sheet,
Dated January 28, 2009 ..................................................... A-501

BCI Exhibit 147 -
Gary Romain Preparation Notes for January 13, 2010
Deposition ......................................................... A-505

v

**Page**

BCI Exhibit 156 -
  Letter from James B. Kobak, Jr. to James R. McDaniel,
  Dated November 14, 2008 .................................................  A-515

BCI Exhibit 157 -
  Letter from Lindsee P. Granfield to James Kobak, Jr.,
  Dated December 29, 2008 (Attachment Omitted) ...............  A-517

BCI Exhibit 164 -
  Letter from Jonathan Hughes to James W. Gidden,
  Dated March 25, 2009.........................................................  A-520

BCI Exhibit 167 -
  Letter from James B. Kobak to Jonathan Hughes,
  Dated April 22, 2009...........................................................  A-523

BCI Exhibit 217 -
  Email from Sean Byrne to Liz James, *et al.*, re:
  Barclays_LBI-Plan.xls, Sent September 19, 2008,
  with Attachment ..................................................................  A-527

BCI Exhibit 220 -
  Email Chain, re: URGENT Options Clearing Corp
  Issues re: Barclays/Lehman transaction,
  Sent September 19, 2008......................................................  A-549

BCI Exhibit 230 -
  Email from Alex R. Rovira to James R. McDaniel,
  Sent September 20, 2008, re: OCC Transfer
  Documents, with Attachment...............................................  A-553

BCI Exhibit 231 -
  Email from Alex R. Rovira to James B. Kobak, re: Options
  Clearance Corporation Transfer Documents, Sent
  September 20, 2008...............................................................  A-562

BCI Exhibit 233 -
  Email from James R. McDaniel to Ronit Berkovich, *et al.*,
  re: LBI Property at OCC, Sent September 20, 2008 ...........  A-572

BCI Exhibit 234 -
  Email from James B. Kobak to Alex R. Rovira, *et al.*, re:
  Options Clearance Corporation Transfer Documents,
  Sent September 20, 2008......................................................  A-574

**Page**

BCI Exhibit 242 -
   Email from James R. McDaniel to Edward J. Rosen, *et al.*,
   re: Issues re: LBI Accounts at OCC, Sent September 20,
   2008 ................................................................................. A-576

BCI Exhibit 249 -
   Email from David Leinwand to A. Keller, *et al.*, re:
   Revised Clarification Letter, Sent September 20, 2008 ....... A-578

BCI Exhibit 262 -
   Email from James R. McDaniel to Edward J. Rosen, re:
   Understanding Relating to the Transfer of LBI's Accounts
   at OCC, Sent September 21, 2008 ...................................... A-598

BCI Exhibit 265 -
   Email from Stephen P. Harbeck, to James R. McDaniel,
   *et al.*, re: Understandings Relating to the Transfer of LBI's
   Accounts at OCC, Sent September 21, 2008 ...................... A-603

BCI Exhibit 267 -
   Email from James R. McDaniel to Stephen P. Harbeck,
   *et al.*, re: Understandings Relating to the Transfer of
   LBI's Accounts at OCC, Sent September 21, 2008 ............. A-605

BCI Exhibit 270 -
   Email from Robert Messineo to Anson Frelinghuysen,
   re: LEHMAN–Barclays, Sent September 21, 2008,
   with Attachment ................................................................. A-608

BCI Exhibit 283 -
   Email from Anson Frelinghuysen to Marilyn Shaw, re:
   Fw: Barclays Guaranty, Sent September 22, 2008,
   with Attachment ................................................................. A-619

BCI Exhibit 284 -
   Redacted Email from Lue Despins to Harvey Miller,
   re: Barclays, Sent September 22, 2008 ............................... A-631

BCI Exhibit 287 -
   Email from Harvey Miller to L. Despins, re: Barclays,
   Sent September 22, 2008 ..................................................... A-633

BCI Exhibit 288 -
   Email from Harvey Miller to Saul Burian, *et al.*,
   re Lehman, Sent September 22, 2008 ................................. A-634

vii

**Page**

BCI Exhibit 296 -
Email from Christopher Kiplok to Jane Buyers-Russo,
*et al.*, re: Fw: Futures Accounts, Sent September 23, 2008,
with Attachment ................................................................. A-635

BCI Exhibit 300 -
Email from Christopher Kiplok to Jane Buyers-Russo,
*et al.*, re: LBI Trustee Authorization/Collateral Move,
Sent September 24, 2008, with Attachment ......................... A-638

BCI Exhibit 309 -
Email from David Murgio to Victor Lewkow, re: Fw:
Financing Facility Collateral List, Sent September 25,
2008, with Attachment ......................................................... A-641

BCI Exhibit 320 -
Email from Glenn West to J. McCarthy, *et al.*, re: Here is
all we have at the moment that makes an effort to describe
what Barclays got and didn't get, Sent September 27, 2008,
with Attachment ................................................................. A-651

BCI Exhibit 320a -
Email from Glenn West to J. McCarthy, *et al.*, re: Here is
all we have at the moment that makes an effort to describe
what Barclays got and didn't get, Sent September 27, 2008,
with Attachment (more legible copy of BCI Exhibit 320) .... A-669

BCI Exhibit 340 -
(Excerpts) Report of Anthony J. Leitner,
Dated January 8, 2010 ......................................................... A-687

BCI Exhibit 353 -
Declaration of Elizabeth James, Dated January 8, 2010 ...... A-701

Exhibit 1 to James Declaration -
"Undelivered Margin from Proprietary Futures Accounts,
Valued as of Account Closeout" .......................................... A-708

Exhibit 2 to James Declaration -
"Customer Collateral Delivered to Date,
Valued as of September 19, 2008" ....................................... A-709

Exhibit 3 to James Declaration -
"Customer Futures of Collateral Undelivered to Date,
Valued as of September 19, 2008" ....................................... A-710

viii

**Page**

BCI Exhibit 376 -
Email from Sheldon Hirshon to Eric Kay, re:
Lehman Brother–DTC, Sent March 21, 2009 ...................... A-711

BCI Exhibit 404 -
Second Circuit Court Mandate, Certified June 19, 2009 ..... A-714

BCI Exhibit 460 -
Email from Lillian Raben to Archie Cox, *et al.*, re: Draft
of Letter, Sent September 17, 2008, with Attachment ......... A-715

BCI Exhibit 470 -
Email Chain from Christopher Kiplok to Carolyn B.
Levine, *et al.*, re: Fw: Barclays Accounts at OCC,
Sent October 3, 2008 ............................................................ A-719

BCI Exhibit 477 -
Email from Michael A. Mazzuchi to Isaac Montal,
re: Barclays Guaranty, Sent September 22, 2008,
with Attachment .................................................................. A-721

BCI Exhibit 479 -
Email from Michael A. Mazzuchi to Sheldon Hirshon,
re: DTC docs, Sent September 22, 2008 ............................. A-727

BCI Exhibit 485 -
Excerpts of Hearing Transcript, Dated October 16, 2008,
Transcript page 58 ............................................................... A-731

BCI Exhibit 505 -
Email from Robert Messineo to Anson Frelinghuysen,
re: LEHMAN–Barclays, Sent September 22, 2008,
with Attachment .................................................................. A-734

BCI Exhibit 514 -
Email from Anson Frelinghuysen to Alastair Blackwell,
re: Representation re: LBI-Barclays Assets for Sale,
Sent September 25, 2008, with Attachment ........................ A-748

BCI Exhibit 517 -
Email Chain between Anson Frelinghuysen and
Neal Ullman, re: Re-sending, Sent September 29, 2008...... A-750

ix

**Page**

BCI Exhibit 519 -
  Email Christopher Kiplok to Laura Vecchio, *et al.*, re:
  Fw: OCC Transfer, Sent October 1, 2008, with Attached
  OCC Summary ................................................................. A-752

BCI Exhibit 642 -
  Email from Robert Messineo to Marie Ford, re: Pls
  print out the two attachms, Sent September 22, 2008,
  with Attached Clarification Letters ..................................... A-757

BCI Exhibit 645 -
  Declaration of Robert L. Messineo,
  Dated February 2, 2010 ...................................................... A-779

BCI Exhibit 646 -
  Chart of OCC Accounts from September 15, 2008 through
  October 31, 2008 ................................................................. A-784

BCI Exhibit 658 -
  Email from Clausen Rocio to Anson Frelinghuysen, re:
  Fw: Barclays Guaranty, Sent September 22, 2008,
  with Attached Letter ............................................................ A-792

BCI Exhibit 680 -
  The Options Clearing Corporation Clearing Fund
  Depository Receipt and Security Agreement,
  Dated April 7, 2008 ............................................................. A-798

BCI Exhibit 681 -
  The Options Clearing Corporation Clearing Fund
  Depository Receipt and Security Agreement,
  Dated June 5, 2008 .............................................................. A-799

BCI Exhibit 682 -
  The Options Clearing Corporation Clearing Fund
  Depository Receipt and Security Agreement,
  Dated June 12, 2008 ............................................................ A-800

BCI Exhibit 683 -
  The Options Clearing Corporation Clearing Fund
  Depository Receipt and Security Agreement,
  Dated June 19, 2008 ............................................................ A-801

x

**Page**

BCI Exhibit 684 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated July 3, 2008.............................................................. A-802

BCI Exhibit 685 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated July 31, 2008............................................................ A-803

BCI Exhibit 686 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated August 21, 2008....................................................... A-804

BCI Exhibit 687 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated August 25, 2008....................................................... A-805

BCI Exhibit 688 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated August 28, 2008....................................................... A-806

BCI Exhibit 689 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated August 29, 2008....................................................... A-807

BCI Exhibit 690 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated September 2, 2008 .................................................... A-808

BCI Exhibit 691 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipts and Security Agreement,
    Dated September 5, 2008 .................................................... A-809

BCI Exhibit 692 -
    The Options Clearing Corporation Clearing Fund
    Depository Receipt and Security Agreement,
    Dated September 12, 2008 .................................................. A-811

xi

**Page**

BCI Exhibit 710 -
(Excerpt) Options Summary.xls–Eric Clark
Reliance Document ............................................................. A-813

BCI Exhibit 731a -
(Excerpts) Barclays Annual Report...................................... A-824

BCI Exhibit 742 -
(Excerpt) Email from David Murgio to Lori Fife, re:
Fw: Schedule B, Sent September 26, 2008 ......................... A-827

BCI Exhibit 755 -
(Excerpt) Email from David Murgio to Robert Messineo,
*et al.*, re: Schedule A and First Part of Schedule B,
Sent September 25, 2008...................................................... A-830

BCI Exhibit 756 -
(Excerpts) Email from David Murgio to Robert Moore, re:
Schedules, Sent September 25, 2008, with Attachment....... A-832

BCI Exhibit 807 -
Email from David Murgio to Robert Messineo, re: Fw:
Barclays Transaction, Sent September 26, 2008,
with Attached Transaction Summary ................................... A-835

BCI Exhibit 820 -
Notice of Electronic Filing of Purchase Agreement
Approved by Order under 11 U.S.C. 105(a), 363, and 365
and Federal Rules of Bankruptcy Procedure 2002, 6004,
and 6006 Authorizing and Approving (a) the Sale of
Purchased Assets Free and Clear of Liens and Other
Interests and (b) Assumptions and Assignment of
Executory Contracts and Unexpired Leases,
Filed on September 22, 2008................................................ A-849

BCI Exhibit 843 -
Email from Kenneth Raisler to Alexandra Guest, *et al.*,
re: Fw: Barclays Letter, Sent September 19, 2008, with
Attached Letter from John C. Lawton to Kenneth M.
Raisler.................................................................................. A-859

xii

**Page**

BCI Exhibit 892 -
Matthew Karnitschnig, Deborah Solomon, Liam Pleven and Jon E. Hilsenrath, "U.S. to Take Over AIG in $85 Billion Bailout; Central Banks Inject Cast as Credit Dries Up --- Emergency Loan Effectively Gives Government Control of Insurer; Historic Move Would Cap 10 Days that Reshaped U.S. Finance", *The Wall Street Journal*, Dated September 17, 2008 .................................................. A-863

BCI Exhibit 893 -
(Excerpt) Robert Shroeder, "Goldman, Morgan to Become Holding Companies", *MarketWatch*, Dated September 21, 2008................................................................................ A-867

BCI Exhibit 973 -
Futures/Foreign Exchange Daily Statements, Dated September 19, 2008 .................................................. A-869

BCI Exhibit 978 -
Trustee's Answer to the Option Clearing Corporation's Interpleader Complaint and Statement of Claim to the Interpleader Funds, Dated February 6, 2009 ....................... A-916

BCI Exhibit 1103a -
(Excerpt) Revised Paul Pfleiderer Demonstratives .............. A-929

BCI Exhibit 1104 -
(Excerpts) Email from Marie Stewart to Brett Beldner, *et al.*, re: Summary of Barcap Deal, Sent October 5, 2008, with Attached Summary of Deal Terms and Work Assignments for Finance Staff ............................................ A-931

BCI Exhibit 1108 -
Excepts of Deposition Transcript of Anson Frelinghuysen, Taken March 4, 2010, Compressed Version ....................... A-936

(i) Transcript Pages 6–13 ............................................... A-938

(ii) Transcript Pages 22–25 ............................................ A-940

(iii) Transcript Pages 34–41 ........................................... A-941

Excerpts of Deposition Transcript of Craig Jones, Taken March 4, 2010, Compressed Version ....................... A-943

(i) Transcript Pages 22–25 ............................................ A-945

xiii

**Page**

Excerpts of Deposition Transcript of Christopher Kiplok,
Taken March 4, 2010, Compressed Version ...................... A-946

    (i) Transcript Pages 26–29 ............................................ A-948

Excerpts of Deposition Transcript of Alex Kirk,
Taken August 31, 2009, Compressed Version.................... A-949

    (i) Transcript Pages 54–65 ............................................ A-951

    (ii) Transcript Pages 102–105 ....................................... A-954

    (iii) Transcript Pages 206–209 ...................................... A-955

Excerpts of Deposition Transcript of James B. Kobak, Jr.,
Taken December 7, 2009, Compressed Version ................. A-956

    (i) Transcript Pages 274–285 ........................................ A-958

    (ii) Transcript Pages 294–297 ....................................... A-961

    (iii) Transcript Pages 302–305 ...................................... A-962

Excerpts of Deposition Transcript of Robert Messineo,
Taken April 1, 2010, Compressed Version ........................ A-963

    (i) Transcript Pages 14–29 ............................................ A-965

Excerpts of Deposition Transcript of Harvey R. Miller,
Taken January 7, 2010, Compressed Version .................... A-969

    (i) Transcript Pages 22–25 ............................................ A-971

    (ii) Transcript Pages 30–33 ........................................... A-972

    (iii) Transcript Pages 50–53 .......................................... A-973

    (iv) Transcript Pages 58–61 .......................................... A-974

    (v) Transcript Pages 94–101.......................................... A-975

Excerpts of Deposition Transcript of John Rodefeld,
Taken August 27, 2009, Compressed Version.................... A-977

    (i) Transcript Pages 26–33 ............................................ A-979

Excerpts of Deposition Transcript of Edward J. Rosen,
Taken February 19, 2010, Compressed Version ................. A-981

    (i) Transcript Pages 110–117 ........................................ A-983

xiv

**Page**

### Movants' Exhibits

Movants' Exhibit 120 -
Lehman Brothers Press Release, "Barclays to Acquire
Lehman Brothers' Business and Assets,"
Dated September 16, 2008 .................................................. A-985

Movants' Exhibit 258 -
(Excerpts) Appellee Barclays Capital Inc.'s Memorandum
of Law in Opposition to Bay Harbour *et al.*'s Appeal,
Dated December 12, 2008 .................................................. A-991

Movants' Exhibit 404 -
(Excerpts) Appellants Opening Brief in Bay Harbour
Appeal ................................................................................. A-994

Movants' Exhibit 419 -
Email from Diane M. Boscarino to Christopher Kiplok, re:
James W, Sent October 2, 2008, with Attachment .............. A-998

Movants' Exhibit 421 -
Email from William H. Navin to Edward J. Rosen, *et al.*,
re: Fw: Barclays Capital Inc. Lehman Related OCC
Settlements, Sent September 21, 2008 ................................ A-1000

Movants' Exhibit 447 -
Email from Robert Messineo to Anson Frelinghuysen,
*et al.*, re: Lehman–Barclays, Sent September 22, 2008,
with Attached Clarification Letter........................................ A-1002

Movants' Exhibit 448 -
Email from Michael A. Mazzuchi to Isaac Montal,
re: Barclays Guaranty, Sent September 22, 2008,
with Attached Clarification Letter........................................ A-1014

Movants' Exhibit 450 -
(Excerpts) DTCC Annual Report 2008 ................................ A-1025

Movants' Exhibit 505 -
(Excerpt) Email from Francis J. Pearn to Tim Stack, re:
Fw: Net Long Options 9/18, Sent September 21, 2008,
with Attached OCC Statement for LBI ................................ A-1030

Movants' Exhibit 555 -
Letter from James B. Kobak, Jr. to Lindsee P. Granfield,
Dated March 27, 2009 ........................................................ A-1043

xv

**Page**

Movants' Exhibit 560 -
  (Excerpts) Trustee's Motion for Order Approving
  Trustee's Allocation of Property of the Estate, Dated
  October 5, 2009 ................................................................... A-1045

Movants' Exhibit 561 -
  (Excerpts) Brief of Securities and Exchange Commission
  in Support of Trustee's Motion for Order Approving
  Trustee's Allocation of Property of the Estate,
  Dated December 11, 2009 .................................................. A-1048

Movants' Exhibit 580 -
  Email Chain between Patrick Clackson and Rich Ricci,
  re: Long Island–draft balance sheet/good will clac,
  Sent September 23, 2008 .................................................... A-1051

Movants' Exhibit 593 -
  Email from James W. Hraska to John Haley, *et al.*,
  re: Fw: 636 Collateral, Sent September 29, 2008,
  with Attachment ................................................................. A-1053

Movants' Exhibit 629 -
  Email from Robert Messineo to Anson Frelinghuysen,
  re: LEHMAN–Barclays, Sent September 21, 2008,
  with Attached Clarification Letter ...................................... A-1056

Movants' Exhibit 670 -
  Letter from Kenneth M. Raisler to Ananda K.
  Radhakrishnan, re: Request for Authorization to
  Transfer Accounts, Dated September 18, 2008 ................... A-1068

Movants' Exhibit 675 -
  (Excerpts) Rules and By-Laws Organization Certificate
  of the Depository Trust and Clearing Corporation ............. A-1072

Movants' Exhibit 678 -
  Lehman Brothers RISC Statement as of September 19,
  2008, Account: Macquarie, 099-02295604 ......................... A-1075

Movants' Exhibit 719 -
  Excerpts of Deposition Transcript of Edward J. Rosen,
  Taken February 19, 2010, Compressed Version ................. A-1080

  Transcript Pages 114–117 .................................................. A-1082

xvi

**Page**

### Trial Transcripts

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held April 9, 2010, Compressed Version ............. A-1083

(i) Transcript Pages 90–101 ................................................ A-1085

(ii) Transcript Pages 130–137 ............................................. A-1088

(iii) Transcript Pages 182–193 ............................................ A-1090

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held April 26, 2010, Compressed Version ........... A-1093

(i) Testimony of Bart McDade,
Transcript Pages 190–205 ................................................ A-1095

(ii) Testimony of Bart McDade,
Transcript Pages 226–241 ................................................ A-1099

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held April 27, 2010, Compressed Version ........... A-1103

(i) Testimony of Bart McDade
Transcript Pages 38–49 ................................................... A-1105

(ii) Testimony of Steve Berkenfeld,
Transcript Pages 198–209 ................................................ A-1108

Excerpts of Transcript of Proceeding before the Hon. James
M. Peck, Held April 28, 2010, Compressed Version ........... A-1111

(i) Testimony of Harvey Miller,
Transcript Pages 22–33 ................................................... A-1113

(ii) Testimony of Harvey Miller,
Transcript Pages 74–97 ................................................... A-1116

(iii) Testimony of Harvey Miller,
Transcript Pages 110–125 ................................................ A-1122

(iv) Testimony of Martin Kelly,
Transcript Pages 254–261 ................................................ A-1126

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held April 29, 2010, Compressed Version ........... A-1128

Testimony of Patrick Clackson,
Transcript Pages 198–209 ................................................ A-1130

xvii

**Page**

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held April 30, 2010, Compressed Version ........... A-1133

Testimony of Jonathan Hughes,
Transcript Pages 222–233 ................................................. A-1135

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held May 3, 2010, Compressed Version ............. A-1138

(i) Testimony of Jonathan Hughes,
Transcript Pages 14–37 ...................................................... A-1140

(ii) Testimony of Jonathan Hughes,
Transcript Pages 50–61 ...................................................... A-1146

(iii) Testimony of Jonathan Hughes,
Transcript Pages 66–81 ...................................................... A-1149

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held May 4, 2010, Compressed Version ............. A-1153

(i) Testimony of James Seery,
Transcript Pages 158–169 .................................................. A-1155

(ii) Testimony of James Kobak,
Transcript Pages 170–201 .................................................. A-1158

(iii) Testimony of James Kobak,
Transcript Pages 206–209 .................................................. A-1166

(iv) Testimony of James Kobak,
Transcript Pages 214–225 .................................................. A-1167

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held May 5, 2010, Compressed Version ............. A-1170

(i) Testimony of James Kobak,
Transcript Pages 26–37 ...................................................... A-1172

(ii) Testimony of James Kobak,
Transcript Pages 54–65 ...................................................... A-1175

(iii) Testimony of James Kobak,
Transcript Pages 78–89 ...................................................... A-1178

(iv) Testimony of James Kobak,
Transcript Pages 98–137 .................................................... A-1181

xviii

**Page**

(v) Testimony of James Kobak,
Transcript Pages 142–145 .................................................. A-1191

(vi) Testimony of James Kobak,
Transcript Pages 150–161 .................................................. A-1192

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held May 6, 2010, Compressed Version .............. A-1195

(i) Testimony of Isaac Montal,
Transcript Pages 6–33 ....................................................... A-1197

(ii) Testimony of Isaac Montal,
Transcript Pages 46–69 ..................................................... A-1204

(iii) Testimony of Saul Burian,
Transcript Pages 134–149 ................................................. A-1210

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held May 7, 2010, Compressed Version .............. A-1214

(i) Testimony of Rich Ricci,
Transcript Pages 206–217 ................................................. A-1216

(ii) Testimony of Rich Ricci,
Transcript Pages 234–253 ................................................. A-1219

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held June 22, 2010, Compressed Version ........... A-1224

(i) Testimony of John Varley,
Transcript Pages 86–97 ..................................................... A-1226

(ii) Testimony of John Varley,
Transcript Pages 170–181 ................................................. A-1229

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held August 23, 2010, Compressed Version ........ A-1232

Testimony of Mark Shapiro,
Transcript Pages 94–105 ................................................... A-1234

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held August 24, 2010, Compressed Version ........ A-1237

(i) Testimony of Edward Rosen,
Transcript Pages 94–169 ................................................... A-1239

xix

**Page**

(ii) Testimony of Edward Rosen,
Transcript Pages 190–261 ................................................. A-1258

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held August 25, 2010, Compressed Version ........ A-1271

Testimony of Stephen King,
Transcript Pages 70–85 ...................................................... A-1273

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held August 30, 2010, Compressed Version ........ A-1277

(i) Testimony of Liz James,
Transcript Pages 6–33 ...................................................... A-1279

(ii) Testimony of Liz James,
Transcript Pages 42–61 ...................................................... A-1286

(iii) Testimony of Liz James,
Transcript Pages 78–97 ...................................................... A-1291

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held August 31, 2010, Compressed Version ........ A-1296

(i) Testimony of Victor Lewkow,
Transcript Pages 54–77 ...................................................... A-1298

(ii) Testimony of Victor Lewkow,
Transcript Pages 162–165 ................................................. A-1304

(iii) Testimony of Victor Lewkow,
Transcript Pages 214–217 ................................................. A-1305

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held September 2, 2010, Compressed Version .... A-1306

(i) Testimony of Gary Romain,
Transcript Pages 10–53 ...................................................... A-1308

(ii) Testimony of Gary Romain,
Transcript Pages 222–233 ................................................. A-1319

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held September 8, 2010, Compressed Version .... A-1322

(i) Testimony of Shari Leventhal,
Transcript Pages 78–79 ...................................................... A-1324

xx

(ii) Testimony of Kenneth Raisler,
Transcript Pages 79–137 ................................................... A-1324

(iii) Testimony of Kenneth Raiser,
Transcript Pages 154–157 ................................................. A-1337

(iv) Testimony of Kenneth Raiser,
Transcript Pages 178–185 ................................................. A-1338

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held October 5, 2010, Compressed Version ........ A-1340

(i) Testimony of Anthony Leitner,
Transcript Pages 10–69 ..................................................... A-1342

(ii) Testimony of Anthony Leitner,
Transcript Pages 94–105 ................................................... A-1356

(iii) Testimony of Anthony Leitner,
Transcript Pages 114–117 ................................................. A-1359

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held October 6, 2010, Compressed Version ........ A-1360

Testimony of Paul Pfleiderer,
Transcript Pages 50–61 ..................................................... A-1362

Excerpts of Transcript of Proceedings before the Hon. James
M. Peck, Held October 21, 2010, Compressed Version ...... A-1365

Transcript Pages 54–65 ..................................................... A-1367

Transcript of Proceedings before the Hon. James M. Peck,
Held June 6, 2011 ............................................................... A-1370

**Additional Materials**

(Excerpts) Order (I) Approving the Break-Up Fee and
Expense Reimbursement, (II) Certain Matters Relating to
Completing Bids, if Any, (III) Approving the Form and
Manner of Sale Notices, and (IV) Setting the Sale Hearing
Date in Connection with Sale of Certain of the Debtors'
Assets, Filed September 17, 2008 ....................................... A-1392

Order Commencing Liquidation,
Filed September 19, 2008................................................... A-1396

xxi

**Page**

Trustee's Joinder in Debtors' Motion for an Order, Pursuant
to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024,
Modifying the September 20, 2008 Sale Order and
Granting Other Relief, Filed September 15, 2009 .............. A-1404

(Excerpts) Trustee's Motion for Relief Pursuant to the Sale
Orders or, Alternatively, for Certain Limited Relief under
Rule 60(b), Filed September 15, 2009 ................................ A-1407

(Excerpts) Notice of Filing of Unsealed Debtor's Rule 60
Motion and Related Appendixes, Filed October 15, 2009,
with Attached Unsealed Brief ............................................. A-1414

(Excerpts) Notice of Filing of Unsealed Trustee's Rule 60(b)
Motion and Related Declarations and Exhibits, Filed
October 16, 2009, with Attached Unsealed Brief ................ A-1419

(Excerpts) Memorandum of Barclays Capital Inc. in
Opposition to the Rule 60 Motions and in Support of
Motion of Barclays Capital Inc. to Enforce the Sale
Order and Secure Delivery of All Undelivered Assets,
Dated January 29, 2010 ...................................................... A-1422

(Excerpts) Reply Memorandum of Barclays Capital Inc.
in Further Support of Motion of Barclays Capital Inc.
to Enforce the Sale Order and Secure Delivery of
All Undelivered Assets, Dated April 5, 2010 ...................... A-1426

(Excerpts) Post-Trial Memorandum of Law and Fact of
Barclays Capital Inc., Dated November 22, 2010 ................ A-1430

Stipulation and Order between the Trustee and Barclays
Concerning Certain Claims under Paragraph 8(ii) of the
Clarification Letter Made in the Motion and Adversary
Complaint Filed by the Trustee and the Motions to Enforce
the Sale Order Filed by Barclays, Filed January 6, 2011 ..... A-1434

(Excerpts) Stipulations of Fact, Filed January 6, 2011 ............ A-1441

Opinion on Motions Seeking Modification of the Sale Order
Pursuant to Rule 60(B), the Trustee's Motion for Relief
under the SIPA Sale Order, Barclays' Cross-Motion to
Enforce the Sale Orders and Adjudication of Related
Adversary Proceedings, Filed February 22, 2011 ................ A-1445

xxii

**Page**

(Excerpts) Trustee's Memorandum Regarding the Proposed
    Orders Submitted by the Trustee and Barclays Capital Inc.,
    Filed April 28, 2011 ............................................................. A-1548

Letter from Jonathan D. Schiller to the Hon. James M. Peck,
    Dated June 3, 2011, with Attachment ................................... A-1551

Order of the Hon. James M. Peck Resolving the
    Trustee's Motion, Filed July 15, 2011 ................................. A-1557

Order of the Hon. James M. Peck Resolving
    Barclays' Motion, Filed July 15, 2011 ................................. A-1561

Order of the Hon. James M. Peck Resolving the Trustee's
    Amended Adversary Complaint, Filed July 15, 2011,
    with Exhibits ........................................................................ A-1564

Bankruptcy Court Judgment for the Trustee,
    Filed July 15, 2011 .............................................................. A-1607

Bankruptcy Court Judgment for Barclays Capital Inc.,
    Filed July 15, 2011 .............................................................. A-1609

(Excerpts) Lehman Brothers 2007 Annual Report ................... A-1611

(Excerpts) Motion under SIPA Section 78fff-2(f), 11 U.S.C.
    Sections 105(a) and 363(b) and Fed. R. Bankr. P. 9019(a)
    for Approval of the Trustee's Implementation of the LBI
    Liquidation Order to Complete the Account Transfers for
    the Benefit of Customers, Including the Related Limited
    Settlement Agreement Completing the PIM Conversion for
    the Benefit of Private Investment Management Customers,
    and Terminating the Account Transfer Process,
    Filed November 20, 2009 ..................................................... A-1614

(Excerpt) Brief of Cross-Appellant James W. Giddens, as
    Trustee for the SIPA Liquidation of Lehman Brothers Inc.,
    Filed October 28, 2011 ......................................................... A-1618

(Excerpts) Second Motion for Order Approving the Trustee's
    Allocation of Property, Filed December 1, 2011 ................. A-1621

Declaration of Gabriela Huaman in Support of Second
    Motion for Order Approving the Trustee's Allocation
    of Property of the Estate, Filed December 1, 2011,
    with Annexed Exhibit .......................................................... A-1624

xxiii

**Page**

(Excerpts) Brief of Statutory Party Securities and Exchange
    Commission, Filed December 22, 2011 .............................. A-1637

(Excerpts) Brief of the Securities Investor Protection
    Corporation, Filed December 23, 2011 .............................. A-1648

(Excerpt) Brief of Appellee James W. Giddens, as Trustee
    for the SIPA Liquidation of Lehman Brothers Inc.,
    Filed December 23, 2011 ..................................................... A-1658

(Excerpt) Trustee's Seventh Interim Report for the Period
    October 22, 2011 through April 20, 2012 .......................... A-1661

Transcript of Oral Argument before the Hon. Katherine B.
    Forrest, Held April 20, 2012, Compressed Version ............. A-1664

(Excerpts) SIPA Liquidation Overview .................................. A-1695

Notice of Appeal of James W. Giddens, as Trustee for the
    Securities Investor Protection Act Liquidation of Lehman
    Brothers Inc., Filed June 7, 2012 ........................................ A-1698

Notice of Appeal of Barclays Capital Inc. and
    Barclays Bank PLC, Filed July 3, 2012 .............................. A-1701

Amended Opinion and Order of the Hon. Katherine B. Forrest,
    Filed July 16, 2012, Appealed From[1] ................................... A-1705

Judgment on Appeal from Bankruptcy Court Decision,
    Filed July 16, 2012, Appealed From .................................... A-1767

Amended Notice of Appeal of James W. Giddens, as Trustee
    for the Securities Investor Protection Act ("SIPA") Liqui-
    dation of Lehman Brothers Inc., Filed July 17, 2012 ........... A-1772

Notice of Appeal of Barclays Capital Inc. and
    Barclays Bank PLC, Filed July 19, 2012 ............................. A-1776

Amended Notice of Appeal of Barclays Capital Inc.
    and Barclays Bank PLC, Filed July 19, 2012 ...................... A-1779

Press Release: "Lehman Brothers Inc. and Lehman Brothers
    International (Europe) Announce Agreement in Principle,"
    Dated October 5, 2012 ........................................................ A-1782

---

[1] The Amended Opinion and Order of the Hon. Katherine B. Forrest amended and superseded the District Court's June 5, 2012 Opinion and Order. Therefore, the parties have not included the June 5, 2012 Opinion and Order in the appendix.

xxiv

**Page**

Press Release: "SIPC: Lehman Agreement Paves Way
for 100 Percent Return of Customer Property,"
Dated October 5, 2012 ...................................................... A-1784

(Excerpts) Trustee's Eighth Interim Report for the Period
April 21, 2012 through October 24, 2012, with Exhibit ...... A-1785

Notice of Hearing on Second Motion for Order Approving
the Trustee's Allocation of Property, Dated January 31,
2013 ................................................................................. A-1795

(Excerpt) Supplement to Second Motion for Order
Approving the Trustee's Allocation of Property.................. A-1798

A-1365

**Excerpts of the Transcript of Proceedings before the Hon. James M. Peck, Held October 21, 2010**

**Transcript pages: 54 – 65.**

58722

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              October 21, 2010

21              9:33 AM

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

58736

## LEHMAN BROTHERS HOLDINGS INC., et al.

Page 54

1 Ricci agreed with me that Bank of New York was Barclays' agent.
2 And Barclays' agent put the amount of collateral that made it
3 over -- remember all the collateral doesn't make it over -- at
4 forty-five. And we add the seven billion in cash that was
5 added to make up the difference. Barclays is calculating its
6 take at fifty-two billion dollars.
7        It's not just Mr. Ricci's testimony. Your Honor will
8 recall this document, Exhibit M-147. This is Marty Malloy
9 writing to LaRocca and Stephen King where he puts it at 52.19
10 on the 19th, the day of the sale hearing. That's the forty-
11 five billion in cash that makes -- let me explain what I mean
12 by makes it over, Your Honor. Your Honor, so this is only one
13 place in the transcript, you'll recall that there were
14 operational difficulties. All the collateral doesn't make it
15 over. That adds to forty-five. And then the difference is
16 made up in cash. Later, there's a dispute with JPM over who
17 gets to keep the cash. But at the time, on the day of the sale
18 hearing, Barclays is putting its take at fifty-two billion.
19 Another person who put it there was our friend, Martin Kelly.
20 While he's preparing the opening balance sheet. he's got 44.8
21 as inventory value, seven billion cash, so he's in the 52.9
22 range. And when he completes that opening balance sheet, he's
23 got 52.880 as the value of the inventory received. Barclays
24 knew 47.4 billion dollars was too low. They're calculating the
25 number of billions and billions higher at the time.

Page 55

1        Romain and others put the number at fifty-two. Mr.
2 Romain testified -- I have the wrong slide. Excuse me, Your
3 Honor. There we go. 9/20, that's the Saturday. There's
4 Barclays analysis that puts the financial assets at 52.19. Mr.
5 Yang who did the haircut summary puts the collateral that made
6 it over at forty-five. Add seven billion. You're at fifty-
7 two. So Barclays knew the number was too low. Actually, as
8 late as October 3rd, Barclays is still at fifty-two.
9        There's a memo that includes Mr. Romain that puts the
10 current acquisition balance sheet at fifty-two billion dollars.
11 Now, this raises the obvious disclosure issue. Why isn't
12 anybody telling the Court you're being told 47.4, Your Honor?
13 But, you know, internally, at Barclays, we've got this roughly
14 in the range of fifty-two. The reason is, as I averred to in
15 the morning -- before, nobody ever told the Court there might
16 be a range. Even if you accept the Barclays view that because
17 a lot of this was Level 3 securities and Level 2 securities and
18 this stuff was really complicated to value, nobody ever told
19 that to the Court. They just said it's due to a drop in the
20 markets.
21        I would point out, Your Honor, and I said I wouldn't
22 deal with the valuation case, and I'm not, but it took
23 Professor Pfleiderer two days on the stand to describe to this
24 Court in excruciating detail just how complicated it is to come
25 to any kind of value with Level 2 and Level 3 securities. It

Page 56

1 took Ms. Fife about five seconds to pick 47.44 and nobody put a
2 disclaimer on that number. Nobody said it could be fifty-two.
3 It might not be 47.4. Nobody said anything like that.
4        I asked Mr. Ricci who was in the charge of the deal
5 for Barclays, what did you do about disclosure. Your Honor
6 will recall each time I asked him that, I got a ritual
7 incantation. I assume my lawyers would make the disclosures
8 that they were supposed to make. I just -- well he must have
9 said that six times. He told us he took no special steps. The
10 problem again is if you don't tell your lawyers, you can depend
11 them all you want. But if they don't know the numbers, they
12 can't make disclosure to the Court.
13        Now very briefly, Your Honor -- and very briefly, I'm
14 going to address the Friday asset scramble. I think the
15 testimony about that has been deep and extensive but only to
16 point out that the end result is this. Barclays, on -- based
17 on Exhibit M-45, based on Yang's haircut summary, which is sent
18 to Keegan, Barclays demands more. Using -- Ricci told us this.
19 I asked him about M-45. I asked him about the Yang haircut
20 summary. And he said he would have given it to Keegan. And
21 Keegan was in New York dealing with Barclays -- dealing with
22 Lehman on Friday morning. And we know that Ricci, Michael
23 Klein and Keegan met with McDade Lowitt and Kirk on Friday
24 morning to come in and say we need more value. If we don't get
25 more value, this deal is not going to close. Barclays said, in

Page 57

1 its own words, it was uncomfortable with the repo collateral
2        Now, according to Mr. McDade, Barclays never said this
3 is how much we need. According to Mr. Ricci, there was a
4 target of about three to four billion dollars. He told us
5 that. But even Mr. Ricci believed that that target wasn't
6 given to Lehman. Barclays never shared its calculation of how
7 it got to that number with Lehman. And Barclays was clear
8 about one thing. If it didn't get additional assets, it wasn't
9 going to close. That's what they told Mr. McDade. I asked him
10 how explicit was Barclays about saying it would not close if
11 this gap could not be filled. His answer: they used those
12 words. Mr. Klein, Barclays' senior advisor and a member of its
13 negotiating team also had said that in his deposition which we
14 talked about at the trial. This is the trial transcript where
15 we're reading his testimony. "I made it known to the parties
16 that were involved that there needed to be more assets because
17 if there weren't more assets, the transaction couldn't take
18 place. But no target, no measure, no analysis. Nobody says.
19 well, you know, our repo haircut brings us 6.04. This is a
20 holdup. This is the morning of the sale hearing. Lehman's got
21 no negotiating leverage at this point. Barclays knows it's the
22 only buyer in town as it's fond of reminding us. And it comes
23 in and says based on our valuation which we're not going to
24 share with you, you need more assets. And what happens then?
25 McDade puts Lowitt in charge along with some others to go find

15 (Pages 54 - 57)

58737

## LEHMAN BROTHERS HOLDINGS INC., et al.

Page 58

1  more assets to give to Barclays so that they can close the
2  deal. And what follows is the Friday asset scramble. One of
3  the people involved in that was also Alex Kirk. And Mr. Kirk
4  wrote an e-mail, which Your Honor may remember from the
5  opening, in which he identifies what appears to be Barclays'
6  standard. "Rich Ricci just told me he won't blow off this
7  trade by being a pig." This is simply Barclays saying we want
8  more. We want more. You need to add more to the pile or we're
9  not going to close. Now what makes that worse is putting
10  Lowitt in charge of the Friday asset search. That basically
11  sends -- that puts the fox right in the middle of the henhouse.
12  Let's review Ian Lowitt a little bit.
13      Ian Lowitt is the chief financial officer of Lehman.
14  By the 18th of September, before the Friday asset scramble even
15  begins, he's under contract to Barclays. He has signed his
16  employment agreement with Barclays. That employment agreement
17  provides that Ian Lowitt will get a bonus of six million
18  dollars. I asked Mr. Lowitt on the stand if that bonus was in
19  respect of services to Lehman and he said no. It was for
20  services to Barclays. He knows he's not going to get that
21  contract, he's not going to have that job unless the deal
22  closes. We talked about that when he was on the stand. "If
23  the transaction doesn't close, you don't have a job at Barclays
24  that following morning, correct?" "Correct." Now we can talk
25  all we want about how Ian Lowitt may have wound up somewhere

Page 59

1  else or Barclays may argue that the amount that they paid him
2  was similar to the amount that he was paid at Lehman. I think
3  everybody in this room can agree a job is better than no job.
4  Six million guaranteed on Monday is better than I'm going to
5  try and get six million somewhere else. Lowitt's got every
6  financial incentive to satisfy Barclays when it demands more
7  assets on the strength of a threat to refuse to close. And
8  here we are again, back to disclosure. Only a few hours after
9  the asset scramble is completed, the parties are in court.
10  Barclays apparently has enough. It's decided not to blow off
11  the deal by being a pig. And nobody tells the Court anything
12  about this exercise. Nobody says we added 1.9 billion dollars
13  in clearance box assets. Nobody says we added what turned out
14  to be 769 million in 15c3-3 assets. Nobody says we added cash,
15  we added margin derivatives. In fact, the Court is told there
16  is no cash in the deal. Nobody talks about the Friday asset
17  scramble.
18      Now, Barclays has responded to the proof about this
19  exercise by suggesting -- and it was interesting to me that
20  every single one of their witnesses -- perhaps this is another
21  circumstances -- chose the word "identified" when they talked
22  about the assets that were added by the Friday asset scramble.
23  Every single one of them decided "identified" was the right
24  verb. Well, they weren't just identified, they were added.
25  They were added. If, as Barclays suggests, all that really

Page 60

1  happened here is Barclays got some comfort that the overall
2  value it was getting since it was getting everything included
3  1.9 billion and 769 million, those negotiations wouldn't have
4  been necessary and, most certainly, the clarification letter
5  wouldn't have been necessary. What would there have been to
6  clarify.
7      The clarification letter adds these assets to the
8  deal. They're not just identified, they're added. And again,
9  let's look at the contemporaneous documents. First, I want to
10  put a document that indicates Mr. Lowitt's mindset about
11  getting it. This is Lowitt's e-mail to Tonucci. After they
12  gathered up these assets, he urges Tonucci, "You need to be
13  close to it. If we don't succeed, you and I are toast despite
14  all heroics." He writes this on Saturday the 20th, two days
15  before the closing.
16      Now, I asked Mr. Lowitt about that and he gave an
17  answer along the lines about how he was concerned about the
18  well being of all folks who had worked at Lehman. I would
19  respectfully suggest that the phrase, "you and I are toast",
20  means nothing of the kind. This is Ian Lowitt expressing to
21  Paolo Tonucci who's working with him on the Friday asset
22  scramble, you got to get this done. Add those assets or you
23  and I are not going to have jobs. And maybe that explains why
24  nobody took a lawyer aside and told them look, you should know
25  about the addition of all these assets. Maybe that explains

Page 61

1  it. But it's right there for everybody to see. Self
2  interested future Barclays employees added billions to the pile
3  that Barclays took away. And what Barclays was writing at the
4  time didn't suggest, as Barclays would have it now, that all
5  that really happened here were additional assets were
6  identified. This is what Michael Klein, who had gone and
7  delivered the threat not to close in return for the demand for
8  more assets, wrote to Bob Diamond. On the 20th on Saturday
9  after the asset grab was held and Mr. Diamond -- Mr. Klein
10  wrote, "We clawed back three billion more of value in the
11  transaction." We clawed back. That's not a man who's writing
12  to his client saying don't worry. The deal is worth what we
13  thought it was worth. We've identified existing assets that
14  were already on their way over. That's a man who says, I've
15  gotten them three billion dollars more. That's the man who's
16  paid ten million dollars by Barclays for a week's worth.
17  That's a man who's reporting he's worth the money. That's a
18  man who says I got you three billion more to add to this deal.
19  Not one word to the Court about any of this. No one tells any
20  of the lawyers and therefore no one tells the Court.
21      Now again, that could be a mistake. It was a deal
22  fraught with tension. It was a deal with communications
23  problems. Mr. Miller used an invocative phrase about the week.
24  He called it organized chaos. And in the organized chaos, this
25  might be attributable to mistake. I would suggest it goes

16 (Pages 58 - 61)

58738

## LEHMAN BROTHERS HOLDINGS INC., et al.

Page 62

1 further but I would also say the Court doesn't need to reach
2 that issue if it's not inclined to make that finding. Mistake
3 is enough under 60(b). Innocent misrepresentations is enough.
4 But the failure to tell the Court about this is a
5 misrepresentation indeed.
6        And that, Judge, brings us to the clarification
7 letter, the next piece in the sequence. Now, Ms. Fife
8 describes the clarification letter to the Court. And she did
9 that not in the part of the sale hearing where she was
10 describing the changes in the economic terms that I put up on
11 the screen. In a different segment when she's describing what
12 in a normal deal might be considered big issues but in this
13 deal they're relatively insignificant. That is, whether a
14 certain or sub or two are included. She says there was some
15 conclusion as to which subsidiaries, if any, are being sold.
16 And she says "And we clarified in a clarification letter which
17 we're hoping to finalize and actually present to Your Honor
18 whenever it comes down to it." But in that letter, we're going
19 to clarify -- and she goes on to describe what's going to be
20 clarified about these subsidiaries. That's everything the
21 Court is told about the clarification letter before the sale
22 order is submitted and signed. That's everything.
23        So what the Court is told is that there's a relatively
24 minor issue regarding risking some subsidiaries that's going to
25 be dealt with in something with a benign name "clarification

Page 63

1 letter" and we're hoping to finalize and get it down. It's
2 undisputed that the clarification letter did not make it down.
3 It's undisputed the clarification letter was never ever given
4 to the Court under a request that it be approved. It was
5 merely filed on the 22nd after the closing as an exhibit to
6 other closing papers. The letter never made it down here. And
7 the letter did much, much, much more than deal with this
8 subsidiary issue about subsidiaries. What the letter did is
9 incorporated the billions that had been made on Friday to add
10 billions more in assets to the deal and make other substantial
11 changes.
12        Now I want to go through for a few minutes the
13 sequence that led to that because the timing, I think, is
14 instructive. At about 12:34 p.m. -- let me put this up on the
15 screen -- at about 12:34 p.m., a draft of the clarification
16 letter is circulated on the day of the sale hearing. And it's
17 this draft -- and this is before the sale hearing even begins.
18 It's this draft that adds the phrase "amended" to the
19 clarification. There have been and they are in evidence as a
20 variety of movants' exhibits and Barclays' exhibits other
21 earlier drafts of the clarification letter. They started
22 working on this as early as the 17th. No surprise there's
23 going to be some kind of clarification document given the
24 organized chaos in which they're dealing but it's just a
25 clarification letter until here. Now, the phrase "shall amend"

Page 64

1 is added. And Mr. Lewkow testified about that. And what Mr.
2 Lewkow is justifiably -- he's a good lawyer. He's a good firm.
3 All the lawyers involved in this were at good firms. Nobody
4 chooses the word "amend" accidentally. This was a deliberate
5 choice to bump this clarification letter up from a supplement,
6 from a clarification which is how it's described in the sale
7 order to an amendment of the asset purchase agreement. Nobody
8 tells the Court that's what it's going to be. Nobody shows the
9 Court that draft. Now later in the day, at about 5:15 p.m.,
10 another draft is surfaced. And I'm going to put that up on the
11 screen. And that's Exhibit M-137.
12        Now this is circulated about 5:15 on the 19th, the day
13 of the sale hearing. And the reason I chose this one to put
14 up, and there are multiple drafts of the clarification letter,
15 is because this is -- if you look at the transcript and judging
16 from the start time at -- there's an adjournment in the
17 beginning and folks started actually addressing the Court in
18 the late afternoon. I think this draft is just about the time
19 that Ms. Fife is describing the economic changes in the deal.
20 Someone in the drafting process is attempting to get that into
21 the clarification letter where it says the purchased assets do
22 not have a book value of approximately seventy million (sic).
23 But they obviously do. So what this indicates s that as the
24 sale hearing is continuing, someone in the drafting process is
25 recognizing -- they're changing the seventy billion dollar book

Page 65

1 value clause -- and you have to recognize it's no longer worth
2 seventy million (sic) dollars. Now Ms. Fife said when she
3 talked to the Court we're hoping to get it down here. Mr.
4 Miller, when we asked him about that -- about the clarification
5 letter on the stand described to us that there was a draft. It
6 may have made its way into the court by e-mail. Lawyers may
7 have had access to it but that's no way to review the document
8 like this. And he was told that the letter was wrong so it
9 needed to be redone. Those were all various explanations
10 perhaps for why it was not shown. But this draft was never
11 brought to the Court's attention, the clarification letter
12 which recognizes the dropping book value. It also indicates
13 that the lawyers, and that would, of course, include Ms. Fife,
14 who's talking about 47.4, are still talking in terms of book
15 value. As late as 5:15 on the 19th, nobody's got a clue that
16 the Lehman's book value. Lehman's book value, according to Mr.
17 Seery, is about 50.6 if you use the Fed repo as the measure.
18 So the lawyers are still talking in terms of book value. This
19 is not shown.
20        Now the next draft is Exhibit BCI-466 -- and when I
21 say the next draft, Your Honor, again, there may interim
22 drafts. This went through a lot. But this one is one I think
23 is instructive. Now it's -- the draft slide at the top of this
24 puts the document itself at 12 a.m. on the 20th. So we've
25 annotated it as midnight the 19th or the 20th. Your Honor will

17 (Pages 62 - 65)

58949

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555(JMP)

5

6    - - - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    LEHMAN BROTHERS HOLDINGS INC., et al.

10

11              Debtors.

12

13   - - - - - - - - - - - - - - - - - - - - - -x

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              June 6, 2011

19              2:00 PM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

58950

```
 1
 2   MATTER re Status Conference
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Transcribed by:  Linda Ferrara
```

58951

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   BOIES, SCHILLER, & FLEXNER LLP
 4          Attorneys for Barclays
 5          575 Lexington Avenue
 6          New York, New York 10022
 7
 8   BY:   JONATHAN D. SCHILLER, ESQ.
 9          JACK G. STERN, ESQ.
10
11   BOIES, SCHILLER, & FLEXNER LLP
12          Attorneys for Barclays
13          10 North Pearl Street
14          Albany, New York 12207
15
16   BY:   TRICIA J. BLOOMER, ESQ.
17
18   BOIES, SCHILLER, & FLEXNER LLP
19          Attorneys for Barclays
20          5301 Wisconsin Ave., N.W.
21          Washington, D.C. 20015
22
23   BY:   HAMISH HUME, ESQ.
24
25
```

58952

1    HUGHES HUBBARD & REED

2        Attorneys for the SIPA Trustee

3        One Battery Park Plaza

4        New York, New York 10004

5

6    BY:   WILLIAM MAGUIRE, ESQ.

7        NEAL J. OXFORD, ESQ.

8

9    QUINN EMANUEL URQUHART & SULLIVAN LLP

10        Special Counsel to the Official Committee of Unsecured

11        Creditors

12        51 Madison Avenue

13        22nd Floor

14        New York, NY 10010

15

16   BY:   JAMES C. TECCE, ESQ.

17

18   JONES DAY

19        Attorneys for the Debtor LBHI

20        222 East 41st Street

21        New York, New York 10017

22

23   BY:   ROBERT W. GAFFEY, ESQ.

24

25

58953

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 5

1           P R O C E E D I N G S

2           THE COURT:  Be seated, please.  Good afternoon.  This

3    is the continued status conference in connection with a form of

4    order.  I'm just going to ask whether there have been any

5    developments since we were last together on May 9 that might

6    resolve the matters that are before the Court at the moment?

7           MR. MAGUIRE:  Your Honor, Bill Maguire for the

8    trustee.  There have been no developments, Your Honor.

9           THE COURT:  Okay.  What I am going to do is provide my

10   bench ruling.  It will probably take about twenty-five minutes

11   or so.  I've prepared it in writing and so I am going to read

12   it into the record.  I did not intend to convert it into a

13   written opinion but I'll discuss with the parties at the end

14   whether or not in lieu of that, a transcript of today's hearing

15   can simply be posted on the docket for those parties who are

16   not present.

17           This ruling resolves remaining disputes regarding the

18   content of the orders contemplated by the Court's 60(b) opinion

19   issued on February 22, 2011.  That opinion dealt with motions

20   brought by LBHI, the committee and the SIPA trustee for relief

21   under 60(b) with respect to the sale orders entered in these

22   cases on September 20, 2008 and a cross-motion by Barclays to

23   enforce those sale orders.

24           The opinion also adjudicated certain counts of

25   related adversary proceedings that arose out of the same

58954

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 6

1    subject matter as the 60(b) motions.  The formulation of orders

2    consistent with the opinion has turned out to be much more

3    protracted and complicated in exercise than originally

4    expected, in part due to the great complexity of the subject

5    matter and the large sums at issue.

6           But the Court also believes that the vigorous disputes

7    regarding the form of the proposed orders may have been

8    motivated by a desire to achieve what in substance is

9    reconsideration of certain determinations in the opinion under

10   the benign guise of disputes over the substance of these

11   orders.

12          In accordance with the Court's directions set forth in

13   the opinion, the parties submitted separate proposed forms of

14   order denying each of the 60(b) motions resolving those counts

15   of each of the adversary complaints impacted by denial of these

16   motions and granting in part and denying in part the Barclays

17   motion to recover disputed assets.

18          Letters submitted to the Court highlighted the

19   conflicting views of the parties as to disputed issues and

20   their thoughts as to the most appropriate way to reflect and

21   interpret the holdings in the opinion.

22          On April 11, 2011, the parties appeared at a chambers

23   conference to discuss various disagreements between the SIPA

24   trustee and Barclays regarding the content of the proposed

25   orders.  In accordance with procedures and deadlines

58955

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 7

1    established at that chambers conference, on April 28, 2011, the

2    SIPA trustee and Barclays submitted memoranda in support of

3    their respective positions relating to the proposed forms of

4    order.  Each of them submitted a reply memorandum of May 4,

5    2011.  And all parties to the 60(b) litigation appeared for a

6    status conference and oral argument on May 9, 2011.

7            At oral argument, counsel for the SIPA trustee

8    Barclays informed the Court that they had succeeded in

9    resolving their dispute concerning the amount of clearance box

10   assets that Barclays is to receive.  Specifically, I stated on

11   the record that parties agreed that "the amount of the

12   undelivered clearance box assets can be set in an order that

13   will specify the payment by the trustee to Barclays of 1.1

14   billion dollars and that there will be no other payment of any

15   kind."

16           The parties also confirmed their substantial agreement

17   that the total amount of margin assets held by Barclays was

18   2.101 billion dollars.  The Court's understanding is that as of

19   May 9, 2011, a difference of approximately 80 million dollars

20   remained in the parties' calculations of these margin assets

21   and they appeared confident as to their ability to reach a full

22   and final resolution that will precisely confirm the amount of

23   the margin assets held by Barclays.

24           In addition, as a result of statements from the bench

25   explaining the reasons for the reference in the opinion to

A-1377

58956

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 8

1  margin assets in connection with the so-called asset scramble,

2  counsel for the SIPA trustee indicated that he was satisfied

3  with the clarity of that explanation and withdrew his request

4  for a provision in the order that would amend the opinion to

5  remove margin assets from the list of additional asset

6  categories identified during the asset scramble.

7      Finally, counsel for the parties confirmed on the

8  record that they had reached an understanding regarding

9  procedures for future financial reporting by the SIPA trustee

10  that would permit Barclays to monitor its potential claim to

11  the Rule 15(c)(33) assets without imposing undue burdens on the

12  SIPA trustee, thereby ending disagreements regarding that

13  aspect of the order.

14      The three remaining issues in dispute all relate to

15  the margin assets.  These are (1) whether the award of margin

16  assets to the SIPA trustee applies to government securities,

17  (2) whether Barclays may claim an offset for certain short

18  positions or whether these were assumed by Barclays under the

19  terms of the asset purchase agreement and/or the clarification

20  letter and (3) whether the SIPA trustee is entitled to

21  prejudgment interest and if so, what is the appropriate

22  interest rate and commencement date to use for the calculation

23  of interest.

24      The Court will address each of these issues in turn,

25  starting with the government securities question that surfaced

58957

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 9

1  as an issue for the first time after issuance of the opinion

2  during vetting by the parties of the form of order.

3          In the opinion, the Court denied Barclays motion to

4  recover "margin assets related to exchange traded derivatives."

5  Despite this clear holding, Barclays' proposed order seeks to

6  exclude approximately 1.5 billion dollars of margin assets that

7  were held in the form of government securities with a maturity

8  of more than three months.

9          Barclays bases this carve-out on the Court's stated

10  understanding at the trial and in the opinion that "there was

11  no Lehman cash going to Barclays." Barclays' focus is

12  particularly on that aspect of the opinion in attempting to

13  limit the relief to cash and cash equivalents, noting that the

14  term cash equivalents excludes government securities with

15  maturities greater than ninety days. In effect, Barclays is

16  seeking a major change in the relief afforded in the opinion by

17  means of language in an implementing order.

18          To be sure, the opinion references as an important

19  factor in the Court's decision the various representations on

20  the record at the sale hearing that no Lehman cash was going to

21  Barclays. As the Court pointed out during oral argument,

22  however, Barclays did not try to separately classify the margin

23  assets and did not raise the issue of its alleged entitlement

24  to long term government securities at trial.

25          Based on proceedings during the thirty-four day trial,

58958

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 10

1    the Court concluded that the margin assets consist of LBI

2    property used to support trading conducted by LBI on its own

3    behalf and on behalf of its customers and affiliates.  As

4    counsel to the SIPA trustee argued, the trial "was a fight

5    about margin and it was very clearly about all the margin."

6          That is clearly a correct statement and Barclays never

7    sought during the trial to distinguish the treatment of margin

8    based on the maturity date of the underlying securities.  In

9    the opinion, the Court recognized the two subparts of the APA's

10   definition of excluded assets that independently encompassed

11   the margin assets.  Clause B excludes all cash, cash

12   equivalents, bank deposits or similar cash items while clause N

13   excludes all assets primarily related to the IND business and

14   derivatives contracts.  All assets is a broad classification

15   that necessarily includes government securities.

16         Additionally, the opinion recognizes the clarification

17   letters carry forward of the asset purchase agreement's

18   exclusion of cash from the transaction and the very clear

19   representations at the sale hearing that Barclays would not be

20   taking any Lehman cash.

21         Specifically, paragraph 1(c) of the clarification

22   letter provides in relevant part that "except as otherwise

23   specified in the definition of purchased assets, excluded

24   assets shall include any cash, cash equivalents, bank deposits

25   or similar cash items."

58959

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 11

1        The opinion also notes that the clarification letter

2    further specified that although LBI's government securities

3    trading operations were part of the business sold to Barclays,

4    the government securities themselves were excluded from the

5    sale.  Indeed, in its memorandum filed in support of its

6    proposed orders, Barclays recognizes that in certain places the

7    Court's opinion appears to go beyond the no cash limitation and

8    appears to hold that all ETD margin assets were excluded from

9    the sale.

10        That exclusion of all ETD margin assets is the proper

11    reading of the opinion.  The opinion, for the reasons stated

12    holds that the SIPA trustee is entitled to all of the margin

13    assets and Barclays is not entitled to receive or retain that

14    portion of the margin assets held in the form of government

15    securities with maturity of more than three months.

16        There is a subsidiary issue that was also argued on

17    May 9 involving clearly funds.  Barclays claims that the order

18    should provide for the identification and transfer to Barclays

19    of some 171 million dollars of clearing funds on deposit at the

20    OCC and an undetermined amount of residual clearing funds on

21    deposit at the CME.  Clearing funds are margin assets by

22    another name.  They are deposits that clearing corporations

23    require their members to deposit into a single pool to secure

24    all obligations of all clearing members.

25        LBI's clearing funds on deposit at the OCC and any

A-1381

58960

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

```
 1    residual clearing funds on deposit at the CME apparently
 2    consistent of government securities.  Barclays bases its claim
 3    to LBI's clearing funds on the Court's holding that Barclays is
 4    entitled to those margin assets that customers were required to
 5    deposit and that were "held for the benefit of customers."
 6          In the opinion, the Court explained that "various
 7    regulations and rules require customers to deposit collateral
 8    with their broker-dealer or with their futures commission
 9    merchant to support trading of futures and options contracts."
10    and that "This collateral, which is deposited by customers with
11    a broker-dealer or futures commission merchant and held for the
12    benefit of customers constitutes the property that may be held
13    to secure obligations under the exchange trade of derivatives."
14    Barclays argues that because clearing funds like customers
15    deposits are funds that various regulations and rules require
16    to support trading of futures and options contracts on behalf
17    of customers, the Court should order all such funds transferred
18    to Barclays.
19          The Court agrees with the SIPA trustee's arguments
20    that clearing funds are not comparable to customer deposits and
21    are virtually indistinguishable from other margin assets.  The
22    clearing funds were specifically excluded from the sale by
23    virtue of the exclusion of all cash, cash equivalents, bank
24    deposits, or similar cash items and the clarification letters
25    specific exclusion of government securities.
```

58961

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 13

1          In addition, and perhaps most importantly, the

2    clearing funds are LBI property and not property deposited by

3    customers.  Accordingly under the opinion, Barclays is not

4    entitled to any of the clearing funds.

5          I'll now address the setoff issue.  Barclays contends

6    that "To the extent the Court is going to order Barclays to

7    return margin assets to the trustee, it must also address the

8    extent to which Barclays is entitled to an offset or lien, or

9    similar right compensate it for liabilities it assumed and paid

10   as consideration for acquiring those margin assets."

11         Barclays bases this alleged setoff right on the

12   consideration it provided under the transfer and assumption

13   agreement which I'll call for these purposes the TAA and

14   Section 550 of the Bankruptcy Code.  As the SIPA trustee points

15   out, this is a new argument that appears to be inconsistent

16   with positions taken by Barclays at trial.  The TAA provided

17   that Barclays acquired all rights and obligations with respect

18   to LBI's accounts at the OCC as of the closing of the sale

19   transaction.  Barclays was to assume all of LBI's long and

20   short positions at the OCC and such rights and obligations

21   included all margin deposits in those accounts.

22         In the opinion, the Court stated that because the TAA

23   never was presented to the Court, it "cannot be dispositive to

24   the parameters of the deal that the Court approved."  Barclays

25   contends that in this respect, the opinion has the effect of

58962

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 14

1   voiding the TAA at least insofar as the TAA on its face

2   transferred all margin deposits to Barclays.

3         But Barclays is stretching when it claims that the TAA

4   Was effectively voided.  The TAA was but one of the agreements

5   touching the same subject matter and a side agreement that was

6   never approved.  The trial made clear that the APA and the

7   clarification letter were the key documents that governed the

8   acquisition and under these documents and the proof presented

9   at trial, Barclays agreed to acquire both long and short

10  positions.  These linked positions may not be separated now.

11        Barclays attempt to use Section 550(a) of the

12  Bankruptcy Code is misplaced because no transfer was avoided

13  within the meaning of that section of the Bankruptcy Code.

14  Barclays was unable to establish its claims for the margin

15  assets but that is hardly the same as the avoidance of a

16  transfer into one of the avoiding powers of the bankruptcy

17  code.

18        Counsel to Barclays has argued that requiring Barclays

19  to assume the OCC accounts without the margin will take away

20  from Barclays "the quo for the quid that was being negotiated"

21  as part of the TAA.

22        However, as was pointed out by counsel to the trustee,

23  that very issue was tried before the Court at great length.

24  The Court specifically rejected Barclays' arguments and the

25  testimony of its expert witness that no rational purchaser

Case 12-2322, Document 208-1, 04/02/2013, 894987, Page46 of 153

58963

LEHMAN BROTHERS HOLDINGS INC., et al.

1    would undertake a deal of this kind without the margin assets

2    and awarded the margin assets to the trustee.

3           Barclays has maintained on a consistent basis that it

4    acquired both long and short positions and has not shown in its

5    recent submissions that it is entitled to any setoff with

6    respect to its obligation to return the margin assets.

7           I'll now turn to the question of prejudgment interest.

8    The trustee seeks prejudgment interest on the margin assets at

9    the nine percent interest rate applicable in New York pursuant

10   to the following state law claims included in his adversary

11   complaint.  Counts Two and Three seeking declaratory judgment

12   under 28 U.S.C. Section 2201 that the margin assets remain

13   property of the LBI estate and that the trustee is entitled to

14   the return of the cash already transferred to Barclays, Count

15   Eleven for breach of contract and Count Twelve for conversion,

16   money had and received.

17          Pursuant to a stipulation known as the adversary

18   complaint stipulation regarding certain claims made in the

19   adversary complaints filed by LBHI, the trustee and the

20   creditors committee, the parties agreed among other things,

21   that certain claims in the trustee's adversary complaint

22   including Counts Two and Three will be resolved in conjunction

23   with the resolution of the 60(b) motions.  And that other

24   claims including Counts Eleven for breach of contract and Count

25   Twelve for conversion would be deferred for further

58964

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 16

1   adjudication.

2           The trustee argues in his reply memorandum that it is

3   mandatory for the Court to award prejudgment interest on his

4   claims at the New York statutory rate of nine percent under

5   C.P.L.R. Sections 5001(a) and 5004.  At oral argument, however,

6   the trustee indicated that it was within the Court's discretion

7   to award interest at the New York statutory rate in connection

8   with his declaratory judgment claims and mandatory only with

9   respect to the conversion claims.

10          The trustee is not entitled to prejudgment interest in

11  the value of the margin assets at the New York statutory rate.

12  While the 60(b) trial required the Court to review and

13  interpret the APA, the clarification letter, and other sale

14  documents, the Court was dealing with and presiding over what

15  at its core is a bankruptcy dispute over the proper

16  interpretation of documents that were all drafted post-petition

17  in relation to sale orders, not a breach of contract or a

18  conversion claim under state law.

19          The parties agreed in the adversary complaint

20  stipulation that the breach of contract and conversion claims

21  would be deferred and such claims were not directly presented

22  to the Court.  Furthermore, while the parties stipulated that

23  the trustee's declaratory judgment claims would be resolved in

24  conjunction with the 60(b) motions, such claims are not state

25  law based.

58965

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 17

1        The applicable New York State prejudgment interest
2    rate is particularly high relative to current market rates and
3    to apply that rate would greatly enhance the estate's recovery
4    while effecting a penalty as to Barclays.

5        This was a good faith business dispute and the
6    objective in establishing an appropriate interest rate should
7    be reasonable compensation to the estate for the period that it
8    did not have possession and control of the margin assets and
9    the ability to manage them.

10       The Court has discretion to award the trustee
11   prejudgment interest on his bankruptcy claims.  As noted by my
12   colleague, Judge Glenn in his decision in Mikhail v. Boulder
13   Capital, LLC in the matter of In Re: 1031 Tax Group, LLC 439 BR
14   84, Courts in the Second Circuit and in this district have
15   recognized that the award of prejudgment interest is
16   discretionary and should be awarded unless there is a sound
17   reason to deny it.  In exercising such discretion, the Court
18   should consider among other things, the need to fully
19   compensate the wronged party for actual damages suffered and
20   both the fairness and the relative equities of the award.
21   While there is a reference rate for post-judgment interest,
22   there is no fixed standard for the award of prejudgment
23   interest.

24       Because Barclays has had the benefit of holding margin
25   assets valued at approximately 2.1 billion dollars since the

58966

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 18

1    date of their transfer to Barclays, the Court finds the

2    prejudgment interest should be calculated from the date of

3    transfer as compensation for the loss of the estate's

4    possessory interest in this property and the ability to earn a

5    return in connection with investing those assets for the

6    benefit of creditors.

7            Accordingly, prejudgment interest should be calculated

8    from the closing date, September 22, 2008, the date the margin

9    assets were transferred to Barclays.

10           Determining an appropriate interest rate is also

11   within the discretion of the Court.  Upon weighing the facts

12   and circumstances of this case, and for reasons noted earlier,

13   the nine percent New York Statutory rate is deemed too high and

14   employing that rate would be excessive under the circumstances.

15           Conversely, the federal judgment rate which was only

16   1.69 percent at the time of the transfer is too low a rate of

17   return and is not adequate to fully compensate the LBI estate

18   for the loss of economic opportunities associated with

19   management of the margin assets.

20           A rate between these two extremes is a more suitable

21   measure of a reasonable prejudgment interest rate under the

22   circumstances presented.  The Court in exercising its

23   discretion concludes that it would be most appropriate to

24   derive an interest rate that is consistent with a benchmark

25   from the credit markets and that is based on the prime rate

58967

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 19

1   that was applicable at the time of the closing.

2           According to statistics published by the Board of

3   Governors of the Federal Reserve, which the Court has reviewed,

4   the bank prime loan interest rate on September 22, 2008 was

5   five percent.  Accordingly, the trustee shall be entitled to an

6   award of prejudgment of interest at the rate of five percent

7   with interest to accrue from September 22, 2008, the date of

8   the transfer of the margin assets to Barclays to the date of

9   entry of judgment.  Thereafter, interest shall accrue with the

10  then applicable post-judgment interest rate.

11          The trustee and Barclays shall submit an agreed order

12  that incorporates this bench ruling and all relevant agreements

13  between the parties concerning the form of the order.  All

14  orders including those submitted by LBHI and the committee

15  shall be docketed on the same date.  I will note that I have

16  those orders in chambers that I have just referenced and unless

17  there are changes to the forms of order to be proposed by

18  counsel for either the committee or LBHI, those are the orders

19  that I will enter.  That's the ruling of the Court.

20          My only question to the parties is whether we have

21  more business today to discuss.  Mr. Maguire, did you have

22  something?

23          MR. MAGUIRE:  I have nothing, Your Honor.

24          THE COURT:  Okay.  I'll simply ask that counsel order

25  a copy of the transcript of these proceedings and docket them

58968

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 20

1    on the record.

2            MR. SCHILLER:  We have reached an understanding with

3    trustee's counsel.  Jonathan Schiller for Barclays, Your Honor,

4    excuse me.  And we'll add that to our order about the parties

5    wish a thirty-day period to resolve stay and bonding issues

6    pending appeal, Judge.  And we've agreed on that because we

7    need more than the automatic fourteen days.  Well include that

8    in the order for Your Honor.

9            THE COURT:  Okay.  I'll see whether or not I'll

10   actually approve that.  Why should we agree on thirty days?

11   This case has been pending for a year and a half.

12           MR. SCHILLER:  We've made a proposal to them on how to

13   handle the bonding issues and they're considering that and they

14   thought that that was an adequate period of time for us to

15   resolve that and avoid litigating the stay and bonding issues.

16           THE COURT:  I am certainly not going to stand in the

17   way of progress but the nature of the relief granted in the

18   opinion has been well known to the parties for a very long

19   time, at least since February and this is now June.  I don't

20   understand why the parties need that much time to deal with the

21   bonding issue or why they haven't discussed it earlier but I

22   will certainly consider the language when I see the order.

23   We're adjourned.

24           (Whereupon these proceedings were concluded at 2:28 p.m.)

25

58969

Page 21

1

2                        I N D E X

3

4                      R U L I N G S

5

6   DESCRIPTION                              PAGE    LINE

7   Barclays is not entitled to               3      13

8   any of the clearing funds

9

10  Barclays is not entitled to               3      15

11  any setoff with respect to its

12  obligation to return the margin assets

13

14  Trustee shall be entitled to an award     5      19

15  of prejudgment of interest at the rate of

16  five percent with interest to accrue

17  from September 22, 2008

18

19

20

21

22

23

24

25

58970

Page 22

1

2                    C E R T I F I C A T I O N

3

4    I, Linda Ferrara, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LINDA FERRARA

9

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:   June 6, 2011

17

18

19

20

21

22

23

24

25

**(Excerpts) Order (I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to Completing Bids, if any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting the Sale Hearing Date in Connection with Sale of Certain of the Debtors' Assets, Filed September 17, 2008**

**Record pages: 58990, 58994, and 58996.**

A-1393

58990

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                    :
In re                                               :    Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*              :    08-13555 (JMP)
                                                    :
            Debtors.                                :    (Jointly Administered)
                                                    :
---------------------------------------------------------------x

### ORDER (I) APPROVING THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (II) CERTAIN MATTERS RELATING TO COMPETING BIDS, IF ANY, (III) APPROVING THE FORM AND MANNER OF SALE NOTICES AND (IV) SETTING THE SALE HEARING DATE IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' ASSETS

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008 (the "Purchase

Agreement"), among the Debtors, Lehman Brothers Inc. ("LBI" and, collectively with the

Debtors, the "Seller") and Barclays Capital, Inc. (the "Purchaser"); (B) establishing sales

procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of certain

of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances

and interests and the assumption and assignment of certain prepetition executory contracts and

unexpired leases (the "Contracts") relating to the Purchased Assets to the Purchaser or the

Successful Bidder(s); and upon the Court's consideration of the Motion and the record of the

---
[1] Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Agreement.

1

58994

5.    If the Sellers do not receive any Qualified Bids, other than the Purchaser's Bid, by the Bid Deadline (as defined on Exhibit A), the Debtors shall seek approval of the Purchaser's Bid pursuant to the Purchase Agreement at the Sale Hearing (as defined below).

6.    The failure specifically to include or reference a particular provision of the matters set forth on Exhibit A in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the matters set forth on Exhibit A be authorized and approved in their entirety as modified by this Order.

Sale Hearing

7.    The Court shall hold a hearing on September 19, 2008 at 4:00 p.m. (New York time) (the "Sale Hearing") in the United States Bankruptcy Court for the Southern District of New York in the courtroom of the Honorable James M. Peck, at which time the Court shall consider the Sale Motion and approve the Successful Bidder. Objections to the Sale Motion shall be interposed by no later than the conclusion of the Sale Hearing and oral objections will be considered at the Sale Hearing; provided, however, that parties with objections to the Sale Motion shall use reasonable efforts to file a written objection or, where filing a written objection is impracticable, to advise the Debtors' counsel of the nature of the objection as soon as reasonably practicable. The Sale Hearing shall not be adjourned or canceled without prior consent of the Purchaser, the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), and the Federal Reserve Bank of New York ("FRBNY").

8.    The failure of any objecting person or entity to timely file and serve its objection by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale, or the Debtors' consummation and performance of the

58996

Reimbursement Cap shall be held in trust for the Purchaser until the Break-Up Fee and the

Expense Reimbursement are paid in full pursuant to this Order and the Purchase Agreement.

Notice

12.　　Notice of (a) the Motion, (b) the Sale Hearing and (c) the proposed assumption

and/or assignment of the Closing Date Contracts to the Purchaser pursuant to the Purchase

Agreement or to a different Successful Bidder shall be good and sufficient, and no other or

further notice shall be required, if given as follows:

(a)　　Notice of Sale Hearing. Within one (1) day after entry of this Order (the "Mailing Date"), the Debtors (or their agent) shall make a copy of this Order (including Exhibit A to this Order) (the "Sale Notice"), the Sale Motion, the Purchase Agreement and the proposed Sale Approval Order (as defined in the Sale Motion) available and shall provide notice of the Sale in a form which is reasonably acceptable to the Purchaser by email, facsimile, federal express or other overnight delivery service, upon (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Closing Date Contracts, (vii) the United States Attorney's office, (viii) the United States Department of Justice, (ix) the SEC, (x) the FRBNY, (xi) the Securities Investor Protection Corporation, (xii) the Internal Revenue Service, (xiii) the CFTC, and (xiv) all persons who have filed a notice of appearance in these cases.

(b)　　Assumption, Assignment and Cure Notice. At least one (1) day prior to the Sale Hearing, the Debtors shall file with this Court and serve on each non-Debtor party to a Contract by federal express, or other overnight delivery service, a notice of assumption, assignment and cure in a form reasonably acceptable to the Purchaser (the "Assumption, Assignment and Cure Notice"). The Assumption, Assignment and Cure Notice shall state that parties to Contracts may find out whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). If the Contract is one which the Purchaser designates for assumption and assignment at the closing (a "Closing Date Contract"), the Debtors will compute the appropriate cure amount (the "Cure Amount") for such Closing Date Contract and will list such Cure Amounts on the Website. If the Contract is one which the Purchaser designates for assumption and assignment within the 60 days after the Closing (a "Designated Contract"), the Debtors will file a motion for approval of procedures reasonably satisfactory to the Purchaser with respect to Designated Contracts at a later date.

(c)　　Any non-Debtor party to a Closing Date Contract shall file and serve on the Notice Parties any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity,

7

A-1396

59050

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**08 CIV 8119**

SECURITIES INVESTOR PROTECTION
CORPORATION,

Civil Action No. 08-__

        Plaintiff-Applicant,

    v.

LEHMAN BROTHERS INC.

        Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/19/08

**ORDER COMMENCING LIQUIDATION[1]**

On the Complaint and Application of the Securities Investor Protection Corporation

("SIPC"), it is hereby:

    I.     ORDERED, ADJUDGED and DECREED that the customers of the

defendant Lehman Brothers Inc. ("LBI") are in need of the protection afforded by the Securities

Investor Protection Act of 1970, as amended ("SIPA").  15 U.S.C. §78aaa et seq.

    II.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(3), James W. Giddens is

appointed Trustee (the "Trustee") for the liquidation of the business of LBI with all the duties

and powers of a trustee as prescribed in SIPA, and the law firm of Hughes Hubbard & Reed LLP

is appointed counsel for the Trustee. The Trustee shall file a fidelity bond satisfactory to the

Court in the amount of $100,000.00.

---

1.   The "LBI Liquidation Order"

59051

2

III.    ORDERED that all persons and entities are notified that, subject to the other provisions of 11 U.S.C. §362, the automatic stay provisions of 11 U.S.C. §362(a) operate as a stay of:

A.    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative or other proceeding against LBI that was or could have been commenced before the commencement of this proceeding, or to recover a claim against LBI that arose before the commencement of this proceeding;

B.    the enforcement against LBI or against property of the estate of a judgment obtained before the commencement of this proceeding;

C.    any act to obtain possession of property of the estate or property from the estate;

D.    any act to create, perfect or enforce any lien against property of the estate;

E.    any act to create, perfect or enforce against property of LBI any lien to the extent that such lien secures a claim that arose before the commencement of this proceeding;

F.    any act to collect, assess or recover a claim against LBI that arose before the commencement of this proceeding;

G.    the setoff of any debt owing to LBI that arose before the commencement of this proceeding against any claim against LBI; and

H.    the commencement or continuation of a proceeding before the United States Tax Court concerning LBI's tax liability for a taxable period the Bankruptcy Court may determine.

Case 12-2322, Document 208-1, 04/02/2013, 894987, Page60 of 153

IV.      ORDERED that all persons and entities are stayed, enjoined and restrained from directly or indirectly removing, transferring, setting off, receiving, retaining, changing, selling, pledging, assigning or otherwise disposing of, withdrawing or interfering with any assets or property owned, controlled or in the possession of LBI, including but not limited to the books and records of LBI, and customers' securities and credit balances, except for the purpose of effecting possession and control of said property by the Trustee.

V.       ORDERED that pursuant to 15 U.S.C. §78eee(b)(2)(B)(i), any pending bankruptcy, mortgage foreclosure, equity receivership or other proceeding to reorganize, conserve or liquidate LBI or its property and any other suit against any receiver, conservator or trustee of LBI or its property, is stayed.

VI.      ORDERED that pursuant to 15 U.S.C. §§78eee(b)(2)(B)(ii) and (iii), and notwithstanding the provisions of 11 U.S.C. §§362(b) and 553, except as otherwise provided in this Order, all persons and entities are stayed, enjoined and restrained for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from enforcing liens or pledges against the property of LBI and from exercising any right of setoff, without first receiving the written consent of SIPC and the Trustee.

VII.     ORDERED that, pursuant to 15 U.S.C. §78eee(b)(2)(C)(ii), and notwithstanding 15 U.S.C. §78eee(b)(2)(C)(i), all persons and entities are stayed for a period of twenty-one (21) days, or such other time as may subsequently be ordered by this Court or any other court having competent jurisdiction of this proceeding, from foreclosing on, or disposing of, securities collateral pledged by LBI, whether or not with respect to one or more of such contracts or agreements, securities sold by LBI under a repurchase agreement, or securities lent

**A-1399**

59053

4

under a securities lending agreement, without first receiving the written consent of SIPC and the

Trustee.

VIII.   ORDERED that the stays set forth in paragraphs three – six shall not apply

to:

A.   any suit, action or proceeding brought or to be brought by the United

States Securities and Exchange Commission ("Commission"), the

Commodity Futures Trading Commission ("CFTC"), or any self-

regulatory organization of which LBI is now a member or was a member

within the past six months; or

B.   the exercise of a contractual right of a creditor to liquidate, terminate, or

accelerate a securities contract, commodity contract, forward contract,

repurchase agreement, swap agreement, or master netting agreement, as

those terms are defined in 11 U.S.C. §§101, 741, and 761, to offset or net

termination values, payment amounts, or other transfer obligations arising

under or in connection with one or more of such contracts or agreements,

or to foreclose on any cash collateral pledged by LBI, whether or not with

respect to one or more of such contracts or agreements; or

C.   the exercise of a contractual right of any securities clearing agency to

cause the liquidation of a securities contract as defined in 11 U.S.C.

§741(7) and the contractual right of any derivatives clearing organization

to cause the liquidation of a commodity contract as defined in 11 U.S.C.

§761(4); or

59054

5

D.     the exercise of a contractual right of any stockbroker or financial institution, as defined in 11 U.S.C. §101, to use cash or letters of credit held by it as collateral, to cause the liquidation of its contract for the loan of a security to LBI or for the pre-release of American Depository Receipts or the securities underlying such receipts; or

E.     the exercise of a contractual right of any "repo" participant, as defined in 11 U.S.C. §101, to use cash to cause the liquidation of a repurchase agreement, pursuant to which LBI is a purchaser of securities, whether or not such repurchase agreement meets the definition set forth in 11 U.S.C. §101(47); or

F.     the exercise of a contractual right, as such term is used in 11 U.S.C. §555, in respect of (i) any extension of credit for the clearance or settlement of securities transactions or (ii) any margin loan, as each such term is used in 11 U.S.C. §741(7), by a securities clearing bank, or the exercise of a contractual right as such term is used in 11 U.S.C. §556 in respect of any extension of credit for the clearance or settlement of commodity contracts by a commodity broker as defined in 11 U.S.C. §101(6). As used herein, "securities clearing bank" refers to any financial participant, as defined in 11 U.S.C. §101(22A), that extends credit for the clearance or settlement of securities transactions to one or more Primary Government Securities Dealers designated as such by the Federal Reserve Bank of New York from time to time; or

60394664_7.DOC

59055

6

G.   the exercise of a contractual right, as such term is used in 11 U.S.C. §555, by a person (or such person's agent) in respect of securities that were sold to such person by LBI pursuant to a repurchase transaction (as such term is used in 11 U.S.C. §741(7) and regardless of whether such transaction is a repurchase agreement within the meaning of 11 U.S.C. §101(47)) with LBI that is subject to a Custodial Undertaking in Connection With Repurchase Agreement among LBI, JPMorgan Chase Bank N.A. and such person (or such person's agent); or

H.   the exercise of a contractual right, as such term is used in 11 U.S.C. §555, by the Federal Reserve Bank of New York; or

I.   any setoff or liquidating transaction undertaken pursuant to the rules or bylaws of any securities clearing agency registered under section 17A(b) of the Securities Exchange Act of 1934, 15 U.S.C.§78q-1(b), or any derivatives clearing organization registered under section 5b of the Commodity Exchange Act, 7 U.S.C. §7a-1, or by any person acting under instructions from and on behalf of such a securities clearing agency or derivatives clearing organization; or

J.   any settlement transaction undertaken by such securities clearing agency using securities either (i) in its custody or control, or (ii) in the custody or control of another securities agency with which it has a Commission approved interface procedure for securities transactions settlements, provided that the entire proceeds thereof, without benefit of any offset, are promptly turned over to the Trustee; or

60394664_7.DOC

59056

7

K.      any transfer or delivery to a securities clearing agency or derivatives

clearing organization by a bank or other depository, pursuant to

instructions given by such clearing agency or derivatives clearing

organization, of cash, securities, or other property of LBI held by such

bank or depository subject to the instructions of such clearing agency or

derivatives clearing organization and constituting a margin payment as

defined in 11 U.S.C. §741(5); or

IX.     ORDERED that the stays set forth in paragraphs three – seven above shall

not apply to the exercise of any rights specified in Sections 362(b)(6), 362(b)(7), 362(b)(17),

362(b)(27), 555, 556, 559, 560 and/or 561 of the Bankruptcy Code by Barclays Capital Inc. or

any affiliate thereof (or any agent of Barclays Capital Inc. or any affiliate thereof), including

without limitation rights of foreclosure and disposition referred to in 15 U.S.C. Section

78eee(b)(2)(C)(ii), with respect to any transaction (or any extension, assignment, novation or

rollover of such transaction) entered into on or prior to the earlier of (i) consummation of the

transactions contemplated by the Asset Purchase Agreement dated September 16, 2008 among

Barclays Capital Inc., Lehman Brothers Inc., Lehman Brothers Holdings Inc. and LB 745 LLC

and (ii) September 24, 2008;

X.      ORDERED that pursuant to 11 U.S.C. §721, the SIPA Trustee is

authorized to operate the business of LBI to:  (a) conduct business in the ordinary course until

6:00 p.m. on September 19, 2008, including without limitation, the purchase and sales of

securities, commodities futures and option transactions, and obtaining credit and incurring debt

in relation thereto; (b) complete settlements of pending transactions, and to take other necessary

and appropriate actions to implement the foregoing, in such accounts until 6:00 p.m. on

A-1403

59057

8

September 23, 2008; and (c) take other action as necessary and appropriate for the orderly transfer of customer accounts and related property.

XI.    ORDERED that the Clerk of the Court is directed to immediately open the docket in this proceeding and that this Order be entered on the docket immediately.

XII.    ORDERED that the Clerk of the Court is directed to produce seventy-five (75) certified copies of this Order, at the regular cost, immediately upon the Order's entry onto the docket.

XIII.    ORDERED that pursuant to 15 U.S.C. §78eee(b)(4), this liquidation proceeding is removed to the United States Bankruptcy Court for the Southern District of New York, and shall be transmitted electronically to by the Clerk of the Court immediately upon entry on the docket.

XIV.    ORDERED that the Trustee is authorized to take immediate possession of the property of LBI, wherever located, including but not limited to the books and records of LBI, and to open accounts and obtain a safe deposit box at a bank or banks to be chosen by the Trustee, and the Trustee may designate such of his representatives who shall be authorized to have access to such property.

Date:    September 19, 2008

_____
UNITED STATES DISTRICT JUDGE

60394664_7.DOC

A-1404

59194

William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice* admission pending)
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**THE TRUSTEE'S JOINDER IN DEBTORS' MOTION FOR AN ORDER, PURSUANT
TO FED. R. CIV. P. 60 AND FED. R. BANKR. P. 9024, MODIFYING THE
SEPTEMBER 20, 2008 SALE ORDER AND GRANTING OTHER RELIEF**

James W. Giddens (the "Trustee"), as Trustee for the SIPA Liquidation of

Lehman Brothers Inc., by his undersigned counsel, hereby joins, to the extent explained below,

in the motion filed by Lehman Brothers Holdings Inc. *et al.* ("LBHI"), seeking entry of an order,

pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024,

A-1405

59195

modifying the September 20, 2008 Sale Order and granting other relief (Docket No. 5148, the "LBHI Motion").

Based on the Rule 2004 discovery conducted to date, the Trustee joins in the LBHI Motion insofar as it relates to certain undisclosed benefits that Barclays realized in connection with the sale transaction, including (i) a multi-billion dollar discount that Barclays obtained on certain securities included in the sale transaction, (ii) Barclays' failure to pay all of the bonus amount that it agreed to pay under the Asset Purchase Agreement, and (iii) Barclays' failure to assume $1.5 billion in contract cure liabilities. The Trustee reserves his rights with respect to the undisclosed benefits described in the LBHI Motion.

The Trustee is filing his own Motion in the SIPA proceeding for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief under Rule 60(b). (LBI Docket No. 1682.) The Trustee's Motion focuses on the billions of dollars in additional assets that are in particular dispute between the Trustee and Barclays and immediately affect the Trustee's ability to make distributions to customers. In his Motion, the Trustee seeks, among other things, an order finding that his interpretation of the sale documents and the Sale Orders is correct and that, therefore, Barclays is not entitled to these assets, or in the alternative, for relief under Rule 60.

2

A-1406

59196

Dated: New York, New York
September 15, 2009

HUGHES HUBBARD & REED LLP

By:   /s/ William R. Maguire
      William R. Maguire

Seth D. Rothman
Neil J. Oxford
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice* admission pending)
1775 I. Street, N.W.
Washington D.C., 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

A-1407

(Excerpts) Trustee's Motion for Relief Pursuant
to the Sale Orders or, Alternatively, for Certain
Limited Relief under Rule 60(b),
Filed September 15, 2009

Record pages: 59197, 59232, and 59233 – 36.

A-1408

59197

Hearing Date: October 15, 2009 at 2:00 p.m. (prevailing Eastern Time)
Objection Deadline: October 9, 2009 at 4:00 p.m. (prevailing Eastern Time)

William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood (*pro hac vice* admission pending)
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) SIPA |
| Debtor. | |

**THE TRUSTEE'S MOTION FOR RELIEF PURSUANT TO THE
SALE ORDERS OR, ALTERNATIVELY, FOR CERTAIN
LIMITED RELIEF UNDER RULE 60(b)**

59232

## Argument

79.    The Trustee seeks an order finding that the Trustee's interpretation of the

Clarification Letter is the correct one and that the Court did not approve the Clarification Letter,

the TAA or the transfers that Barclays claims are contemplated therein.  (Point I, below.)

Alternatively, the Trustee seeks relief from the Sale Orders to the extent that they can be deemed

to provide Barclays a right to any of the Disputed Assets.  (Point II, below.)

## I.    THE TRUSTEE IS ENTITLED TO AN ORDER FINDING THAT HIS INTERPRETATION OF THE SALE DOCUMENTS AND THE SALE ORDERS IS CORRECT.

### A.    Under The Terms Of The Sale Documents, The Trustee Is Entitled To The Disputed Assets.

80.    Barclays has no rights to the DTCC clearance box assets because it expressly

agreed in the DTCC Letter that the "accounts of LBI maintained at the Clearing Agencies

Subsidiaries," were "Excluded Assets," and therefore not included in the sale.  (See supra ¶¶ 56,

58.)

81.    The DTCC Letter specifically addresses LBI's clearance boxes at DTCC, and

therefore supersedes the more general provision of the Clarification Letter, which refers simply

to LBI's "clearance boxes," regardless of their location. See Meer v. Bugliarello, 147 A.D.2d

568, 568-69, 537 N.Y.S.2d 617, 617 (2d Dep't 1989) (holding that the relevant "specific

procedures" in one agreement superseded the general principles in another); Aramony v. United

Way of Am., 254 F.3d 403, 413-14 (2d Cir. 2001) (applying New York law to find that "specific

words will limit the meaning of general words if it appears from the whole agreement that the

parties' purpose was directed solely toward the matter to which the specific words or clause

relate" (quotation omitted)); 22 N.Y. Jur. 2d Contracts § 251 (2009) ("Where there are general

59233

and special provisions relating to the same thing, the special provisions control, even if there is inconsistency between specific provisions and the general provisions.").

82.     It makes no sense to construe these agreements any other way. If, as Barclays claims, the Clarification Letter transfers the DTCC clearance box assets to Barclays, it would render the entire DTCC letter a nullity and conflict with the deal that was explained to and approved by the Court. See Corhill Corp. v. S. D. Plants, Inc., 9 N.Y.2d 595, 599, 176 N.E.2d 37, 38, 217 N.Y.S.2d 1, 3 (1961) ("It is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect." (quotations omitted)); see also U.S. Naval Inst. v. Charter Commc'ns Inc., 875 F.2d 1044, 1051 (2d Cir. 1988). Moreover, the Clarification Letter could not affect Barclays' undertaking in the DTCC Letter that the assets were "Excluded Assets" because DTCC was not a party to the Clarification Letter.

83.     Barclays' claim for $769 million in securities under ¶ 8(ii) of the Clarification Letter is similarly without merit because such a transfer could only have been made "to the extent permitted by applicable law." This meant, among other things, that there had to be a sufficient excess in LBI's Reserve Account under SEC Rule 15c3-3 and that LBI had to receive regulatory approval to release that excess. (See supra ¶¶ 61, 63.) As neither of these conditions was met, Barclays has no right to the $769 million in securities that it is demanding. (See supra ¶¶ 62, 64.)

84.     Barclays' claim that it has an absolute right to $769 million in securities, regardless of whether there was an excess or a deficiency in the Reserve Account for the protection of customers, is inconsistent with the express language of the Clarification Letter, with the Redacted understanding that regulatory approval was required, and with their

-31-

59234

course of dealing. (See supra ¶¶ 61, 63, 65.) It is also inconsistent with the fundamental purpose of Rule 15c3-3, SIPA, and the sale, which was to protect public customers by safeguarding customer property. Customers are deemed as a matter of law to rely on the customer protection rules, and private parties are estopped from claiming that private contractual rights defeat the purpose of these requirements. See In re Weis Sec., Inc., 605 F.2d 590, 594-96 (2d Cir. 1978) (holding that lender was estopped from rescinding subordination agreement where rescission would defeat the public policy behind Rule 15c3). Accordingly, there is no merit to Barclays' claim that the Clarification Letter should be read to provide it with an absolute right to $769 million in securities.

85.     Finally, as explained in detail above, there is no evidence of any business negotiation, much less any agreement, between Lehman and Barclays to transfer as much as $▮ billion in margin and clearing funds to Barclays. Neither the APA nor the Clarification Letter mentions the margin or clearing funds at the OCC or at other derivatives exchanges. (See supra ¶¶ 69-70.) Barclays relies on the inclusion in the APA of the term "derivatives" in the definition of "Purchased Assets" (see Maguire Decl. Ex. 2 (APA) § 1.1). Redacted

▮▮▮▮▮▮ ) The Clarification Letter similarly contains no reference to margin and clearing funds, and the single parenthetical "(any property held to secure obligations under these derivatives)" cannot fairly be read to confer upon Barclays as much as $▮ billion in margin and other funds. (See supra ¶ 70.)

86.     The Trustee's reading of the Clarification Letter is consistent with "the well-established rule of construction in the law of contracts that contracts affecting the public interest

-32-

59235

**REDACTED**

are to be construed in the manner most favorable to the public." Lindenbaum & Young v. New York, 79 Misc. 2d 638, 640, 360 N.Y.S.2d 807, 810 (Sup. Ct. Kings County 1974). The Trustee's reading of the Clarification Letter preserves the value of the LBI estate to satisfy claims of LBI's customers; Barclays interpretation, however, would require the Trustee to transfer the Disputed Assets to Barclays at the direct expense of LBI's customers and for the benefit of Barclays. See Herrera v. Katz Commc'ns, Inc., 532 F. Supp. 2d 644, 647 (S.D.N.Y. 2008) ("a meaning which serves the public interest . . . is preferred over a meaning which does not").

### B. The Sale Orders Do Not Authorize The Transfers Of The Disputed Assets To Barclays.

87. Under § 363 of the Bankruptcy Code, any transfer of the Disputed Assets requires the approval of the Court. The Clarification Letter was never submitted to the Court on a separate motion and the TAA was never submitted to the Court at all. As the Sale Orders do not approve the Clarification Letter or the TAA to the extent that they materially change the sale transaction that was presented to and approved by the Court, Barclays is not entitled to the Disputed Assets and should return any portion of the Disputed Assets that was already transferred to it.

88. The Trustee is entitled, under Sections 549 and 550 of the Bankruptcy Code, to the return of the estimated $█ billion in Disputed Assets that Barclays has already received. Section 549 of the Code provides that "the trustee may avoid a transfer of property of the estate - (1) that occurs after the commencement of the case; and . . . (B) that is not authorized under this title or by the court." 11 U.S.C. § 549. Section 550 provides that "to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1)

59236

# REDACTED

the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]"
11 U.S.C. § 550(a). As the Court did not authorize the transfer of the Disputed Assets to
Barclays, the Trustee is entitled to avoid such transfers under Section 549 and to recover the
Disputed Assets under Section 550 of the Bankruptcy Code. These sections of the Code also
permit the Trustee to recover any other undisclosed benefits that Barclays reaped from the
transaction.

## II.     THE TRUSTEE IS ENTITLED TO RELIEF UNDER RULE 60(b).

89.     To the extent that the Sale Orders can be read to approve the Clarification Letter
or the TAA <u>and</u> Barclays can convince the Court that its undisclosed interpretation of the
Clarification Letter or the TAA entitles it to any of what may be as much as $█ billion in
additional assets, the Court should grant the Trustee relief from the Sale Orders because this
result was never intended by the Court or the Trustee and was clearly the result of mistake or
inadvertence. <u>See</u> Fed. R. Civ. P. 60(b).

90.     The Trustee respectfully requests relief under Rule 60(b) to protect the interests of
the estate pending the Court's review of the contractual dispute arising from Barclays' demands
for the Disputed Assets, including the Court's determination of the validity of the Clarification
Letter and the TAA to the extent that they purport to convey any of the Disputed Assets to
Barclays.

### A.     Rule 60(b) Grants The Court Broad Discretion To Rectify
### Any Mistakes In Connection With The Sale Orders.

91.     The Court may modify the Sale Orders, as necessary, pursuant to Rule 60(b) and
Federal Rule of Bankruptcy Procedure 9024. <u>See</u> Gey Assocs. Gen. P'ship v. 310 Assocs., L.P.,
No. 02-Civ-0710 (SHS), 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002), aff'd, 346 F.3d 31,
34 (2d Cir. 2003). Rule 60(b) permits the Court, "[o]n motion and just terms . . . to relieve a

-34-

# (Excerpts) Notice of Filing of Unsealed Trustee's Rule 60(b) Motion and Related Declarations and Exhibits, Filed October 16, 2009, with Attached Unsealed Brief

**Record pages: 59263, 59279, and 59332 – 34.**

A-1415

59263

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe

Attorneys for Debtor
and Debtor in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

### NOTICE OF FILING OF UNSEALED
### DEBTOR'S RULE 60 MOTION AND RELATED APPENDIXES

**PLEASE TAKE NOTICE** that on September 15, 2009, Lehman Brothers

Holdings Inc. (the "Debtor") filed the Debtor's Motion for an Order, Pursuant to Fed. R. Civ. P.

60 and Fed. R. Bankr. P. 9024, Modifying the September 20, 2008 Sale Order and Granting

Other Relief (Docket No. 5148) (the "Rule 60 Motion") and five volumes of related appendixes

(Docket Nos. 5149-5151, 5154 and 5156) (the "Appendixes").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confidentiality

Stipulation and Protective Order Between the Examiner, Debtors, Trustee, the Official

Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee") and

Barclays Capital Inc. (Docket No. 4524) (the "Protective Order"), portions of the Rule 60

59279

(iv) "terminating" the Repurchase Agreement, all presumably to avoid the mandate of Section 559. They did this in two paragraphs in the Clarification Letter that was finalized and signed only after the Sale Order was entered. These major changes to the deal were never brought to the attention of the Court or the creditors.

9.     The undisclosed gains for Barclays did not end with the delivery to Barclays of this $5 billion windfall. Evidence uncovered in discovery also shows that on the day the Sale Hearing was conducted, and into the weekend following issuance of the Sale Order, a scramble was going on inside Lehman to find billions more in assets to turn over to Barclays, without additional consideration and without disclosure. On the purported basis that Lehman had fallen short of what it was supposed to deliver under the Asset Purchase Agreement – which, of course, did not take the undisclosed discount into account – Barclays executives demanded even more assets. Lehman executives agreed to turn over an *additional* $5 billion in assets to Barclays. These assets consisted of approximately $800 million in so-called "15c3-3 assets" and at least $1.9 billion worth of unencumbered assets contained in so-called "clearance boxes." In addition, by inserting various clauses in the post-hearing Clarification Letter, additional assets, worth approximately $2.3 billion more, supposedly were transferred to Barclays, also without consideration, disclosure or the Court's approval.

10.     Discovery also has revealed that -- from the very beginning -- the consideration Barclays was to pay in the Sale Transaction, in the form of assumed liabilities, was significantly and intentionally inflated. The Court was told that, as consideration in the Sale Transaction, Barclays would assume approximately $2 billion in 2008 bonus liabilities to Lehman employees who transferred to Barclays. The accrual upon which this assumed liability was based had, in fact, been deliberately inflated by $1 billion. And, in any event, Barclays ultimately paid no

7

59332

114.    In addition to the 15c3-3 assets and unencumbered assets, over the weekend,

Lehman executives also looked into certain margin accounts maintained by Lehman at the

Options Clearing Corporation ("OCC") as yet another possible source of assets. (*See* A. 78

("We did find $5 bn of exchange listed options which we are investigating"); A. 106; A. 105; A.

78; *see also* A. 11 [Fleming] 132:21-133:11, 137:6-138:3.) Lehman's account statements

showed that these margin accounts contained excess assets. (A. 120.) In the execution copy of

the Clarification Letter, prepared several days after the Sale Hearing, the parties added for the

first time a clause (A. 32 at ¶ 1(a)(ii)(C)) purporting to authorize the transfer to Barclays of those

assets, too, totaling an additional $2.3 billion worth of securities and cash. (*See* A. 134 (valuing

OCC assets to be transferred at $2.3 billion).) McDade claimed no one even told him about this

multi-billion dollar addition to the deal. (A. 20 [McDade] 275:3-278:4.)

### 3.    The Net Effect of the Search for Additional Value

115.    By Saturday, September 20, Lowitt apparently thought his asset search team had

met its goal. He wrote to Tonucci and Berkenfeld to thank them for their help in "getting us over

the goal line." (A. 86.) Even then, however, he urged Tonucci (who, like Lowitt, had a lucrative

job offer from Barclays) to "stay close" to ensure the assets made their way to their future

employer, Barclays, because: "If we don't succeed *you and I are toast* despite our heroics." (*Id.*

(emphasis added).)[59]

116.    Lowitt's concern that he and Tonucci would be "toast," as it turned out, was a

phantom concern. The billions more in additional value was delivered to Barclays, allowing

(continued...)

substitutes. (A. 12 [Hraska] 145:13-21, 245:5-246:20, 296:11-19.) He estimated that Barclays claims it is still owed
about $600-700 million in such securities. (*Id.* at 246:24-247:9, 224:23-225:12.)

[59] Lowitt claimed that when he wrote "you and I are toast" to Tonucci he actually meant he was expressing
concern for the "whole franchise and all the employees of Lehman Brothers[.]" (*see* A. 19 [Lowitt] 177:21-178:11.)

NYI-4215277v1

59334

purported to make fundamental changes to the deal that had been presented to the Court. The Clarification Letter was never put before the Court for approval. It was simply filed, as an exhibit, without explanation, in the afternoon of September 22, along with the Asset Purchase Agreement and a First Amendment that the Court *had* seen and approved at the hearing. (Docket No. 280.)

119.    Among other things, the Clarification Letter completely changed the definitions of "Purchased Assets," including for the first time the securities transferred a few days before under the Repurchase Agreement. In this major change, all references to the "Long Positions" to be sold under the Asset Purchase Agreement were now erased. Instead, the definition of "Purchased Assets" was changed to include "the securities owned by LBI and transferred to [Barclays] or its Affiliates under the Barclays Repurchase Agreement . . . as specified on Schedule A previously delivered by Seller and accepted by [Barclays]. (A. 32 at ¶ 1(a)(ii).)[60]

120.    The post-hearing Clarification Letter also purported to add to "Purchased Assets" the "additional value" that Lowitt, Kelly and Tonucci had scrambled to assemble on September 19, while the Sale Hearing was going on and during the following weekend. These unauthorized additions to the deal made their way into the revised definition of "Purchased Assets" as "(B) such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B

---

[60] This erasure of the "Long Positions" and substitution of the assets transferred under the Repurchase Agreement first emerged in a draft of the Clarification Letter generated on September 20, 2008 at 2:39 p.m., after the Court issued the Sale Order. (A. 83 ¶ 1(a).) In a draft the prior evening, at approximately 7:30 p.m., the Clarification Letter still included the "Long Positions," but stated it was "understood that the Long Positions referred to in clause (d) of Purchased Assets do not have a book value of approximately $70 billion." (A. 74 ¶ 1(a).) Of course, a "book value" of $70 billion had never been correct; the purchase price of $70 billion had been agreed to reflect the $5 billion discount from the actual book value.

62

**(Excerpts) Notice of Filing of Unsealed Trustee's Rule 60(b) Motion and Related Declarations and Exhibits, Filed October 16, 2009, with Attached Unsealed Brief**

**Record pages: 59630 and 59374.**

A-1420

59360

William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

In re

    LEHMAN BROTHERS INC.,

                  Debtor.

Case No. 08-01420 (JMP) SIPA

## NOTICE OF FILING OF UNSEALED
## TRUSTEE'S RULE 60(b) MOTION AND RELATED
## DECLARATIONS AND EXHIBITS

    **PLEASE TAKE NOTICE** that on September 15, 2009, James W. Giddens (the

"Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor") filed

the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited

Relief Under Rule 60(b) (Docket No. 1682) (the "Rule 60(b) Motion"), Declaration of James B.

Kobak, Jr. in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or,

A-1421

59374

(i) finding that the Trustee's interpretation of the Clarification Letter and the DTCC Letter is correct and consistent with the transaction that the Court approved;

(ii) finding that, to the extent that the Clarification Letter or the TAA may be read to transfer any of the Disputed Assets to Barclays, these transfers were never approved by the Court and are therefore outside the scope of the Sale Orders;

(iii) to the extent that the Sale Orders authorize the transfer of any of the Disputed Assets to Barclays, granting the Trustee relief from the Sale Orders under Rule 60(b);

(iv) requiring an accounting of all assets which Barclays has received or to which it claims entitlement under the Sale Orders and the actual value of all liabilities that it assumed under the Sale Orders;

(v) permitting the Trustee to take further discovery as necessary to assess the transaction on an accurate and complete record; and

(vi) awarding such other and further relief as this Court finds just and proper.

**Jurisdiction And Venue**

11.     The Court has jurisdiction to decide this Motion pursuant to 15 U.S.C. § 78eee(b)(2) and (b)(4). This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended), and Rule 9024 of the Federal Rules of Bankruptcy Procedure. The Sale Orders also retained jurisdiction, pursuant to the Court's statutory powers under 28 U.S.C. § 157(b)(2), "to, among other things, interpret, implement, and enforce" their terms and provisions. (Maguire Decl. Ex. 1 (LBHI Sale Order) ¶ 20 (incorporated by reference in LBI Sale Order).)[2]

---

2.  References to "Maguire Decl." are to the accompanying Declaration of William R. Maguire in Support of the Trustee's Motion for Relief Pursuant to the Sale Orders or, Alternatively, for Certain Limited Relief Under Rule 60(b).

A-1422

**(Excerpts) Memorandum of Barclays Capital Inc. in Opposition to the Rule 60 Motions and in Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, Dated January 29, 2010**

**Record pages: 60608 and 60908 – 09.**

60608

Hearing date: March 25, 2010

Objections Date for Movants' Rule 60
Motions: January 29, 2010

Objections Date for Motion by Barclays Capital Inc.
to Enforce the Sale Order and Secure Delivery of All
Undelivered Assets: March 4, 2010

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

## MEMORANDUM OF BARCLAYS CAPITAL INC. IN OPPOSITION TO THE RULE 60 MOTIONS AND IN SUPPORT OF MOTION OF BARCLAYS CAPITAL INC. TO ENFORCE THE SALE ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

January 29, 2010

60908

634.    Third, to the extent the Committee is relying upon paragraph 25 of the Sale Order, that limitation on *further changes* — *i.e.* changes to the deal between the time of the Sale Order and Closing — does not apply to the provisions of the Clarification Letter challenged by Movants, as those provisions were part of the agreement between the parties before the Sale Hearing and described to the Court. The Sale Order approved the Purchase Agreement (including the Clarification Letter, even though not yet finalized), and Paragraph 25 provided a limitation on further changes to that Purchase Agreement, which *included* the Clarification Letter.  Had the terms of the Clarification Letter been reduced to writing in time for the Sale Hearing (as Weil indicated it had hoped to be the case) there would be no question that the restriction on changes in Paragraph 25 would refer only to any further (post-Sale Hearing) revisions to the Clarification Letter.  The result should not be any different simply because the Debtor and the Court (given the extraordinary circumstances) elected to proceed based upon a description of the changes that would be set forth in the Clarification Letter — namely, that certain Purchased Assets had lost value, others were being removed, and the precise identification of the "assets used in the Business" was being refined (all in a manner that was consistent with the APA, as explained below).

635.    For instance, part of the agreement reached as of Friday night and described to the Court was the removal of the upside sharing provision that was in the original APA.  That change was within the scope of what the Court approved at the Sale Hearing.  It would make no sense for Paragraph 25 to apply to that provision and to allow the Committee to prevent the Sale based on that provision.  Thus, Paragraph 25 does not apply to terms on which the parties reached agreement prior to the Sale Hearing and which were therefore part of the agreement

60909

described to the Court, and then reflected in the Clarification Letter. Paragraph 25 applies only to post-Sale Hearing changes to the parties' agreement.

### D. The Clarification Letter Did Not Have A Material Adverse Effect On The Estates.

636.    Even if the provisions of the Clarification Letter challenged by Movants were subject to the restriction contained in Paragraph 25 of the Sale Order (which they are not), there is no basis for concluding that the parties failed to comply with paragraph 25 in finalizing the Clarification Letter and proceeding with the Closing. Paragraph 25 provided that the Purchase Agreement (including the Clarification Letter) could be "modified, amended or supplemented" after issuance of the Sale Order and "without further order of the Court," so long as the parties agreed to such modification, and so long as the modification did "not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors, and the Purchaser." BCI Ex. 16 [Sale Order] at ¶ 25. The provisions in the Clarification Letter did not have a "material adverse effect on the Debtors estates," and they were clearly "agreed to by the Committee, the Debtors, and the Purchaser."

637.    The APA defined the Purchased Assets to be acquired by Barclays as including "*all* of the assets of Seller *and its Subsidiaries* used *in connection* with the Business (excluding the Excluded Assets)." BCI Ex. 1 [APA] at § 1.1, p. 6 (definition of "Purchased Assets") (emphasis added). This definition was narrowed in the Clarification Letter, which provides: "The Purchased Assets means (i) all of the assets of Seller used *primarily* in the Business or *necessary for the operation* of the Business (in each case, excluding the Excluded Assets) and (ii) *none of the assets of Subsidiaries* of LBHI (other than assets of LBI) except as otherwise specifically provided in the Agreement or this Letter." BCI Ex. 5 [Clarification Letter] at § 1(a) (emphasis added).

281

A-1426

**(Excerpts) Reply Memorandum of Barclays Capital Inc. in Further Support of Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, Dated April 5, 2010**

**Record pages: 61579 and 61611 – 12.**

A-1427

61579

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**REPLY MEMORANDUM OF BARCLAYS CAPITAL INC. IN FURTHER SUPPORT
OF MOTION OF BARCLAYS CAPITAL INC. TO ENFORCE THE SALE ORDER AND
SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

April 5, 2010

61611

would be both illogical and redundant for the parties to add language to the definition of Purchased Assets to accomplish the same result.

51.     The Trustee rests his illogical argument on the contention that "[t]he distinction between 'held' and 'posted' is an important one," because property "held" by LBI does not include property "posted" by LBI to a clearing corporation or exchange. Trustee Reply Br. at ¶ 101. That is not correct. First, as explained above, the plain language of the provision is not limited to property "held by LBI," but rather covers "any property held to secure obligations" under the ETDs — regardless of what entity holds the property. BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C). Second, the Trustee admits that the customer ETD margin that he agrees was to be transferred to Barclays was *both* "held by LBI" *and* posted at an exchange. *See, e.g.,* Trustee Reply Br. at ¶ 70 ("The disputed Margin Assets do not include customer property that customers deposited with LBI and that LBI *held* on behalf of its customers *at an exchange* or with other custodians.") (emphasis added).[34]

2.     ETD Margin Is Not An Excluded Asset Under the APA.

52.     The Trustee raises another new argument in his reply: that all of the ETD Margin is excluded from the definition of Purchased Assets by virtue of subparagraph (n) of the definition of Excluded Assets, which refers to "all assets primarily related to the IMD Business and derivatives contracts." Trustee Reply Br. at ¶¶ 77-82; BCI Ex. 1 [APA] at p. 4 (definition of Excluded Assets (n)). This subparagraph does not apply to "exchange-traded derivatives," which are publicly-traded futures and stock options, but instead applies solely to "derivatives contracts"

---

[34] The same logical inconsistency applies to the Trustee's argument (again, never before made) that Section 1(b) of the Clarification Letter excludes certain of the disputed ETD Margin. Trustee Reply Br. at ¶ 82. Section 1(b) of the Clarification Letter carves out of the acquired "Purchased Assets" any "government securities . . . *held by [LBI]* . . . ." BCI Ex. 5 [Clarification Letter] at § 1(b) (emphasis added). But this language is qualified with the phrase "except as otherwise specified herein or in the Agreement." *Id.* The government securities posted as ETD Margin are "otherwise specified" by Section 1(a)(ii)(C), stating that Barclays was acquiring "any property held to secure obligations" under the ETDs (just as similar securities were "otherwise specified" by their inclusion in the Repo collateral covered by Section 1(a)(ii)(B) of the Clarification Letter).

27

**61612**

that are entered into over the counter through bilateral transactions. This is clear from the plain language of the contract and from its logical structure and the actions of the parties after September 22, 2008.

53.    The Trustee's interpretation of subsection (n) of the Excluded Assets definition would make it directly inconsistent with the Trustee's own narrow reading of Section 1(a)(ii)(C). Subsection (n) excludes "all assets primarily related to . . . derivatives contracts." If the Trustee's interpretation were accepted, such that "derivatives contracts" means ETDs (which it does not), then subsection (n) would necessarily exclude the *customer margin* associated with those ETDs, because those assets are "primarily related" to the ETDs. Thus, the Trustee's reading of subsection (n) of Excluded Assets would nullify even the Trustee's (unduly narrow) reading of the ETD parenthetical.[35]

54.    In each instance in which the parties intended to refer to *exchange-traded derivatives*, they used the words "exchange-traded derivatives." *See, e.g.*, BCI Ex. 1 [APA] at § 1.1 (at p. 6, definition of Purchased Assets (d)); BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C). By contrast, where the parties intended to refer to other kinds of derivatives, they referred to "derivatives contracts." BCI Ex. 1 [APA] at § 1.1 (at p. 3, definition of Excluded Assets (l) ("derivatives contracts by Lehman Brothers Derivatives Products Inc.") and (n) ("IMD Business and derivatives contracts")).[36] It is not surprising, therefore, that the Trustee cannot point to a

---

[35] Moreover, the Trustee's interpretation of subsection (n) would make it directly inconsistent with any possible reading of the Section 1(a)(ii)(C). Subsection (n) excludes "all assets primarily related to . . . derivatives contracts." That language necessarily includes *the "derivatives contracts" themselves.* Thus, the Trustee's reading of subsection (n) would exclude the "exchange-traded derivative" *positions* themselves, which even the Trustee admits *are* to be included in the definition of Purchased Assets, as provided in paragraph 1(a)(ii)(C) of the Clarification Letter.

[36] *Compare* BCI Ex. 1 [APA] at § 1.1 definition of Purchased Assets at (d) ("exchange traded derivatives" are Purchased Assets) *with id* at § 1.1, definition of Excluded Assets at (l) and (n) (the only two places in the entire Purchase Agreement where the simple term "derivatives contracts" appears); BCI Ex. 5 [Clarification Letter] at § 1(a)(ii)(C); BCI Ex. 320 [Sept. 27, 2008 12:53 pm email from G. West to J. McCarthy, *et al.*, with attachments]

28

# (Excerpts) Post-Trial Memorandum of Law and Fact of Barclays Capital Inc., Dated November 22, 2010

**Record pages: 64697, 64841, and 65008.**

A-1431

64697

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**POST-TRIAL MEMORANDUM OF LAW AND FACT**
**OF BARCLAYS CAPITAL INC.**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

November 22, 2010

64841

(APA) at p. 4, ¶ (n). Without exception, when the parties intended to refer to "exchange-traded derivatives," they used the term "exchange-traded derivatives" — not the term "derivatives contracts," which was used solely to describe over-the-counter derivatives, which were *indisputably* excluded from the deal. BCI Ex. 1 (APA) at p.6; BCI Ex. 5 (Clarification Letter) at p.1; *see* FOF ¶ 31.10; *see also* BCI Ex. 124. As a matter of law, because the parties used different terms to describe "exchange-traded derivatives" (as in paragraph (d) of the APA's Purchased Assets provision) and "derivatives contracts" (as in paragraph (n) of the APA's Excluded Assets provision), it must be presumed that "they intend this language to mean different things." *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744-45 (7th Cir. 1996); *see also International Fidelity Insurance Company v. County of Rockland*, 98 F. Supp. 2d 400, 412-13 (S.D.N.Y. 2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning.").

249. Moreover, the exclusion of assets "primarily related" to "derivatives contracts" obviously means that *the derivatives contracts themselves* are also excluded assets, since they are obviously related to themselves. That means that the Trustee's argument would require the Court to conclude that subparagraph (n) *was excluding the exchange-traded derivatives positions themselves*: even Movants have never argued that, and the plain text of the APA and all the extrinsic evidence confirms that Barclays *was* acquiring the exchange-traded derivatives, and was *not* acquiring the over-the-counter derivatives contracts. *See* FOF ¶¶ 31.6-31.10. Thus, the Trustee's argument is illogical, proves too much, is contradicted by the plain terms of the APA, and must therefore be rejected. *See* COL ¶¶ 30, 31, 32, 39.9-39.10.

136

65008

43.4.1.2    Mr. Lewkow testified:

> "And Mr. Miller said something to the effect — I don't
> remember his words but said something to the effect, it
> seems to me that we haven't done anything in this
> clarification letter inconsistent with what we told the Court,
> that we don't have to go back. We can close as desired
> without having to go back to the Court. Does anyone
> disagree? And most of us don't like to disagree with Mr.
> Miller. But no one did disagree. And that was — and we
> proceeded on that basis.
>
> Q.    Let me ask you a question. I asked Mr. Miller
> during this trial — I read to him a comment, an assertion,
> presented to Judge Peck on April 9th, during the parties'
> opening arguments as to this decision that you've just
> testified about. At page 58, line 1 through 3, movants'
> counsel said, and I quote, said to Judge Peck, "But the fact
> remains not bringing the clarification back to Court is a
> mistake and an egregious one."
>
> What is your comment on that assertion?
>
> A.    I don't — at the time when Mr. Miller — the
> conversation I just testified to when he said what he said
> then seemed right to me. I didn't think we had changed
> any of the substance certainly to the negative to the estate.
> So it didn't seem to me we needed to go back then. And I
> agree with Mr. Miller's testimony."
>
> 8/31/10 Tr. at 72:21-73:17 (Lewkow).

43.4.2.    The Sale Order allowed for prospective approval of the Clarification Letter as
long as there would be no "material adverse effect on the Debtors' estates."
BCI Ex. 16 (Sale Order) at ¶ 25.

43.4.3.    The Court stated at the Sale Hearing that "[w]e must close this deal this
weekend." BCI Ex. 49 (9/19/08 Tr.) at 248:19.

43.4.4.    Dennis O'Donnell testified that the Creditors' Committee received the text of
the Clarification Letter on September 22, 2008 and did not tell Weil that there
were material changes that would require the Committee's consent:

> "Q.    Based on the text of the Clarification Letter, did Milbank
> ever tell Weil that there were material changes requiring Committee
> consent?
>
> A.    No."

143

A-1434

66727

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                Debtors.

Chapter 11

Case No. 08-13555

(Jointly Administered)

In re:

LEHMAN BROTHERS INC.,

                Debtor.

Case No. 08-01420 (JMP) SIPA

## STIPULATION AND ORDER BETWEEN THE TRUSTEE AND BARCLAYS CONCERNING CERTAIN CLAIMS UNDER PARAGRAPH 8(ii) OF THE CLARIFICATION LETTER MADE IN THE MOTION AND ADVERSARY COMPLAINT FILED BY THE TRUSTEE AND THE MOTION TO ENFORCE THE SALE ORDER FILED BY BARCLAYS

WHEREAS, the following motions have been filed with the Court by Lehman

Brothers Holdings Inc. ("LBHI" or the "Debtor"); James W. Giddens (the "Trustee"), as Trustee

for the SIPA liquidation of Lehman Brothers Inc. ("LBI"); and the Official Committee of

Unsecured Creditors (the "Committee" and, collectively with LBHI and the Trustee, "Movants")

seeking, *inter alia*, modifications of (i) the Court's Order Under 11 U.S.C. §§ 105(a), 363, and

365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and

Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B)

Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20,

2008, or (ii) the Court's Order Approving, and Incorporating by Reference for Purposes of this

Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman

Brothers Holdings Inc. Chapter 11 Proceeding; or both such Orders (individually or collectively,

the "Sale Order"):

66728

(1) Debtor's Motion for An Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated September 15, 2009 ("LBHI's Motion");

(2) The Trustee's Motion for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 ("Trustee's Motion"); and

(3) Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. §§ 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rule of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (and Related SIPA Sale Order) and Joinder In Debtor's and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order ("Committee's Motion");

(4) Motion of Lehman Brothers Holdings Inc., Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying The SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motion for Relief From SIPA Sale Order ("LBHI's Joinder"); and

(5) The Trustee's Motion to Join in Debtors' Motion for an Order Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2009 Sale Order and Granting Other Relief ("The Trustee's Joinder," and collectively with the above-referenced motions, the "Rule 60 Motions").

WHEREAS, pursuant to Paragraph 1 of the Scheduling Order concerning Certain

Motions Filed by LBHI, the Trustee, and the Committee "so ordered" by the Court on

October 27, 2009, the following adversary complaints have also been filed with the Court:

(A) Lehman Brothers Holdings Inc., v. Barclays Capital, Inc., Adv. Proc. No. 09-01731 (JMP) ("LBHI's Adversary Complaint");

(B) James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc., v. Barclays Capital Inc., Adv. Proc. No. 09-01732 (JMP) ("Trustee's Adversary Complaint"); and

(C) The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. v. Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc., Adv. Proc. No. 09-01733 (JMP) ("Committee's Adversary Complaint" and collectively with the above-referenced adversary complaints, the "Rule 60 Movants' Adversary Complaints").

66729

WHEREAS, Barclays Capital Inc. ("Barclays") also filed a Motion to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated January 29, 2010 (LBHI Docket No. 6815, LBI Docket No. 2582);

WHEREAS, counsel for Barclays, LBHI, the Trustee, and the Committee have agreed that certain claims made in the Rule 60 Movants' Adversary Complaints shall necessarily be resolved through the resolution of the Rule 60 Motions, while certain other claims made in the Rule 60 Movants' Adversary Complaints may not be resolved through the resolution of the Rule 60 Motions, but may instead require further adjudication;

WHEREAS, Barclays asserts that the Trustee was authorized to transfer, and did in fact agree to transfer, $769 million in securities from LBI's Customer Reserve Accounts held pursuant to SEC Rule 15c3-3, and that such transfer was authorized and agreed to irrespective of whether there were assets held in "excess" of the Rule 15c3-3 reserve requirement as of September 19, 2008 or any other date;

WHEREAS, Barclays also asserts that Paragraph 8(ii) of the Clarification Letter provides that even if there were an obstacle to the transfer of the $769 million in securities from LBI's Customer Reserve Accounts, the Trustee agreed to transfer "securities of substantially the same nature and value" to Barclays;

WHEREAS, the Trustee disputes these interpretations of the Clarification Letter, and asserts that the transfer of the $769 million in securities referenced in Paragraph 8(ii) of the Clarification Letter is conditioned on, among other things, there being a sufficient excess in LBI's Customer Reserve Accounts as of September 19, 2008, and the Trustee asserts that there is no such excess;

3

A-1437

66730

WHEREAS, Barclays asserts that it does not have sufficient access to all the books and records needed to conduct a Rule 15c3-3 reserve calculation for LBI at any date;

WHEREAS, Barclays, in Request #5 of its Third Request for Production of Documents to the Trustee, served on November 12, 2009, requested that the Trustee produce "[a]ny analyses, reconciliations or communications concerning the amounts held or required to be held, including but not limited to any excess amounts, in LBI's Reserve Account";

WHEREAS the Trustee objected to this Request on December 2, 2009, on grounds including work product privilege;

WHEREAS, on September 21, 2010, Barclays filed a motion to compel the Trustee to produce work product relating to LBI's Rule 15c3-3 reserve calculation from the Trustee's financial advisors at Deloitte & Touche (LBHI Docket No. 11515);

WHEREAS, the parties wish to avoid a dispute regarding Barclays' motion to compel and to avoid committing resources, including judicial resources, to issues that may not be necessary to resolve;

A-1438

66731

NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:

1. Barclays shall withdraw its motion to compel, filed on September 21, 2010, without prejudice to its ability to re-file such motion in the future.

2. Presentation of evidence relating solely to whether there was an excess in LBI's Customer Reserve Accounts on any date shall be deferred until such time as the Court determines whether Barclays' entitlement under Paragraph 8(ii) of the Clarification Letter is dependent on whether there was an excess in LBI's Customer Reserve Accounts as of any date. In the interim, the Trustee and Barclays agree that no party shall (i) present to the Court any additional evidence or testimony, either lay or expert, solely for the purpose of establishing or disproving the existence or non-existence of an excess in LBI's Customer Reserve Accounts on any date, including testimony from Daniel McIsaac or Peter Vinella, or (ii) ask the Court to enter any fact findings, and there shall be no fact findings, as to (a) the existence or non-existence of an "excess" in LBI's Customer Reserve Accounts as of any particular date, or (b) the ability of the Trustee to satisfy customer claims out of the property currently held by the Estate or the property that would be held if Barclays' demands for undelivered assets were satisfied. The Trustee and Barclays agree that in the event either of the other Rule 60 Movants seeks to present evidence or testimony or asks the Court to enter any fact findings contrary to the foregoing agreement between the Trustee and Barclays, Barclays reserves all its rights, including the right to declare this stipulation void and seek any and all appropriate relief.

3. In the event that the Court determines that Barclays' entitlement under Paragraph 8(ii) of the Clarification Letter is dependent on whether there was an excess in LBI's Customer Reserve Accounts as of any date, Barclays and the Trustee shall meet and confer in an

5

66732

effort to agree upon a process for resolving that factual issue. That process may involve further party and non-party discovery, or further court proceedings.

4. After the completion of the evidentiary hearings, closing arguments, and filing of final briefs in the Rule 60 proceedings has been completed (currently scheduled to be completed on November 21, 2010), Barclays may (but shall not be required to) seek additional discovery from the Trustee or third parties in an effort to obtain sufficient data to conduct its own calculation of LBI's Rule 15c3-3 reserve requirement. Should Barclays choose not to take such discovery, that shall not prejudice Barclays' entitlement to seek additional discovery when and if the Court finds that Barclays' entitlement to the $769 million in securities referenced in Paragraph 8(ii) of the Clarification Letter depends upon the existence of an excess in LBI's Customer Reserve Accounts.

5. The agreements embodied in this stipulation shall govern to the extent they are in conflict with the agreements embodied in the Stipulations and Proposed Orders between the Debtors, the Trustee, the Committee, and Barclays Capital Inc. Concerning Certain Claims Made in Adversary Complaints Filed by LBHI, SIPA Trustee and Creditors Committee, each of which were so ordered on January 13, 2010.

6. This stipulation is not intended to impact the finality of any judgment by the Court or impact any party's right to seek an appeal of any such judgment.

6

66733

Dated: October 4, 2010
New York, New York

By: ___/s/ Jonathan D. Schiller___
    Jonathan D. Schiller
    Hamish P.M. Hume
    Jack G. Stern

    BOIES, SCHILLER & FLEXNER LLP
    575 Lexington Avenue
    New York, NY 10022
    (212) 446-2300

Attorneys for Barclays Capital Inc.

By: ___/s/ Neil J. Oxford___
    William R. Maguire
    Neil J. Oxford

    HUGHES HUBBARD & REED LLP
    One Battery Park Plaza
    New York, New York 10004
    (212) 837-6000

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**SO ORDERED:**

Dated: New York, New York
    January 6, 2011

        ___*s/ James M. Peck*___
        UNITED STATES BANKRUPTCY JUDGE

7

A-1441

**(Excerpts) Stipulations of Fact,
Filed January 6, 2011**

**Record pages: 66738 and 66753 – 54.**

A-1442

66738

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS, INC., | SIPA Proceeding Case No. |
| Debtor. | 08-01420 (JMP) |

STIPULATIONS OF FACT

Barclays Capital, Inc. ("Barclays"), Lehman Brothers Holdings, Inc. ("LBHI"),
the Trustee in the Securities Investor Protection Act proceedings (the "Trustee"), and the
Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc. (the
"Creditors' Committee" or the "Committee") (collectively with LBHI and the Trustee,
"Movants"), hereby stipulate that for the purposes of this matter only, the following
statements may be taken as true, subject, however, to the right of any party to object to
the admissibility, relevancy or materiality of any of the statements or any document or
testimony referenced in any of the statements:

1.      Mr. Azerad testified that as Global Head of Asset and Liability
Management for Lehman, he had a large number of people reporting to him from three
groups, only one of which was liquidity management.

2.      At the time of the Sale Transaction, Azerad reported to Paolo Tonucci.

NY14271696v3

66753

138. In connection with the Sale Transaction, the assets that Lowitt was instructed to identify beginning on September 19, 2008 were assets in addition to those included in the Repurchase Agreement.

139. In connection with the Sale Transaction, the term "unencumbered assets" was sometimes used to designate assets identified as available to be transferred to Barclays as Purchased Assets.

140. On Friday September 19, Lehman executives reported to Barclays that they had identified additional value in: (1) unencumbered collateral located in LBI's "clearance boxes" that was marked by Lehman at approximately $1.9 billion and (2) an excess amount of value held in LBI's customer reserve account, which was estimated by Lehman to be over $1 billion.

141. Mr. Lowitt and his team identified "unencumbered assets" marked by Lehman as being worth approximately $1.9 billion.

142. Some listings of the unencumbered "clearance box" assets identified over the weekend of September 19, 2008 through September 21, 2008 showed Lehman marks as high as $2.3 billion.

143. The Clarification Letter, dated as of September 20, 2008, was finalized and executed on September 22, 2008.

144. The Court did not review the Clarification Letter prior to or at the Sale Hearing on September 19, 2008.

145. In the week before the Sale Hearing, the DTCC had concerns about LBI's ability to satisfy its liabilities to the DTCC in connection with its open trading positions.

66754

146.   On early Monday morning, September 22, 2008, the DTCC, Barclays, and the Trustee executed the DTCC Letter.

147.   Barclays claims that it is entitled to $769 million of securities that LBI had maintained in a reserve account pursuant to SEC Rule 15c3-3 or securities of substantially the same nature and value.

148.   Approximately $1.3 billion in cash assets held at the OCC has already been transferred to Barclays.

149.   LBI included approximately $507 million of its deposits at the OCC as a debit item in computing its required reserve for the protection of customers under Rule 15c3-3.

150.   The Trustee signed the Transfer and Assumption Agreement ("TAA") late on September 19, 2008, or early on September 20, 2008.

151.   The OCC and Barclays executed the TAA over the weekend of September 20-21, 2008 and/or on the morning of September 22, 2008.

152.   In connection with the Sale Transaction, Barclays paid $238,200,978 in contract cure liabilities through July 14, 2009.

153.   Chase agreed to release a lien it held on LBI's account to effect the December 2008 Settlement.

154.   On or about February 9, 2009, Barclays announced its financial results for the year ending December 31, 2008.

155.   In February 2009, Barclays announced that it had secured a £2.262 billion gain from its acquisition of Lehman's North American business.

66795

FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------

In re                                          :        Chapter 11
                                               :
                                               :        Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., *et al.*,        :
                                               :        (Jointly Administered)
              Debtors.                         :
                                               :
--------------------------------------------------------------

--------------------------------------------------------------
                                               :
In re                                          :
                                               :        Case No. 08-01420 (JMP) SIPA
LEHMAN BROTHERS INC.,                          :
                                               :
              Debtor.                          :
                                               :
--------------------------------------------------------------

**OPINION ON MOTIONS SEEKING MODIFICATION OF THE SALE ORDER**
**PURSUANT TO RULE 60(B), THE TRUSTEE'S MOTION FOR RELIEF UNDER THE**
**SIPA SALE ORDER, BARCLAYS' CROSS-MOTION TO ENFORCE THE SALE**
**ORDERS AND ADJUDICATION OF RELATED ADVERSARY PROCEEDINGS**

JONES DAY
*Attorneys for Lehman Brothers Holdings Inc., et al.*
222 East 41st Street
New York, New York 10017

          Robert W. Gaffey, Esq.
          Jayant W. Tambe, Esq.
          William J. Hine, Esq.
          Tracy V. Schaffer, Esq.

66796

QUINN EMANUEL URQUHART & SULLIVAN LLP
*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*
51 Madison Avenue, 22nd Floor
New York, New York 10010

> Susheel Kirpalani, Esq.
> James C. Tecce, Esq.
> Eric M. Kay, Esq.
> Robert K. Dakis, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004-1482

> William R. Maguire, Esq.
> Seth D. Rothman, Esq.
> Neil J. Oxford, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
1775 I Street, N.W., Suite 600
Washington, D.C. 20006

> John F. Wood, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
575 Lexington Avenue
New York, New York 10022

> Jonathan D. Schiller, Esq.
> Jack G. Stern, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

> Hamish P. M. Hume, Esq.

2

66797

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
333 Main Street
Armonk, New York 10504

    David Boies, Esq.

U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for U.S. Securities and Exchange Commission*
100 F Street, N.E.
Washington, D.C. 20549-8030B

    Jacob H. Stillman, Solicitor
    Katharine B. Gresham, Assistant General Counsel
    Mark Pennington, Assistant General Counsel
    Dimple Gupta, Attorney

U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for the U.S. Securities and Exchange Commission*
3 World Financial Center
New York, New York 10281

    Alistaire Bambach, Esq.
    Patricia Schrage, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for the Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, D.C. 20005

    Josephine Wang, General Counsel
    Kenneth J. Caputo, Senior Associate General Counsel

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

## I.   Introduction

*A.*   *Overview of Opinion*

These matters arise out of the hurried, at times harried and now challenged sale of assets

to Barclays Capital Inc. ("Barclays") under Section 363 of chapter 11 of title 11 of the United

66798

States Code (the "Bankruptcy Code"). Before the Court are motions for relief under Federal Rule of Civil Procedure 60(b) (the "60(b) Motions") from the order approving the sale to Barclays entered on September 20, 2008 (the "Sale Order"), a related motion by Barclays to secure delivery of certain undelivered assets (the "Disputed Assets") and three separate adversary proceedings brought against Barclays by each of the moving parties (the "Movants[1]") that filed the 60(b) Motions. The proceedings have illuminated the factual background of the largest, most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy history – the sale to Barclays by Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Inc. ("LBI") and certain of their affiliates (together, "Lehman") of assets collectively comprising the bulk of Lehman's North American investment banking and capital markets business (the "Broker-Dealer Business").

The lengthy trial provided an opportunity to review in slow motion and from multiple vantage points the circumstances of an acquisition that had to proceed so very quickly due to the need for speed to salvage the Broker-Dealer Business after LBHI's unplanned bankruptcy filing on September 15, 2008. The evidentiary hearings relating to the 60(b) Motions took place over a thirty-four day period from April through October 2010. Following the close of the record, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law in late November. These submissions are encyclopedic in their scope and attention to detail, and they offer insights as to the motivations and behavior of many of the key actors during the most momentous week of the greatest financial crisis of our lives. The trial itself was a showcase of outstanding advocacy uniformly conducted at the highest professional level.

---

[1] The Movants are Lehman Brothers Holdings Inc., the Official Committee of Unsecured Creditors (the "Committee") and the Trustee of Lehman Brothers Inc. under the Securities Investor Protection Act (the "SIPA Trustee").

4

66799

Approximately thirteen billion dollars is at issue, but the amount in dispute is only one of the reasons that this litigation has attracted so much attention. Foundational principles of bankruptcy jurisprudence are also being tested. The 60(b) Motions constitute a most unusual after the fact challenge to the fairness of a transaction of global significance, a transformative business combination in the financial services industry that was accomplished at a time of fear and major dislocation in the markets. The resulting litigation is highly visible due to interest in the Lehman bankruptcy, the large sums involved and the extraordinary nature of the relief being sought. Because the 60(b) Motions seek to overcome the finality and binding effect of the Sale Order that was entered at the height of the financial crisis and *that has also been affirmed on appeal*, these motions are unprecedented in challenging the very same order that the Movants themselves (other than the Committee) defended throughout the appellate process.

The circumstances of these proceedings may be exceptional, but the core legal principles are familiar ones that are generally applicable in other chapter 11 cases. The issues governing the right to relief under Federal Rule of Civil Procedure 60(b) ("Rule 60(b)") are the same ones that might arise in any challenge to a final order authorizing a sale of assets under Section 363 of the Bankruptcy Code. These issues are grounded in the tension between the right of aggrieved parties to obtain relief from final orders for cause shown and the right of purchasers of assets from a chapter 11 debtor to rely with confidence on the integrity and enforceability of final sale orders that have been entered by the bankruptcy courts, especially those that have been affirmed following appellate review.

This tension relating to finality naturally exists to some extent in every motion under Rule 60(b), but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice. Sale orders

5

**66800**

ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders. The Court is well aware, however, that the language of Rule 60(b) setting forth grounds for relief from a final order has general application to all orders including sale orders and that no order is exempt from this type of relief for cause shown.

This broadly framed right to relief under Rule 60(b) in the case of sale orders must be balanced against the well-recognized bankruptcy policy that encourages third parties to buy assets from debtors for the ultimate benefit of creditors and that protects third parties that have purchased assets from a debtor in good faith reliance on an order of the bankruptcy court. A basic question addressed in this Opinion is whether the Movants have shown sufficient special circumstances to authorize the granting of relief from the Sale Order that was entered here in the face of a profound emergency, that thereafter was affirmed by the United States District Court for the Southern District of New York (the "District Court") and that Movants did not challenge until one year later after the financial crisis of 2008 had subsided and markets had stabilized. Because the Sale Order was the essential means to the end of completing this crucial acquisition, the Court believes that something greater than ordinary mistake or inadvertence must be proven to overcome the finality and binding effect of that order.

As explained in this opening narrative and in the following sections of this Opinion, Movants have proven that some very significant information was left out of the record of the hearing on Lehman's motion to approve the sale of the Broker-Dealer Business to Barclays held on September 19, 2008 (the "Sale Hearing") — facts that in a more perfect hearing the Court would have known. Despite what in retrospect appears to be a glaring problem of flawed disclosure, Movants have not carried their burden in establishing a right to relief from the Sale

6

66801

Order under Rule 60(b) because this new information would not have changed the outcome of the Sale Hearing or altered the form and content of the Sale Order in any material respect. Importantly, the failure to disclose material information in this case does not involve fraud, misrepresentation or misconduct. If the evidence had demonstrated such improprieties and abuses, relief under Rule 60(b) in all likelihood would have been granted.

A number of the issues in dispute also depend upon the enforceability and interpretation of a document dated September 20, 2008 and finalized on September 22, 2008. The parties identify the document as the clarification letter (the "Clarification Letter"). The Clarification Letter is identified in the text of the Sale Order and was in the early stages of being drafted when that order was entered. The document went through a number of revisions during the weekend immediately following the Sale Hearing, but the final form of the Clarification Letter was never presented for bankruptcy court approval. Instead, the parties decided among themselves that approval was not required and then caused the executed Clarification Letter to be filed on the docket on September 22, 2008. Thereafter, the parties to this letter agreement relied upon the document as if it had been approved under the original Sale Order and for all purposes treated the Clarification Letter as a binding agreement. The Clarification Letter stands out as a critically important transaction document that purports to change and "clarify" some fundamental terms of that certain Asset Purchase Agreement dated as of September 16, 2008 among LBHI, LBI, LB 745 LLC and Barclays (together with the First Amendment To Asset Purchase Agreement, dated September 19, 2008,[2] the "APA") even though it was not formally blessed by separate order.

The failure to obtain such an order adds a layer of extra doubt to consideration of the demands by Barclays to recover the Disputed Assets and leads to some nagging questions about the enforceability and binding effect of what amounts to a vital side letter or amendment to the

---

[2] The First Amendment Clarifying Asset Purchase Agreement is referred to herein as the First Amendment.

A-1452

66802

APA – one never presented to the Court for approval – that makes major changes to the structure of the acquisition and that affects property rights of entities that quite obviously are subject to the Court's jurisdiction under the Bankruptcy Code and provisions of the Securities Investor Protection Act of 1970 ("SIPA").

The Clarification Letter includes any number of clarifications that are really more than that – they are important additions or alterations designed to match the documentation for the transaction with the evolving business understandings of the parties. Some of these provisions are either radically different from anything presented at the Sale Hearing or in actual conflict with statements made during that hearing. This is a document that should have been subjected to further judicial oversight, either to confirm that it was in fact covered by the language of the existing Sale Order or to obtain express bankruptcy court approval for these agreed changes to the APA. The Court has little doubt that such a further hearing would have been requested if there had not been such inordinate timing pressure to immediately close the acquisition.

Despite the lack of explicit bankruptcy court approval and in recognition of the conduct of the parties in relying on the Clarification Letter as a controlling document, the Court has decided to treat the document as having been approved by virtue of the combination of references made to the Clarification Letter in the Sale Order and the conduct of the parties demonstrating unequivocal reliance on the document. Consequently, the Clarification Letter is enforceable and will be interpreted in a manner that is consistent with the record of the Sale Hearing. That record makes clear that Lehman cash is excluded from the purchase and does not expressly mention certain additional categories of assets that were specified for the first time in drafting the Clarification Letter. These newly described assets were identified or discovered on the morning of the Sale Hearing in the course of a final search by Barclays for additional assets

8

66803

(the so-called "asset scramble"). The asset scramble yielded the three disputed asset classes that are now the subject of the motion by Barclays to compel delivery of the Disputed Assets. These assets, described more fully below, are the 15c3-3 assets (the "15c3-3 Assets"), margin related to exchange traded derivatives (the "Margin Assets") and assets in clearance boxes (the "Clearance Box Assets").

The Court denies relief under Rule 60(b) to the Movants, grants the motion of Barclays to recover the Clearance Box Assets, and denies that motion as it relates to the Margin Assets and the 15c3-3 Assets. The decision to deny 60(b) relief is based on the failure of the Movants to show that the outcome of the Sale Hearing would have been different if all material facts (including those relating to the structure of the transaction and the value of the acquired assets) had been disclosed. The determination of the motion by Barclays to recover the Disputed Assets depends upon a nuanced interpretation of the Clarification Letter in light of the record of the Sale Hearing, the language of the document and extrinsic evidence concerning the negotiation and drafting of that language. The immediately following sections of this Introduction provide observations regarding a number of the key issues presented in this litigation.

B.     *The 60(b) Motions Have Emphasized Information That the Court Did Not Know and Should Have Known, But This Information Would Not Have Changed the Outcome of the Sale Hearing*

The 60(b) Motions rest on the proposition that the Court was not fully informed when it entered the Sale Order approving the sale of the Broker-Dealer Business and that Barclays, with the active and complicit assistance of certain senior executives of Lehman with allegedly conflicting loyalties, ended up with too favorable a deal during a period of market turmoil, uncertainty and confusion. Stated simply, the 60(b) Motions allege that Barclays should forfeit the protections of the Sale Order, even though that order is final and has been affirmed on

66804

appeal, because it achieved a substantial windfall gain as a result of buying financial assets at a deep discount from fair value to the detriment of all creditors of the Lehman estates. These motions are premised on the troubling notion that material information relating both to the value of the assets being sold and the means for implementing the transaction was not disclosed to the Court. Barclays disagrees strongly with this assertion and submits that the Court acted properly and was given all necessary evidence under the exigent circumstances to approve the sale, that the 60(b) Motions should be denied in all respects and that Barclays should be awarded the Disputed Assets.

Barclays points out, among other things, that the Movants knew about the so-called discount yet chose to align themselves with Barclays and steadfastly supported the Sale Order throughout the appellate process that led to the decision of the District Court affirming the Sale Order. Barclays has portrayed the Movants as parties who were content to accept the obvious benefits of the Sale Order while the markets were unsettled during the early stages of the bankruptcy case and who now are pursuing claims for incremental consideration from Barclays after the markets have recovered and it has become safe for them to seek extraordinary relief.

Barclays has denied that there are legally sufficient grounds to support such relief and has explained that the acquisition was structured from the outset to include a favorable spread between long and short positions (described by its senior officers as a "buffer"), that this feature of the transaction was publicly disclosed immediately after signing of the APA (although not disclosed in so many words to the Court), that its acquisition balance sheet (the "Acquisition Balance Sheet") fairly reflects sound valuation and accounting judgments made after consultation with its independent auditors and that its multi-billion dollar gain on acquisition reflected the negative goodwill of a business combination that, from the perspective of Barclays,

10

66805

always was intended to be capital accretive and to include an assortment of intangible assets that were of no value to the estate after filing for bankruptcy and were not separately valued at the time of the acquisition.

The urgent sale to Barclays took place during the terribly stressful days immediately following LBHI's bankruptcy filing and was one of the landmark events of the extraordinary week from September 15 through September 22, 2008 (labeled by the Court as "Lehman Week" for purposes of this Opinion). At the time, the transaction was regarded by many as an admirable, even heroic, achievement that helped to salvage jobs, preserve going concern values and provide for the orderly transition of many thousands of brokerage accounts to a financially secure firm with the resources to manage and service the financial assets held in those accounts. The widely-held belief was that without the virtually immediate rescue by Barclays the direct and indirect damage to Lehman, its customers, creditors, and the entire financial system resulting from the bankruptcy would have been even more devastating. The perception during Lehman Week was that the transaction with Barclays benefitted all interested parties, mitigated systemic risk and helped to save every one of us from an even greater economic calamity. Nothing in the voluminous record presented to the Court in these protracted proceedings has done anything to change that undeniably correct perception.

The sale was the only available transaction at a time of unrivaled worldwide financial distress bordering on panic. The APA needed to be approved, not conditionally with exposure to the potential risks of hindsight challenges, but absolutely and finally. In exercising its discretion to approve the transaction described in the APA, the Court recognized that it was dealing with an uncommon emergency but is satisfied that it still managed to comply with all applicable requirements of the Bankruptcy Code and of procedural due process. The District Court

11

66806

affirmed the correctness of that conclusion in an appeal in which the Movants collectively supported (or, in the case of the Committee, did not oppose) this Court's approval of the sale.

The 60(b) Motions do, however, prompt the Court to engage now in a careful inquiry as to whether what was not disclosed regarding the transaction so impaired the Court's ability to properly evaluate the overall fairness of the terms of the acquisition that Barclays should lose the protections of the Sale Order and become exposed to multi-billion dollar claims for additional consideration. Having dwelled at some length on this question, the Court concludes that nothing in the current record, if presented at the Sale Hearing, would have changed the outcome of that hearing. The Court still would have entered the very same Sale Order because there was no better alternative and, perhaps most importantly, because the sale to Barclays was the means both to avoid a potentially disastrous piecemeal liquidation and to save thousands of jobs in the troubled financial services industry.

C.      *The Broker-Dealer Business Had to Be Sold in a Great Hurry to Save Jobs, Preserve Going Concern Value and Minimize Claims Against the Estate*

The APA represented the best possible alternative for Lehman's employees at a time when the proverbial "ice cube" was melting. The Court knew that the Broker-Dealer Business was being sold to the one buyer in a position to employ thousands, to protect customers and to maintain the on-going operations of what had been Lehman's core business. While it is true that a number of highly relevant and clearly important disclosures were not made at the Sale Hearing, those failures to disclose are far outweighed by the fact that the Court was well enough informed to approve the acquisition with complete confidence that it was better than any alternative. Indeed, it was the only alternative.

Effective management of a financial services business requires a highly-skilled workforce. That was true for Lehman, and the value of its Broker-Dealer Business depended

12

66807

upon the relationships, sophisticated knowledge and experience of that workforce. In the aftermath of the bankruptcy filing, employees were leaving the firm in great numbers, and without a going concern sale that provided assurances of continued employment, there would be nothing left for Lehman to sell other than a substantial book of assets discounted by the distressed circumstances of a liquidation sale in a most uncertain market. That reality and the desire to save the enterprise drove the professionals responsible for documenting the acquisition to work under extraordinary time pressure to accomplish within a few days what ordinarily would take weeks or longer.

Knowing that approval of the transaction would save a multitude of financial sector jobs probably was the most significant single factor influencing the Court's thinking when it considered the sale. The transaction included offers of employment to most members of the Lehman work force that not only helped these individuals at a most difficult time on Wall Street, but also unquestionably was good for the estate, brokerage customers and the general economy. A going concern sale to Barclays also was the one way to eliminate claims of employees for lost wages and benefits as well as claims of counterparties for potential damages arising under a variety of executory contracts with Lehman. Assumption of these obligations by Barclays meant that the Lehman bankruptcy estate would avoid exposure to liability for many claims that could only be estimated.

The trial has focused attention on whether the estimates in the APA for these compensation and cure expenses ("comp and cure") were inflated as part of a conscious effort to make it appear that Barclays was paying more for the acquired assets, but the Court has not given much weight to this evidence in its current deliberations. It is true that the estimates were incorrect and turned out to be excessive in relation to the actual amounts paid by Barclays for

13

66808

comp and cure, but the Court did not rely on the pinpoint accuracy of these estimates when it approved the sale to Barclays (although it did believe that the numbers provided were reasonable and represented the best good faith estimates of potential exposure at the time). The number provided for cure costs turned out to be materially overstated and unreliable, but the Court does not conclude that the discrepancy is the result of a deliberate effort to make it appear that Barclays would be paying more for these liabilities. What mattered most to the Court about comp and cure was the knowledge that Barclays was picking up all of these expenses, whatever they might turn out to be, thereby satisfying the entire universe of comp and cure claims that might otherwise have been asserted against the estate.

D.     *Context Matters, and the Urgency of Lehman Week Is an Inescapable Factor Impacting Both the Expedited Approval of the Sale to Barclays and the Decision Not to Revisit that Sale Now*

The sale to Barclays was and remains to this day truly extraordinary in that Barclays, without prior planning, agreed to purchase the Broker-Dealer Business almost immediately after the bankruptcy filing, and the sale process itself was expedited to the point of raising some very real due process concerns. The Sale Order was entered only five days after commencement of the LBHI case and within hours after the filing of the LBI case. That is a speed that takes ordinary transactional coping skills to the breaking point and beyond. This was also all occurring at a time of market disruptions unlike anything ever experienced since the dawn of the age of electronic trading and globally connected markets, and sophisticated market participants were unsteady and losing their composure.

Lehman Week certainly was no ordinary week. Each day brought with it a new systemic shock. Merrill Lynch had just been sold to Bank of America in a hastily-arranged transaction. Lehman filed for bankruptcy relief in the early morning hours on September 15th (the "Filing

14

66809

Date") after running out of options, and AIG was bailed out by the Federal Reserve the very next

day. Seasoned observers too young to recall the Great Depression had never seen anything to

match these disastrous events. By the end of the week, Goldman Sachs and Morgan Stanley had

sought refuge under the Bank Holding Company Act to achieve greater operational stability and

security. By virtue of astonishingly fast-moving market forces, venerable Wall Street institutions

were toppling, being rescued or restructured on a daily basis. Financial counterparties had

reason to distrust the soundness of blue chip firms with once seemingly unimpeachable

credentials.

   This loss of confidence was fueled by widespread skepticism concerning the underlying

financial strength and reliability of balance sheets that included illiquid and hard-to-value

securities backed by subprime assets. These securities and other structured financial products

had been widely disseminated to financial institutions throughout the world. Just about every

major bank had to make tough judgment calls as to the valuation of these highly-complex and

now-suspect structures and faced questions as to the fair value of these assets. This difficult

week ushered in an uncertain and volatile period when trust was in very short supply and

incremental risk was something to be avoided.

   At this very time of market turmoil and reduced tolerance for risk, Barclays chose to act

boldly and seized the opportunity to greatly expand its business platform in North America.

Barclays was particularly well situated to move forward opportunistically because in the days

immediately preceding the Lehman bankruptcy, it had been engaged in intense negotiations to

purchase Lehman's global business operations in their entirety. Those prepetition negotiations,

while unsuccessful, served as a prelude to and essential preparation for a high-speed emergency

66810

bankruptcy acquisition and placed Barclays in a uniquely advantageous position relative to any other institution that might be interested in competing for the Lehman franchise.

After the bankruptcy, Barclays, at the suggestion of Lehman's President Bart McDade, promptly renewed discussions regarding a possible acquisition and, by September 16, had come to terms on the elements of a transaction in which it would purchase Lehman's investment banking business as detailed in the terms and conditions of the APA. The impact of the transaction was enormous for both parties. For Lehman, it meant a going concern sale that would save the jobs of about ten thousand employees and allow for the orderly transfer of customer accounts, thereby minimizing further market disruptions. For Barclays, it was a strategic acquisition that, virtually overnight, would enable it to become a leading player in the North American capital markets. Given the tumultuous and unpredictable state of the financial markets at the time, this was a bold business decision for Barclays that required full-time attention and immediate execution. Everything happened very quickly, and, in retrospect, especially in light of all of the litigation that has ensued, perhaps too quickly.

The Broker-Dealer Business was "melting." Images of employees leaving with their office possessions in cardboard boxes portrayed an unplanned exodus of the firm's human resources; employees quite literally were walking out the door apparently with the expectation of never returning. Lehman had a desperate need for an expedited sale to preserve jobs and to hold on to what it could of its going concern value and the firm's intellectual capital. Barclays knew that it had to act at once and that it had the luxury of leverage because achieving its strategic objective was optional and would only occur on terms favorable to Barclays.

Barclays was unwilling to allow its transformative corporate vision to potentially impair its own capital base, especially at a time of such unusual turbulence in the markets. Its board

16

66811

instructed management that the transaction could only proceed if it were capital accretive. This directive from the board of Barclays was not communicated by anyone to the Court. The Court only knew what could be gleaned from pleadings, the statements of counsel and the evidence presented at the hearing to approve bidding procedures on September 17 (the "Bid Procedures Hearing") and the Sale Hearing that commenced on September 19 in the late afternoon and concluded in the early morning hours of September 20.

The Court knew while presiding at the Sale Hearing that everything was happening so fast that errors, omissions and miscommunications were bound to occur. Also, given the scale and complexity of the matters being presented and the limited time to process all of this information, it was impossible to fully comprehend every aspect of the acquisition, which had changed between the Bid Procedures Hearing on the 17th and the start of the Sale Hearing on afternoon of the 19th, or to precisely determine the fair value of all of the assets that were being transferred.

The Court has coined the term the "fog" of Lehman to characterize the confusion, ambiguity and uncertainty that prevailed during Lehman Week, something akin to the classic expression the "fog of war." Time was compressed and work was being performed under inordinately stressful conditions. Many of the smartest and most sophisticated people on Wall Street were confronting a frightening array of challenges and had to make decisions with imperfect information, draft documents and act so quickly that events began to blur.

As if describing a scene from a war zone, witness after witness during the trial conveyed recollections of personal experiences, perceptions and understandings during the chaos and confusion of Lehman Week. Repeatedly, witnesses described scenes in which countless unnamed individuals (lawyers, traders and bankers) participated in around-the-clock separate

17

**A-1462**

66812

negotiating sessions that were occurring simultaneously in multiple conference rooms at Lehman's headquarters building at 745 Seventh Avenue and the offices of Weil, Gotshal & Manges, Lehman's bankruptcy counsel. Coordination was difficult. Just about everyone involved during this catastrophic week also was sleep deprived and stressed out. No one individual possibly could have had a complete appreciation for what was taking place during these marathon negotiating and drafting sessions. Bart McDade, who served as Lehman's chief negotiator and Harvey Miller, Lehman's lead outside lawyer, probably come the closest to being the most fully informed at a senior level. They each tell a story of an honest effort to make the best of a very bad situation, and their testimony does not support relief from the Sale Order.

The APA and the Clarification Letter, the two most centrally important documents in this litigation, were generated during this highly-pressurized atmosphere described as organized chaos by Harvey Miller, a description validated by the testimony of other witnesses. Given the chaotic circumstances, some misunderstandings, mistakes and disagreements relating to the transaction in general and these two documents in particular were foreseeable, but the Court finds no support for the proposition that the resulting disclosure problems and disputes were caused by willful misconduct, deliberate misrepresentations or the intentional withholding or concealment of relevant information during the Sale Hearing. Instead, it appears that the failure to provide a coherent and complete narrative of the transaction was circumstantial and not due to any conscious decision to hide the truth. The need for speed, while not an excuse for inadequate disclosure, is the best explanation for those lapses in full disclosure at the Sale Hearing that have become the main focus of this litigation.

18

66813

E.   *The Court Did Not Know About the "Buffer" Required By Barclays or the "Take Out" By*
    *Barclays of the New York Fed, But Knowledge of These Facts Would Not Have Affected*
    *the Sale Order*

Movants have changed from supporters to opponents on the basis of information about

the transaction that they assert came to light as a result of discovery conducted after the

conclusion of the appeal to the District Court. In particular, they argue that they are entitled to

relief from the Sale Order because the Court knew nothing about the existence of a multi-billion

dollar discount in the value of acquired financial assets and was not told about a major structural

change to the transaction involving the agreement by Barclays to "take out" Lehman's

obligations to the New York Federal Reserve Bank (the "New York Fed") under a repurchase

agreement that enabled Barclays to achieve its acquisition objective of a $5 billion "buffer"

between the value of acquired assets and related liabilities to the New York Fed.

Indisputably, facts regarding this "buffer" were not disclosed during the Sale Hearing, but

the Court has determined that the revelations on this subject are not entitled to much weight now

because the Court was not concerned, one way or the other, about the existence of a spread

between the value of assets and liabilities. The numbers involved, of course, are huge and

represent a significant potential recovery for the Movants. While evidence of the buffer is

indicative of material information that the Court did not know when it approved the sale, these

disclosures do not support relief from the Sale Order because the overall transaction with

Barclays, notwithstanding the buffer, provided the means for the most favorable disposition of

these assets with the least amount of risk.

At the Sale Hearing, no one represented that there was to be any rough equivalence

between the value of assets and liabilities, and the Court did not base its approval of the sale on

the concept of a "wash" or on any conclusion as to the reasonableness or presumed accuracy of

A-1464

66814

the $47.4 billion value ascribed to the loosely-described assortment of financial assets that was being acquired by Barclays. Lori Fife, LBHI's counsel, mentioned that number at the start of the Sale Hearing to illustrate the sharp and unexpected drop in value from the $70 billion figure that had appeared a few days earlier in the APA, but that number was referenced only once in colloquy as an indication of the terrible market conditions during Lehman Week and played no role whatsoever in the deliberations regarding approval of the sale. That information, however, did contribute to a greater sense of urgency to proceed immediately with the sale rather than to run the risk of an even greater drop in values that might result from the forced liquidation of these assets.

The Court placed considerable reliance on the offers of proof and testimony that supported approval of the sale and the emphatic endorsements of the transaction made in open court by representatives of the federal regulators. These representatives of the regulators were unanimous and unqualified in their support, and the unmistakable impression was that approval of the APA with Barclays most definitely was in the public interest and was needed to contain incremental systemic risk and to protect customers and creditors alike.

Approval ultimately rested on the strength of a general proposition, supported by the testimony of Barry Ridings of Lazard, that this going concern sale to Barclays manifestly was more favorable than any other disposition of Lehman's assets. Mr. Ridings stands by that testimony and offered the same opinion in his video deposition that was played during the trial. The Court agrees with the position articulated by Barclays that the Court had an adequate record to support all findings in the Sale Order and that the newly-presented facts, while very significant to be sure, do not change the essence of the approval process and would not have made any difference in the Court's ruling.

20

66815

The Court concludes on the basis of the mostly congruent and consistent testimony of those who took part in the expedited negotiations of this acquisition that the APA and the Clarification Letter were the product of arm's-length negotiations, that Barclays acted in good faith (while still pressing hard for the very best deal it could get), and that mark-to-market valuation judgments during Lehman Week were uncertain at best due to extreme market volatility. Whatever the Court did not know at the time about the specifics of the sale does not appear to have been withheld deliberately.

Greater transparency always is preferable but is not always feasible. The conclusion reached here is that the disclosure that took place during the Sale Hearing was adequate under the circumstances and additional disclosure, while highly desirable, would not have made any difference in the outcome. Also, in evaluating the evidence, the Court thinks that the mismatch in valuation is something of a red herring. The Movants, in seeking relief from the Sale Order, have stressed what the Court did not know and the importance to the Court's deliberations of not having been told about the now-revealed five billion dollar mismatch between the values of the financial assets and related liabilities, but the Court, having reflected on its role during Lehman Week, is unconvinced that knowing about the mismatch would have changed anything.

While this was not an "anything goes" situation, the reality is that the transaction with Barclays would have been approved in any event because, taken as a whole, it was demonstrably better for all parties than any alternative, and no evidence has been presented to the contrary. Importantly, the trial record makes clear that Barclays at all times intended for there to be a generous buffer in its favor with respect to the trading book of acquired financial assets but does not demonstrate that there was anything improper about the marking down of stale or inflated asset values or that the amount actually paid for these assets was less than reasonably equivalent

21

66816

value at the time of the sale. That is one of the critical elements of proof missing from the trial record – there has been a strong implication of duplicitous behavior by certain Lehman employees or of preferential treatment having been shown to Barclays in the marking down of the asset values, but it has not been established that the marking down process was arbitrary or unfair under the atypical market conditions that prevailed during Lehman Week or, perhaps most importantly, that the aggregate amount paid was not a fair price for these assets.

F.    *Movants Did Not Establish That Barclays Received an Unfair Gain on the Acquisition*

The Court was unimpressed with the opinion testimony presented by the entire team of expert witnesses retained by the Movants who endeavored to show that Barclays realized a multi-billion dollar windfall gain. Their opinions were based on a hindsight challenge to the valuations ascribed to various categories of financial assets acquired by Barclays. These opinions were effectively challenged on cross-examination and were not convincing. The opinions, reflecting an unsurprising litigation bias, came across as having been designed and manufactured for the trial and were not at all persuasive, particularly when compared with the comprehensive and compelling testimony presented by Barclays' expert witness, Professor Paul Pfleiderer.

The Court also does not believe that any Lehman employees breached their duties of loyalty to the estate because of the prospect of future employment or as a consequence of signing lucrative employment contracts with Barclays. That aspect of the Movants' case is built on a faint aroma of venality and conflicted loyalty, but no breach of duty or other misconduct was demonstrated. Despite the insinuations of wrongdoing, the Court concludes that the marking down of asset values during Lehman Week appears to have been consistent with an attempt, apparently undertaken in good faith, by employees of both Lehman and Barclays to estimate

66817

market values for assets that were difficult to value at a time of extreme uncertainty in the financial markets. Barclays also may have been endeavoring to increase its buffer and take advantage of Lehman's vulnerable position at a time when its own negotiating leverage was at its peak. That may well be true, but the Court does not find that Barclays received assets that collectively were worth any more in the market than it paid for them.

The Court has made this determination notwithstanding the damaging testimony of certain witnesses (Martin Kelly for one) from Barclays who were so thoroughly prepared for trial that it damaged their own credibility. The evidence is clear that traders from Barclays engaged in an exercise of discounting the value of assets before the Sale Hearing for purposes of lowering the values assigned to various classes of assets and increasing the so-called "haircut" applicable to these assets. These activities were a deliberate departure from customary mark-to-market practices within Lehman and yielded what some have called "liquidation" values (although what was actually meant by the use of that term is unclear). Movants have stressed that the Court was not told about this unconventional procedure at the time of the Sale Hearing and have noted the discrepancy between the term "book value" as used in the APA and these liquidation values that were privately being developed by the traders. Their point is that Barclays acquired these assets at an undisclosed discount from Lehman's own regularly updated internal valuations thereby raising well-founded suspicions as to the fairness of the pricing from Lehman's perspective.

While these facts certainly raise disturbing questions about the accuracy of statements made at the Sale Hearing as to the real reason that values assigned to the trading assets had dropped from $70 billion to $47.4 billion, it has not been shown that this *ad hoc* reduction in Lehman's marks resulted in a material understatement of realizable fair market values of the assets within the trading book. This conclusion is bolstered by the fact that many of the assets

23

66818

were complex structured financial products that were difficult to value with any degree of confidence. The valuation witnesses offered by Barclays, including Stephen King who impressed the Court with his knowledge of the subject matter, stressed that valuation judgments as to many asset classes were uncertain and fraught with risk after the LBHI bankruptcy. Given that uncertainty, the Court is unable to conclude that the "marking down" process, while facially suspect, actually resulted in an arbitrary or unfair discount relative to fair market value for these assets or that the discount caused the estate to lose any otherwise realizable value from these assets.

Barclays' audited Acquisition Balance Sheet prepared under the direction of Gary Romain is also consistent with a finding that Barclays received and accounted for assets that were fairly valued (or at least not unfairly valued) and does not show any direct linkage between the substantial gain on acquisition recognized by Barclays and the book of acquired trading assets. The Acquisition Balance Sheet, with remarkable symmetry, happens to carry these trading assets at the very same aggregate number ($45.5 billion) that had been assigned to the assets as a result of the marking down process within Lehman immediately before the Sale Hearing.

Movants have questioned the credibility of that astounding coincidence – and astounding is the right word for it – and have intimated that the numbers used in the Acquisition Balance Sheet must have been tweaked or adjusted by members of Barclays' Product Control Group as part of a deliberate effort to lower the basis applicable to the acquired assets in order to create or boost future trading profits, but it has not been shown by any direct evidence that the numbers were manipulated in any way or that the Acquisition Balance Sheet is unreasonable in its depiction of accounting reality, and Movants do not even attempt to show that the audited

66819

financial statements of Barclays for the period in question are misleading. Movants have expressed their doubts regarding the accounting treatment of the acquisition but have not established that the treatment was inappropriate under applicable accounting standards.

G.     *Considering the Unequal Bargaining Positions, Barclays Structured a Favorable Acquisition for Itself That Did Not Take Unfair Advantage of Lehman*

The testimony of the most senior ranking executives from Barclays, former Chairman John Varley and President (now Chairman) Robert Diamond, confirms that Barclays conditioned the acquisition on the requirement that it be capital accretive and include substantial negative good will by operation of applicable accounting principles in the United Kingdom. Barclays always intended a transaction that would allow it to expand its operations in North America while augmenting its own balance sheet and allowing it to realize a material first day gain on acquisition. This self-interested but understandable business reality was not communicated to the Court at any time during the Sale Hearing.

The Court believes that no bank, domestic or foreign, at the height of the financial crisis of 2008, would have considered an acquisition such as this one that was not structured to minimize risks to the buyer as much as possible, and the Court is not surprised that Barclays, in pursuing this transformative transaction, was focused on its own objectives and took aggressive steps to protect itself. To do otherwise would not have been rational. The pivotal question, however, is whether Barclays took unfair advantage of Lehman and its creditors in connection with the sale and whether the failures to disclose material variations to the transaction described in the APA compromised the integrity of the approval process to the point of justifying relief from the Sale Order.

The record does not support such a conclusion or such negative perceptions of Barclays. Barclays never agreed to assume any risks relating to Lehman's internal marks and never agreed

25

66820

that the trading assets and liabilities would be in approximate balance with one another. It is important to note the obvious – this was a quintessential distressed sale, and there was no reason to regard the transaction as being characterized by equal bargaining power or to assume that the buyer would treat the seller gently. The seller was in bankruptcy and had no leverage — time was short, key employees were leaving and the markets were tanking. And to make matters even worse from the seller's perspective, there were no other buyers. In this tough bargaining environment, the Court did not need to be told that Barclays was on the scene purely as an opportunistic "white knight." The only reasonable inference was that Barclays was structuring an acquisition that had a high likelihood of being very beneficial for Barclays.

Thus, the Court understood, without having to be told in so many words, that this had to be a very good deal for Barclays, perhaps even an outstanding one, but the Court also perceived that the transaction was beneficial to the estate because it allowed the Broker-Dealer Business to remain intact, paid the appraised value for the real estate, and included $250 million for the intangible attributes of the Broker-Dealer Business. But there were other benefits as well – it also provided for the orderly transfer of approximately 72,000 customer accounts, avoided a piecemeal liquidation of assets at a time of turmoil in the financial markets, assumed comp and cure liabilities and provided for the retention of about ten thousand employees. The fact that the transaction as modified was structured to also include a spread equivalent to the "haircut" obtained by the New York Fed in its financing of the operations of LBI during Lehman Week is new information, but that disclosure does not support relief under Rule 60(b). Rather, it serves to demonstrate that Barclays, by substituting itself for Lehman with respect to the repo and becoming a borrower from the New York Fed, adopted a valuation spread that was consistent

66821

with financings arranged by the New York Fed during Lehman Week and that followed the valuation example set by the New York Fed.

H.    *While Not Formally Approved, the Clarification Letter Is Enforceable to the Extent Consistent With the Record of the Sale Hearing*

The Sale Hearing came to an end in the early morning hours on Saturday when the Court issued its bench ruling approving the sale. The Sale Order was entered shortly thereafter, and the transaction closed on the morning of Monday, September 22 following a weekend of intense negotiations that produced the Clarification Letter, an agreement that clarifies, modifies and supplements the terms and conditions set forth in the APA.

If there had not been such an urgent need to close right away, it is most likely that the parties, acting prudently, would have chosen to obtain a separate order approving the Clarification Letter. That did not happen, but the parties did what they must have believed to be the next best thing. The agreement was filed on the docket on September 22, 2008, the date it was finalized, thereby giving broad notice of its terms. Despite such notice and subsequent proceedings in the bankruptcy court and District Court that referenced this letter, no one within a period of over two years has ever sought formal approval of the Clarification Letter or a determination that it should not be enforced in accordance with its terms.

The parties have relied on the Clarification Letter as a binding and enforceable transaction document, and so despite the lack of formal approval, the Court is willing to do the same. Reliance is not, and ordinarily should not be, a substitute for actual approval, but the combination of circumstances surrounding the execution of the Clarification Letter leads to the conclusion that it is appropriate to treat this document as if it had been approved. Those parts of the Clarification Letter that amplify, clarify or bring the transaction into better alignment with the actual structure of the transaction and agreement of the parties are enforceable to the extent

27

66822

that these provisions are not inconsistent with the record of the Sale Hearing and the language of the Sale Order.

The failure to obtain bankruptcy court approval, however, leads to a vexing problem relating to assets identified during the asset scramble that were added to the definition of Purchased Assets[3] under the APA. One such addition involves the 15c3-3 Assets, securities held in reserve pursuant to Rule 15c3-3, the Customer Protection Rule promulgated by the United States Securities and Exchange Commission (the "SEC"). Another change purports to grant rights to Barclays in the Margin Assets – the Lehman cash held by exchanges as margin to support the trading and clearance of exchange traded derivatives. The Clearance Box Assets, the third category of assets claimed by Barclays, facilitate the clearance of securities trading. Barclays relies on the Clarification Letter in seeking to recover all three categories of assets in its motion to compel delivery of the Disputed Assets.

All of these Disputed Assets were identified as a result of last-minute demands made by Barclays for additional assets on the morning of the scheduled Sale Hearing with the threat that Barclays might otherwise be unwilling to close the acquisition. That demand for incremental value to sweeten the deal was not disclosed during the Sale Hearing, and the Court knew nothing about this exercise of leverage by Barclays at the eleventh hour. Among other things, the Clarification Letter reflects the addition of these final "sweeteners" to the deal. For reasons stated in Section VI of this Opinion, based upon the Court's interpretation of the Clarification Letter in light of the record of the Sale Hearing, Barclays does not have an unconditional right to the 15c3-3 Assets and is not entitled to the Margin Assets, but does have a right to the Clearance Box Assets.

---

[3] The APA defines those assets that Barclays agreed to purchase thereunder as "Purchased Assets."

28

66823

*I.   The Court's Own Experience During the Sale Hearing Is a Factor That Cannot Be
      Ignored in Deciding That Relief Under Rule 60(b) Is Not Warranted and That Barclays Is
      Not Entitled to Any "Lehman Cash"*

In reaching the conclusions expressed here, the Court does not write on a "clean slate"

and cannot disregard applicable personal experiences from the Sale Hearing. Thus, in addition to

the evidence in these proceedings, the author of this Opinion has his own vivid recollections and

impressions of what occurred during the Sale Hearing and of the atmosphere both in the

courtroom and in the financial markets immediately following the bankruptcy of LBHI. The

events of those early urgent days of the Lehman bankruptcy are sealed forever in the memories

of all participants, including the Court. Because the same individual who presided at the Sale

Hearing also presided during these proceedings, the deliberative process as reflected in this

Opinion necessarily is affected by the Court's own experience.

The Court has applied that experience in considering the facts presented in an extensive

trial record, in deciding that Rule 60(b) relief is not appropriate and in considering claims arising

under the Clarification Letter. The Court is convinced that the deal made and approved so

hurriedly was a good one both for Lehman and Barclays and was the best and only transaction

for the Broker-Dealer Business that could have been accomplished. As detailed here, the Court

has had the privilege of learning a great deal more about the acquisition than it knew or could

have known when it entered the Sale Order. The Court and other parties in interest undoubtedly

would have been better informed if the Sale Hearing had included more disclosures about

changes to the structure and economics of the transaction that occurred after execution of the

APA, but these omissions are not sufficient cause to grant relief from the Sale Order. The 60(b)

Motions were presented well, but, as explained in the following sections of this Opinion, they

66824

fail to persuade the Court that grounds exist to undo what has already has been done or to change the economics of the fully-consummated transaction.

Similarly, certain of the claims made by Barclays to obtain even greater economic benefits from the acquisition based upon the Clarification Letter are directly contradicted by the declarative statement made and repeated several times during the Sale Hearing that still resonates. That memorable statement, in plain language, confirmed that no Lehman cash would be going to Barclays. The Court relied on that clear representation that was given to assure the Court and parties who had objected to the sale that the assets being acquired by Barclays would not include cash.

The words used are absolute, unconditional and easily understood without regard to the language of the APA. "No cash" quite simply means "no cash." The Court has interpreted the Clarification Letter based on the language used in drafting that agreement and with reference to the testimony of those who negotiated the language of the document. That interpretation is influenced by the announcement at the Sale Hearing that Lehman cash would not be going to Barclays. For that reason, Barclays should not now be entitled to Margin Assets that constitute Lehman proprietary cash and should return any such cash that it may have received.

## II.  **Procedural History**

The Sale Order was entered during the early morning hours on September 20, 2008. An appeal (the "Bay Harbour Appeal") from that order by Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks (collectively, "Bay Harbour") was prosecuted in the District Court. *See* District Court Case Nos. 08-cv-08869, 08-cv-08914. The Movants filed

**66825**

pleadings in the District Court in opposition to the Bay Harbour Appeal.[4]  On March 13, 2009,

the District Court issued its Opinion & Order affirming the Sale Order.  District Court Case No.

08-cv-08869, ECF No. 18; District Court Case No. 08-cv-08914, ECF No. 19.  Bay Harbour

pursued a further appeal of this decision, but ultimately abandoned its efforts to obtain relief

from the United States Court of Appeals for the Second Circuit (the "Second Circuit").  On May

28, 2009, the Clerk of Court of the Second Circuit entered an order dismissing the appeal due to

Bay Harbour's failure to respond to the Second Circuit's prior order to show cause.  *See* District

Court Case No. 08-cv-08869, ECF No. 21.  At that point, the Sale Order became final and no

longer was subject to further appellate review.

Despite the procedural finality of the Sale Order, LBHI initiated a discovery process that

marked the beginning of efforts to obtain relief from the Sale Order.  The Court observed a

preview of this discovery initiative at a December 22, 2008 hearing on a motion to approve a

settlement agreement (the "Settlement Agreement") between Barclays, LBI and JPMorgan Chase

("JPMorgan"), LBI's collateral agent.  The Settlement Agreement was the result of long

negotiations (later revealed to have included accusations of fraud by JPMorgan) following a

high-level and high-stakes dispute between Barclays and JPMorgan that eventually required the

intervention (at Barclays' request) of the New York Fed.  M Ex. 119A (Leventhal Decl.) ¶ 21;

9/7/10 Tr. 155:3-14 (Leventhal).

---

[4] In addition to LBHI's counter-designations of bankruptcy record on appeal, LBHI filed Answering Brief of
Lehman Brothers Holdings Inc., et al. in Opposition to Bay Harbour Appeal, and the SIPA Trustee filed Brief of
Appellee James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.  District Court Case No.
08-cv-08869, ECF Nos. 4, 5, 8, 12; District Court Case No. 08-cv-08914, ECF Nos. 3, 4, 10, 13; BCI Ex. 33 (M Ex.
405); M Ex. 552.  The Committee did not participate in the Bay Harbour Appeal.  The Committee did, however, file
a Counter-Statement of Official Committee of Unsecured Creditors of Issues Presented on Appeal and Counter-
Designation of Additional Items to be Included in the Record on Appeal in the later-withdrawn appeal of a group of
creditors that called themselves the Informal Noteholder Group.  District Court Case No. 08-cv-09108, ECF No. 5;
BCI Ex. 398.

66826

The dispute centered around a $7 billion "box loan" provided by JPMorgan to LBI in connection with the so-called Lehman III transaction.[5] The $7 billion was transferred into Barclays' account at JPMorgan and then later removed by JPMorgan, allegedly due to Barclays' failure to renew a $15.8 billion repurchase agreement secured by Lehman assets. This caused LBI to have to borrow $15.8 billion from JPMorgan. JPMorgan wanted Barclays to "take out" this financing in a similar fashion to what Barclays had done with respect to a repurchase agreement between LBI and the New York Fed.[6] *See* 6/21/10 Tr. 201:5-202:8 (Diamond); 9/7/10 Tr. 152:1-153:21 (Leventhal). Barclays realized that the $7 billion was not in its account after the sale transaction had closed and the Clarification Letter had been signed. M Ex. 119A (Leventhal Decl.) ¶¶ 19-21; M Ex. 119C (LaRocca Decl.) ¶ 11; 9/7/10 Tr. 27:19-22, 133:23-134:8 (Leventhal); 6/21/10 Tr. 201:5-202:8 (Diamond).

After Barclays and JPMorgan (with the help of the New York Fed) reached agreement, the parties sought the help of the SIPA Trustee in filing a motion to seek approval of the settlement. *See* M Ex. 642. Barclays, JPMorgan and LBI signed the Settlement Agreement on December 5, 2008; on that same day, the SIPA Trustee filed a motion seeking approval of the Settlement Agreement (the "Settlement Motion"). BCI Ex. 30 (M Ex. 119).

The Committee, which had been given only a cursory preview of the Settlement Agreement, filed an objection to the Settlement Motion on December 19, 2008. *See* M Ex. 852; M Ex. 860; BCI Ex. 37 (M Ex. 398). The Committee raised specific concerns about alleged undisclosed changes made to the sale transaction following entry of the Sale Order. BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 45:11-50:7 (Kirpalani, Peck). At the hearing on the Settlement

---

[5] The Lehman III transaction and the circumstances surrounding the $7 billion "box loan" are discussed *infra* at 42-45.

[6] The repurchase agreement between LBI and the New York Fed, defined as the "Fed Repo," and Barclays' agreement with the New York Fed to "take out" its financing obligation thereunder are discussed *infra* at 41-45.

**66827**

Motion, LBHI expressed similar concerns, but did not object to the settlement because the

proposed order did not bar any future discovery or claims. BCI Ex. 50 (M Ex. 262) (12/22/08

Tr.) 32:6-34:21 (Miller). Counsel to JPMorgan and Barclays confirmed that the settlement

would not pose any collateral estoppel effect and that parties would be free to pursue claims

related to the "overall sales transaction." BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 35:3-5, 40:9-11,

41:7-12 (Schiller), 39:13-20 (Novikoff). The Court approved the Settlement Motion

> based on the record and the representations that have been made including the comments
> confirming that the settlement is not to have collateral estoppel impact that would
> preclude further investigation of the circumstances surrounding the original sales
> transaction between the estates and Barclays Capital approved by order entered
> September 20[, 2008].

BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 58:11-18 (Peck).

On May 18, 2009, some five months after approval of the Settlement Agreement, LBHI

filed a motion of for an order authorizing discovery from Barclays. (the "2004 Motion"). Case

No. 08-13555, ECF No. 3596. In the 2004 Motion, LBHI sought discovery related to the sale to

Barclays "specifically focused on whether the estate received appropriate value." 2004 Motion ¶

1. Each of the Committee and the SIPA Trustee subsequently filed papers joining in the 2004

Motion. Case No. 08-13555, ECF No. 3778 (Committee); Case No. 08-13555, ECF No. 4074

(SIPA Trustee). Barclays opposed the 2004 Motion. Case No. 08-13555, ECF No. 3776.

After a hearing on June 3, 2009, the Court granted the 2004 Motion and entered an order

authorizing discovery (the "Discovery Order"). Case No. 08-13555, ECF No. 4164. The

Discovery Order granted the relief requested in the 2004 Motion, and led to an extensive

examination of the facts surrounding the sale of the Broker-Dealer Business to Barclays. This

discovery became the basis for the filing of the 60(b) Motions.

66828

On September 15, 2009, one year to the day after LBHI filed its voluntary bankruptcy petition, each of LBHI, the Committee and the SIPA Trustee[7] moved for relief from the Sale Order by filing separate motions under Rule 60(b).[8] Case No. 08-13555, ECF No. 5148 (the "LBHI Motion"); Case No. 08-13555, ECF No. 5169 and Case No. 08-01420, ECF No. 1686 (collectively, the "Committee Motion"); Case No. 08-01420, ECF No. 1682 (the "SIPA Trustee Motion"). Since that date, the parties have worked together cooperatively to coordinate and manage the 60(b) litigation and related adversary proceedings as described below. Given the complexity and importance of the issues presented, the case is a model of efficient case management. All counsel worked with each other and with the Court in a manner that minimized unnecessary and distracting procedural disputes.

On October 27, 2009 the Court entered a scheduling order concerning these motions (the "Scheduling Order"). Case No. 08-13555, ECF No. 5636; Case No. 08-01420, ECF No. 1989. The Scheduling Order contemplated the possible filing of adversary complaints in relation to the 60(b) Motions, and set a deadline of November 16, 2009 for commencing these actions. The Scheduling Order set forth other deadlines and agreements of the parties relating to the prosecution and management of this litigation, including dates by which Barclays would submit its consolidated opposition to the 60(b) Motions and would file its motion to enforce the Sale Order and secure delivery of the Disputed Assets.

---

[7] The SIPA Trustee's motion addresses both the Sale Order and the Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, and Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding (the "SIPA Sale Order"). Case No. 08-01420, ECF No. 3.

[8] The SIPA Trustee also filed a motion to join in LBHI's 60(b) motion. Case No. 08-13555, ECF No. 5173. LBHI filed its own 60(b) motion addressing the SIPA Sale Order. Case No. 08-01420, ECF No. 1702.

34

66829

On November 16, 2009, each of the Movants filed an adversary complaint (each, an

"Adversary Complaint" and collectively, the "Adversary Complaints") under Fed. R. Bankr. P.

7001, commencing the following adversary proceedings:

> Lehman Brothers Holdings, Inc. v. Barclays Capital Inc. (the "LBHI Adversary"), Adv. Proc. No. 09-01731(JMP);
>
> James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. v. Barclays Capital Inc. (the "SIPA Trustee Adversary"), Adv. Proc. No. 09-01732(JMP); and
>
> The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. v. Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays Capital Inc. (the "Committee Adversary"), Adv. Proc. No. 09-01733(JMP).

As the parties anticipated in the Scheduling Order, each Adversary Complaint to some

extent overlaps with one or more of the 60(b) Motions, and so the parties have entered into a

stipulation (the "Adversary Proceeding Stipulation") providing for the resolution of certain

claims in the Adversary Complaints in conjunction with resolution of the 60(b) Motions and

deferring certain claims for further adjudication. The Adversary Proceeding Stipulation was "so

ordered" by the Court. Adv. Proc. No. 09-01731, ECF No. 4; Adv. Proc. No. 09-01732, ECF

No. 5; Adv. Proc. No. 09-01733, ECF No. 3.

The Adversary Proceeding Stipulation provides that (i) the following claims in each

respective Adversary Proceeding shall be resolved through the resolution of the 60(b) Motions,

(ii) the 60(b) Motions (and all documents filed in connection therewith, including any opposition

papers submitted by Barclays) shall be treated as dispositive motions with respect to the listed

claims and (iii) any evidentiary hearing that is required by the Court to resolve the 60(b) Motions

also shall be used to resolve the claims:

> In the LBHI Adversary: Count III (Unauthorized Post-Petition Transfers – Bankruptcy Code § 549), Count IV (Recovery of Avoided Transfers – Bankruptcy Code § 550), Count V (Recovery of Excess Collateral on Liquidation of Repurchase Agreement –

35

66830

Bankruptcy Code §§ 542 and 559), Count VI (Disallowance of Claims Under Bankruptcy Code § 502(d), and Count IX (Declaratory Judgment – 28 U.S.C. §§ 2201, 2202);

In the SIPA Trustee Adversary: Count I (Declaratory Judgment Under 28 U.S.C. § 2201 – DTCC Clearance Box Assets), Count II (Declaratory Judgment Under 28 U.S.C. § 2201 – OCC Margin and Clearing Funds), Count III (Declaratory Judgment Under 28 U.S.C. § 2201 – Funds at Other Exchanges), Count IV (Declaratory Judgment Under 28 U.S.C. § 2201– $769 Million in Rule 15c3-3 Securities or Substantially Similar Securities), Count V (Avoidance of Transfers and Recovery of Property under §§ 549 and 550 of the Bankruptcy Code), Count VII (Turnover of Property under § 542 of the Bankruptcy Code), Count VIII (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities Under § 548 of the Bankruptcy Code), Count IX (Fraudulent Conveyance Under § 273 of the New York Debtor & Creditor Law, as Made Applicable by § 544(b) of the Bankruptcy Code), Count X (Recovery of the Excess Value of the Repo Securities Under §§ 559 and 542 of the Bankruptcy Code), and Count XIV (Disallowance of Claims Under § 502(d) of the Bankruptcy Code); and

In the Committee Adversary: Count I (Declaratory Judgment as to Clarification Letter Pursuant to 28 U.S.C. §§ 2201, 2202), Count II (Accounting), and Count III (Attorneys' Fees, 28 U.S.C. § 2202).

Adversary Proceeding Stipulation ¶ 2.

In accordance with the Scheduling Order, on January 29, 2010, Barclays opposed the

60(b) Motions and filed its motion addressed to the SIPA Trustee to enforce the Sale Order and

secure the delivery of the Disputed Assets (the "Barclays Motion"). Case No. 08-13555, ECF

No. 6814; Case No. 08-01420, ECF No. 2581. On March 18, 2010, each of the Movants filed a

reply memorandum in further support of their 60(b) Motions and, in the case of the SIPA

Trustee, in opposition to the Barclays Motion. Case No. 08-13555, ECF No. 7641 and Case No.

08-01420, ECF No. 2843 (collectively, the "LBHI Response"); Case No. 08-13555, ECF No.

7667 and Case No. 08-01420, ECF No. 2857 (Committee); Case No. 08-01420, ECF No. 2847

(SIPA Trustee). Barclays completed the initial round of briefing on the 60(b) Motions on April

5, 2010 with the filing of its reply memorandum in further support of the Barclays Motion. Case

No. 08-13555, ECF No. 8076; Case No. 08-01420, ECF No. 2996 (the "Barclays Reply").

36

**66831**

On April 9, 2010, the Court heard oral argument on the 60(b) Motions and the Barclays

Motion. At the outset of this hearing, the Court noted that it would not be deciding the 60(b)

Motions on the papers, that an evidentiary hearing would be necessary and that arguments on the

Motions would be treated as opening arguments for the evidentiary hearing. 4/9/10 Tr. 10:20-24

(Peck).

April 26, 2010 was the first day of what developed into a 34-day trial. The Court heard

live testimony from 37 witnesses[9] and admitted 1,787 exhibits (some for limited purposes) into

the record. On November 22, 2010, each of the Movants and Barclays filed a post-trial

memorandum, including proposed findings of fact and conclusions of law.[10] Case No. 08-13555,

ECF No. 12950 and Case No. 08-01420, ECF No. 3909 (collectively, the "LBHI Post-Trial

Memorandum"); Case No. 08-13555, ECF No. 12970 and Case No. 08-01420, ECF No. 3916

(collectively, the "Committee Post-Trial Memorandum"); Case No. 08-13555, ECF No. 12971

and Case No. 08-01420, ECF No. 3917 (collectively, the "Barclays Post-Trial Memorandum");

Case No. 08-01420, ECF No. 3911 (the "SIPA Trustee Post-Trial Memorandum").

**III.    The Rule 60(b) Standard and Background of Movants' 60(b) Claims**

Rule 60(b) applies in all cases under the Bankruptcy Code, except for certain

circumstances not relevant to this decision. Fed. R. Bankr. P. 9024. Rule 60(b) lists multiple

grounds upon which a court may relieve a party from final judgment, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been
>      discovered in time to move for a new trial under Rule 59(b);
> (3) fraud …, misrepresentation, or misconduct by an opposing party;

---

[9] The Court also heard video deposition testimony from four witnesses, and read designated deposition testimony from eighteen witnesses.

[10] The SEC and the Securities Investor Protection Corporation ("SIPC") also filed post-trial memoranda. Case No. 08-13555, ECF No. 12961 and Case No. 08-01420, ECF No. 3914 (collectively, the "SEC Post-Trial Memorandum"); Case No. 08-01420, ECF No. 3912 (SIPC).

A-1482

66832

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Rule 60(b) "should be liberally construed when substantial justice will ... be served." *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) (quoting *Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963)). However, courts should not "lightly reopen[]" final judgments under Rule 60(b). *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citations omitted). Thus, such a motion generally is "not favored and is properly granted only upon a showing of exceptional circumstances." *Enron*, 352 B.R. at 369 (quoting *U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001)). A motion seeking 60(b) relief is "addressed to the sound discretion of the [trial] court with appellate review limited to determining whether that discretion has been abused." *Nemaizer*, 793 F.2d at 61-62 (citations omitted).

Movants seek relief under four separate subsections of Rule 60(b) – 60(b)(1) (mistake, inadvertence or excusable neglect); 60(b)(2) (newly-discovered evidence); 60(b)(3) (innocent or intentional misrepresentation or fraud by an opposing party) and 60(b)(6) (fraud by any other party or fraud on the court). LBHI Mot. ¶¶ 145-170; Committee Mot. ¶¶ 63-77; SIPA Trustee Mot. 89-105. Movants also reference Federal Rule of Civil Procedure 60(d), which provides that "[Rule 60]" does not limit a court's power to, *inter alia*, "set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3); LBHI Mot. ¶¶ 167-70.

All of these claims are based on the allegation that certain crucial facts surrounding the sale to Barclays were not disclosed to the Court. Movants submit that such a failure to disclose

38

66833

at best qualifies as mistake, inadvertence or excusable neglect under Rule 60(b)(1). LBHI Resp.

¶¶ 150-161. Movants further assert that

> [w]hen the evidence is reviewed in terms of scienter, motive, opportunity, justification, excuse and any number of other considerations, the Court could very well determine that these "mistakes" were more than that, which might justify findings of bad faith, breach of fiduciary duty, misrepresentation or even fraud[,]

thus bringing their claims under the purview of Rule 60(b)(3), 60(b)(6) and/or 60(d). LBHI

Resp. ¶ 150, n. 63. During the trial, Movants focused on three broad categories of "mistake"

surrounding the sale – (i) Barclays' multi-billion dollar day-one gain on the sale, (ii) the non-

disclosure to the Court of the structural shift from the purchase of assets described in the APA to

the "take out" by Barclays of the New York Fed and (iii) the actual amounts paid for

compensation obligations and contract cures in comparison with the much higher estimated

amounts disclosed to the Court at the Sale Hearing.[11] Movants base their Rule 60(b)(2) claim on

the allegation that they were justifiably ignorant of these "mistakes" despite their reasonable

efforts and diligence.

*A.      The Acquisition Gain and the Changing Character and Structure of the Sale*

     At trial, the parties spoke of and characterized three separate negotiated structures of an

asset purchase by Barclays, described in shorthand as Lehman I, Lehman II and Lehman III. The

negotiations surrounding "Lehman I" encompassed a potential acquisition of Lehman's global

business and commenced either late Thursday, September 11, 2008 or early Friday, September

12, 2008. 4/26/10 Tr. 145:10-146:7 (McDade). Those discussions ended on Sunday, September

14, 2008, when Barclays informed Lehman of its "inability to consummate" the transaction.

4/26/10 Tr. 146:21-147:1 (McDade); 6/21/10 Tr. 137:7-12 (Diamond); 6/22/10 Tr. 81:9-11

(Varley). That inability was followed almost immediately by the filing by LBHI of its

---

[11] By virtue of the SIPA Trustee's Joinder, he is a party to this argument, but he also bases his 60(b) claims, at least in part, on issues surrounding the Clarification Letter. These claims are discussed on pages 97-99 of this Opinion.

66834

bankruptcy petition on September 15, 2010.  4/28/10 Tr. 11:12-18 (Miller); Case No. 08-13555, ECF No. 1.

Discussions between representatives from Barclays and Lehman concerning an alternative structure and a potential Lehman II transaction commenced early on Monday, September 15.  4/26/10 Tr. 146:21-147:3 (McDade); 4/28/10 Tr. 11:12-21 (Miller).  Lehman II is the transaction for the acquisition of the Broker-Dealer Business reflected in the APA; the negotiations surrounding Lehman II took place in a compressed time frame, and, as described by participants, were conducted within a "scene of organized chaos" and with a "sense of frenzy, distress."  4/28/10 Tr. 11:22-12:21 (Miller); 4/29/10 Tr. 15:18-18:11 (Lowitt); BCI Ex. 365 (Lowitt Decl.) ¶7.  The negotiations continued into the early morning hours of September 16, 2008, when the parties signed the APA.  4/26/10 Tr. 150:14-24 (McDade); 4/28/10 Tr. 150:17-151:15 (Kelly); 4/29/10 Tr. 63:4-20, 77:13-18 (Lowitt); 4/27/10 Tr. 110:8-111:7 (Berkenfeld); 4/28/10 Tr. 13:4 (Miller); BCI Ex. 1 (M Ex. 1) at 1.

Movants contend that during the course of the negotiations, certain Lehman executives (who were given offers of employment by Barclays) agreed to prices for Lehman's assets that were fixed below Lehman's marks.  Barclays counters that because Lehman last closed its books on September 12, 2008, the Lehman marks were stale and needed to be adjusted to account for the impact of the events of Lehman Week on the financial markets. *See, e.g.*, 4/29/10 Tr. 93:6-17 (Lowitt) (traders from both Lehman and Barclays were meeting to agree on "what was the appropriate value for those securities given the nature of the environment and the market they were dealing with … [and] there was a difference between what was on [LBHI's] books and what was the outcome of that process … [of] around five billion dollars").

40

66835

Regardless of the reasons given for the mark-down procedure, the evidence shows that the parties had negotiated a value for the Purchased Assets that was discounted from Lehman's marks by approximately $5 billion. M Ex. 7 (9/16/08 e-mail from Martin Kelly to Ian Lowitt and Paolo Tonucci at the conclusion of the negotiations for Lehman II, stating that the "[f]inal price did not change meaningfully – approx a $5b all in economic loss versus our marks"); 4/28/10 Tr. 155:12-18 (Kelly) (explaining that $5b all in economic loss means that "the transaction included an approximately five billion dollar difference between the values that had been negotiated for the assets that were moving, and their most recent book values on the books of Lehman").

Before the APA was presented to the Court for approval, the New York Fed had agreed to provide financing to LBI through a series of short-term funding agreements (collectively, the "Fed Repo") so that LBI could continue to operate as a broker-dealer for a limited period of time. Stip.[12] ¶¶ 130,165. As part of the Fed Repo, LBI had to post collateral to the New York Fed. Stip. ¶ 131. As is typical in repo transactions, the New York Fed required LBI to post as collateral securities valued in excess of the principal amount advanced by the New York Fed. Stip. ¶ 132. The amount by which the value of securities transferred exceeds the amount paid for them is referred to as a "haircut." Stip. ¶ 133. The "haircut" is measured at market value. 9/7/10 Tr. 52:22-53:19 (Leventhal).

By the close of business on Wednesday, September 17, LBI had posted collateral valued at approximately $50.62 billion in exchange for financing from the New York Fed of approximately $46.22 billion. M Ex. 119A (Leventhal Decl.) ¶ 9. This "haircut" reflected excess

---

[12] All references to "Stip." as used herein shall be to the Stipulations of Fact agreed to and signed by the parties in April 2010. *See* 4/26/10 Tr. 73:3-13 (Gaffey) (describing Stipulations of Fact to the Court).

**66836**

collateral of $4.4 billion. *See* Tonucci Dep. Tr. 17:5-15 (describing a "haircut" as "the difference between the market value and the cash received").

When the New York Fed learned that Barclays planned to purchase the Broker-Dealer Business, it became insistent that it be relieved of its short-term financing role for LBI and that Barclays take on the role of providing such financing to LBI.[13] Stip. ¶ 134; *see also* 4/29/10 Tr. 113:15-19 (Lowitt); M Ex.119A (Leventhal Decl.) ¶ 7; 9/7/10 Tr. 7:9-8:23, 23:5-24:8 (Leventhal). This arrangement in which Barclays became the source of financing to LBI is the transaction termed Lehman III – the transaction that actually was consummated but that was not fully disclosed to the Court or other parties in interest.

In order to facilitate the Lehman III transaction, the New York Fed agreed to provide Barclays with financing and a cash advance. *See* M Ex. 844 (describing financing mechanism); 9/7/10 Tr. 103:3-105:5 (Leventhal). Barclays relieved the New York Fed of its short-term financing role by means of a repurchase agreement between LBI and Barclays (the "September 18 Repurchase Agreement"). *See*, M Ex.119A, (Leventhal Decl.) ¶ 12; Stip. ¶ 135.

On the morning of September 18, 2008, steps were taken to effect the transition from the Fed Repo to the September 18 Repurchase Agreement. This involved unwinding the Fed Repo, and the return by the New York Fed to LBI of securities that had been pledged as collateral. Later that day, pursuant to the September 18 Repurchase Agreement, Barclays forwarded to LBI approximately $45 billion in cash (its advance from the New York Fed) and LBI was to post as collateral securities valued at approximately $50 billion, reflecting an approximate $5 billion

---

[13] By September 16, 2008, Barclays had negotiated the terms of an agreement with the New York Fed (the "Take-Out Agreement"). *See* M Ex. 874 (e-mail sent at 1:37 a.m. on September 17, 2008 from the New York Fed to counsel to Barclays attaching draft of Take-Out Agreement). Under the terms of the Take-Out Agreement, which was signed on September 17, 2008, Barclays agreed to purchase from the New York Fed the entirety of its positions in the Fed Repo in exchange for all of the collateral posted in connection therewith. BCI Ex. 4 (M Ex. 348). The Court knew nothing about the Take-Out Agreement at the time of the Sale Hearing.

**A-1487**

66837

"haircut" in the value of LBI's collateral. *See* M Ex. 119A (Leventhal Decl.) ¶¶ 10-12; 9/7/10 Tr. 118:25-122:13 (Leventhal); Stip. ¶ 136. When asked to review the pool of collateral Barclays was to take over from the New York Fed, Stephen King concluded that Barclays would be sufficiently collateralized in loaning $45 billion against this pool of securities.[14] 8/25/10 Tr. 49:19-53:2, 55:2-10 (King); King Dep. Tr. 75:6-77:20.

Due to operational problems, by the close of business on September 18, LBI had not transferred all of the pledged collateral to Barclays. Instead of approximately $50 billion in collateral, LBI transferred at least $42.7 billion[15] in collateral under the September 18 Repurchase Agreement. M Ex.119A (Leventhal Decl.) ¶ 14; 4/30/10 Tr. 183:18-184:7 (Hughes); 4/29/10 Tr. 272:4-24 (Clackson). To make up the difference, LBI took a so-called "box loan" of $7 billion, provided by JPMorgan and secured by an equivalent amount of securities held in LBI's clearance boxes at JPMorgan. M Ex. 36; M Ex. 50; M Ex. 66; 9/7/10 Tr. 122:21-123:17 (Leventhal); 4/30/10 Tr. 183:18-184:7 (Hughes). LBI paid the full cash proceeds of this loan over to Barclays as a replacement for the portion of collateral that could not be transferred on September 18.[16] Hraska I Dep. Tr. (8/14/09) 50:8-22; 9/7/10 Tr. 24:9-28:2 (Leventhal); 4/30/10 Tr. 183:18-184:7 (Hughes). Thus, Barclays received at least $49.7 billion in collateral and cash

---

[14] Barclays later claimed that it was worried about the value of the securities posted as collateral for the September 18 Repurchase Agreement, and threatened not to close if Lehman did not come up with more assets. *See* Section VI.A of this Opinion for a description of the so-called "asset scramble."

[15] Bank of New York, as Barclays' collateral agent, valued the transferred collateral at approximately $45 billion. M Ex. 102; 8/25/10 Tr. 157:17-158:3 (King).

[16] *See* 31-33, *supra*, for a discussion regarding the ensuing dispute between JPMorgan and Barclays over this $7 billion.

**A-1488**

**66838**

to secure LBI's obligations for the $45 billion advanced to it under the September 18 Repurchase Agreement.[17]  9/7/10 Tr. 123:18-124:7 (Leventhal).

On September 19, 2008, pursuant to a Complaint and Application of SIPC, the District Court entered an Order Commencing Liquidation, which (i) found that the customers of LBI were in need of the protection afforded by SIPA, (ii) appointed a trustee "for the liquidation of the business of LBI with all the duties and powers of a trustee as prescribed in SIPA" and (iii) referred the liquidation proceeding (the "SIPA Liquidation Proceeding") to this Court.  Case No. 08-1420, ECF No.1.  The SIPA Liquidation Proceeding constituted a defined event of default under the September 18 Repurchase Agreement.  BCI Ex. 8 (M Ex. 4) (Master Repurchase Agreement) ¶¶ 2(a), 11; M Ex. 38 (Notice of Termination).  As a result of that default, Barclays immediately issued a Notice of Termination under the September 18 Repurchase Agreement.  M Ex. 38.

Barclays claims that the issuance of the Notice of Termination was inadvertent or a mistake.  8/31/10 Tr. 64:23-65:8 (Lewkow) (recalling "being told at some point" that "some back office person" unintentionally sent notice); Lewkow Dep. Tr. 68:17-69:14.  The parties addressed the issue after the Sale Hearing, when they continued their negotiations over the following weekend.  They included a paragraph in the Clarification Letter that purported to rescind the earlier termination and then terminate the September 18 Repurchase Agreement retroactively, all effective at Closing.  It provides, in relevant part, that

> [e]ffective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 [Repurchase Agreement] shall be deemed to constitute part of the Purchased Assets ..., (ii) Seller and Purchaser shall be deemed to have no further obligations

---

[17] From the Court's perspective, the fact that Barclays had effectively "purchased" these assets one day *before* commencement of the Sale Hearing is troublesome, to say the least.  While no improprieties have been shown, it is curious that any financial institution would take on any exposure at a time of such upheaval in the markets *prior to* the entry of a court order approving the acquisition.

44

66839

> to each other under the [September 18] Repurchase Agreement …,
> and (iii) the [September 18] Repurchase Agreement shall
> terminate. Additionally, the Notice of Termination relating to the
> [September 18] Repurchase Agreement dated September 19, 2008
> is hereby deemed rescinded and void *ab initio* in all respects.

BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 13.

As a result of the insertion of this paragraph, all of the collateral pledged in connection

with the September 18 Repurchase Agreement – including the $5 billion "haircut" that under

Section 559 of the Bankruptcy Code otherwise would have had to be returned to the LBI estate –

was transferred to Barclays. Thus, upon the signing of the Clarification Letter, Lehman III was

consummated and Barclays maintained a gain on acquisition equivalent to what it had negotiated

under Lehman II. It is important to note, however, that the Court did not know at the Sale

Hearing that the structure of the transaction had changed from Lehman II to Lehman III.

*B.     Comp and Cure Payments*

To guide the documentation of the sale to Barclays, during the course of Lehman Week

the parties prepared a schedule showing the value of certain assets that were to be transferred to

Barclays and the liabilities to be assumed by Barclays (the "9/16/08 Financial Schedule"). BCI

Ex. 106 (M Ex. 2); 4/27/10 Tr. 115:2-10, 118:12-16, 123:19-124:22 (Berkenfeld); *see also*

8/31/10 Tr. 36:9-23 (Lewkow) (describing Berkenfeld signing 9/16/08 Financial Schedule);

8/23/10 Tr. 69:10-70:22 (Shapiro) (describing development of 9/16/08 Financial Schedule).

Two categories of liabilities on the 9/16/08 Financial Schedule are "Comp" and "Cure Pmt."

BCI Ex. 106 (M Ex. 2).

Paragraph 9.1(c) of the APA addresses the obligation of Barclays to pay 2008 bonuses to

Transferred Employees – *i.e.*, former Lehman employees who transferred to Barclays – and

expressly references the 9/16/08 Financial Schedule. BCI Ex. 1 (M Ex. 1) ¶ 9.1(c); BCI Ex. 106

(M Ex. 2); 4/26/10 Tr. 177:17-180:23 (McDade); 8/23/10 Tr. 89:15-92:4 (Shapiro); 8/31/10 Tr.

45

66840

97:2-9 (Lewkow); 8/24/10 Tr. 27:16-28:4 (Exall); M Ex. 24. Thus, the aggregate amount of

such 2008 bonus payments was established by the $2 billion figure set forth on the 9/16/08

Financial Schedule. BCI Ex. 106 (M Ex. 2); 4/26/10 Tr. 168:13-169:9, 177:17-180:23

(McDade); 8/24/10 Tr. 27:16-28:4 (Exall). The plain language of the Paragraph 9.1(c) of the

APA specifically refers only to bonuses, not severance.[18] Moreover, the $2 billion figure for

bonuses was an "agreed number" that reflected a "full requirement for Barclays to pay." 4/26/10

Tr. 164:6-8, 215:13-18 (McDade).

    Barclays contends, however, that it can (and did) satisfy this obligation by including in

the total payments of severance, taxes and other forms of compensation and argues that

"according to a document prepared by Barclays' Paul Exall regarding compensation to former

Lehman employees for their pre-acquisition services (the 'Exall Spreadsheet'), Barclays has paid

or promised to pay for 2008 approximately $1.66 billion in bonuses, $265 million in severance

payments, and approximately $21 million in taxes." Barclays Mot. ¶ 300. According to

Barclays, "[t]hese liabilities total $1.946 billion, an amount fully consistent with the $2 billion

estimate of the parties." Barclays Mot. ¶ 300; *see also* 8/23/10 Tr. 189:2-194:8 (Exall); 8/24/10

Tr. 8:21-9:17, 61:11-62:22 (Exall) (discussing prepared chart showing total for bonus, severance

and taxes of $1.951 billion); BCI Ex. 142A (M Ex. 107).

    Mr. Exall, the executive charged with monitoring the compensation paid to former

Lehman employees who transferred to Barclays, was instructed immediately after the closing of

the sale to plan on paying bonuses to former Lehman employees of approximately $1.4 billion,

not the $2 billion set forth in the APA. *See* BCI Ex. 295 (M Ex. 91) at 2; 8/24/10 Tr. 45:5-13

---

[18] Paragraph 9.1(b) of the APA separately defines the obligation of Barclays to make severance payments to
Transferred Employees who were later laid off. Paragraph 9.1(b) does not reference the 9/16/08 Financial Schedule.
*See* 8/24/10 Tr. 28:5-19 (Exall); 8/23/10 Tr. 92:5-94:23 (Shapiro) (describing having reviewed the APA to ensure it
accurately reflected the deal, and noting that Paragraph 9.1(b) does not refer to the 9/16/08 Financial Schedule);
Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection c").

46

66841

(Exall); M Ex. 92 at 2; M Ex.130 (9/16/08 e-mail reflecting $1.3 billion "bonus accrual"); M Ex.134 (9/17/08 e-mail, showing $1.3 billion "bonus accrual"); M Ex. 43 (9/18/08 e-mail to Ricci stating that "[w]e have assumed only $1.5bn of comp accrual is required rather than $2bn in completion balance sheet"). Exall's team prepared twice-daily reports tracking bonus payments. 8/24/10 Tr. 46:4-47:11 (Exall). Exall also prepared a spreadsheet showing that, in the aggregate, Barclays paid to transferred Lehman employees approximately $1.951 billion in all forms of compensation. M Ex.107; 8/24/10 Tr. 8:21-9:17, 65:18-66:2 (Exall). Several entries on the spreadsheet, however, do not relate to bonuses.[19] BCI Ex. 142A (M Ex. 107); 8/24/10 Tr. 66:3-83:11 (Exall); Exall Dep. Tr. 78:22-84:3; 110:22-115:18; 124:22-125:6; 128:8-137:7; 141:5-144:12, 151:15-23. In the end, subtracting out all non-bonus payments, Barclays paid approximately $1.5 billion in bonuses to Transferred Employees. BCI Ex. 142A (M Ex. 107).

As set forth in the 9/16/08 Financial Schedule, the estimated cost of cure payments to be assumed by Barclays was $2.25 billion. BCI Ex. 106 (M Ex. 2). Martin Kelly was the Lehman executive responsible for estimating the amount of cure liabilities that Barclays would pay. 4/27/10 Tr. 52:13-18 (McDade); 4/29/10 Tr. 90:17-92:19, 121:24-122:17 (Lowitt); 8/23/10 Tr. 94:23-95:20 (Shapiro) (explaining that the estimate was prepared to answer an inquiry by Cox from Barclays); 6/22/10 Tr. 224:18-225:11 (Cox) (stating that cure estimates came from Martin Kelly). As of September 16, 2008, Kelly came up with an estimate for cure of $2.25 billion, the number set forth on the 9/16/08 Financial Schedule. 4/26/10 Tr. 161:11-19, 163:8-169:10 (McDade).

---

[19] For example, Exall's chart reflects Barclays' payments to various taxing authorities in the total amount of approximately $71 million. M Ex. 107. These taxes were not paid to individual employees, but rather to the applicable taxing authority. 8/24/10 Tr. 67:4-68:9, 70:14-71:4, 71:16-72:5 (Exall). This includes some $50 million included in Exall's entry for "Bonus including social tax." M Ex. 107; 8/24/10 Tr. 70:11-71:15 (Exall).