66842

By the time of the September 17, 2008 hearing on the Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sale Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Bid Procedures Motion"), the cure liability estimate had declined to $1.5 billion – the number that was disclosed to the Court. BCI Ex. 11 (M Ex. 118) ¶ 14 (explaining that "[t]he parties estimate that the cure costs associated with such assumptions and assignments will be approximately $1.5 billion"); 4/26/10 Tr. 161:20-23 (McDade); BCI Ex. 48 (M Ex. 260), 9/17/08 Tr. 24:1-5 (Miller) (stating that "in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts, are estimated to be a billion five hundred million dollars").

Barclays, however, had its own estimate of $200 million for cure payments related to contracts that it deemed to be "mission critical." BCI Ex. 107 (M Ex. 11); 6/22/10 Tr. 225:16-229:15 (Cox) (confirming that his notes in M Ex. 11 read, in pertinent part, that "[t]he 200 mill is for more than 3,000 contracts mission critical[,]"acknowledging that Barclays' liability for mission-critical contracts had been estimated at $200 million and conceding that there was a swing of roughly $1.3 billion of what was told to the Court). Barclays' $200 million estimate was never disclosed to the Court. 6/22/10 Tr. 228:19-229:15, 205:2-3, 206:4-24 (Cox). By September 19, 2008, Barclays had developed internally an "official line" regarding cure payments – namely, that they "are optional and tho [sic] some will be incurred, most will be covered by our ongoing supplier relationships and fall into monthly expenses." M Ex. 41: 4/30/10 Tr. 16:3-12 (Clackson). Ultimately, after taking over the Broker-Dealer Business, Barclays paid only $238,200,978 in cure liabilities through July 14, 2009. Stip. ¶¶ 128, 152,

48

66843

162; *see* BCI Ex. 133 (M Ex. 105) at 00115845 line 41; 9/2/10 Tr. 41:23-42:1, 47:2-25
(Romain).

C.    *Disclosures Made to the Court*

On September 17, 2008, LBHI and LB 745 LLC filed the Bid Procedures Motion,
seeking approval of the sale to Barclays. BCI Ex. 11 (M Ex. 118). The Bid Procedures Motion
describes the sale to Barclays as a transaction that was to be consummated on the terms and
conditions set forth in the APA. BCI Ex. 11 (M Ex. 118) ¶ 5. Because events were taking place
so quickly and the elements of Lehman III had not yet fallen into place, the Bid Procedures
Motion does not disclose the existence or set forth the terms of Lehman III, nor does it reveal a
discounted price for the Purchased Assets or clarify the estimates for compensation and cure
payments. BCI Ex. 11 (M Ex. 118).

On that same day, the Court held the Bid Procedures Hearing. At that hearing, counsel to
Lehman described the nature and overall value of the sale to the Court in connection with a
request for a break-up fee and outlined the components of the Lehman II transaction. BCI Ex. 48
(M Ex. 260) (9/17/08 Tr.) 22:8-24:17 (Miller). The Committee had only just been appointed and
retained its counsel. It therefore requested an adjournment so that it could study the transaction,
but the Court denied that request due to the extraordinary need to move quickly to preserve the
Broker-Dealer Business. BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 27:10-35:1 (Despins, Peck,
Miller).

Although the September 18 Repurchase Agreement was about to become the centerpiece
of the sale transaction, the Court was told virtually nothing about it. Counsel to LBHI described
the repurchase agreements superficially as a means to continue short term financing so that LBI
could get through the week – not as a centrally important mechanism for structuring the

49

**66844**

acquisition and establishing a mismatch between the value of acquired assets and assumed liabilities. BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 24:9-17 (Miller) ("And then, Your Honor, in the interim, LBI has entered into an arrangement with the prospective purchaser where there's a repo agreement in which they are backing up and allowing these repos to be settled and to be financed ...")

With respect to cure liability, the $1.5 billion estimate was specifically disclosed to the Court in connection with the Bid Procedures Motion. First, the Bid Procedures Motion stated that "[t]he parties estimate that the cure costs associated with such assumptions and assignments will be approximately $1.5 billion." BCI Ex. 11 (M Ex. 118) ¶ 14. Additionally, in his presentation to the Court, counsel to LBHI explained that "in connection with the assumption and assignment of contracts, the cure amounts and other payments in connection with the contracts are estimated to be a billion five hundred million dollars." BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 24:1-5 (Miller); *see also* 6/22/10 Tr. 230:8-24 (Cox) (Lehman was making a "good faith estimate" with respect to cure liability).

There was little more disclosed to the court at the Sale Hearing. With respect to the nature of the sale, the Court's understanding at the time was that the transaction had not changed and that the subject matter was the same APA with a lower value for the Purchased Assets than had been described just two days earlier.

It is true that counsel explained to the Court that there were "many changes" to the transaction by the time of the Sale Hearing (and that a Clarification Letter documenting such changes would be forthcoming). Statements from counsel indicated that there was a positive difference between the Purchased Assets and the Assumed Liabilities:

> In terms of the economic changes, they result largely because of the markets, unfortunately. And from the time that the transaction was actually entered

66845

> into till [sic] now, the markets dropped and the value of the securities dropped as
> well. So, originally, we were selling assets that had a value of seventy —
> approximately seventy billion dollars. And today, Your Honor, we're only
> selling assets that have a value of 47.4 billion dollars. Barclays is assuming
> liabilities, however, of 45.5 billion dollars in connection with those assets. So
> that has not changed from the original transaction.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 46:21-47:7 (Fife). Counsel to LBHI mentioned the

September 18 Repurchase Agreement only in passing, however, stating that "Barclays basically

stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit

Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral

that Lehman posted in connection therewith." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 63:18-22

(Miller).

Regarding the estimate for comp, the Court was told that "Barclays will also assume

exposure for the employees that accept offers of employment, which is estimated to have a value

of approximately – an exposure of approximately two billion dollars." BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 99:22-25 (McDade Proffer).

With respect to cure, the disclosure was that "Barclays is also assuming the cure amounts

relating to contracts and leases that will be assumed pursuant to the asset purchase agreement.

And that has a potential exposure … of 1.5 billion dollars … ." BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 100:1-4 (McDade Proffer).

## IV. Notwithstanding Incomplete and Flawed Disclosure, Cause Does Not Exist for 60(b) Relief

The evidence is clear and shows beyond all doubt that the Court did not know some very

basic information regarding the transaction that evolved over the course of Lehman Week. The

Court finds, however, that the failure to disclose this information is not cause for relief under

**66846**

Rule 60(b). Based on the record of the trial, the Court concludes that the parties negotiated in good faith and at arm's length, and that there was no effort to conceal relevant facts.[20]

After careful deliberation and consideration of an extensive record, the Court concludes that nothing in that record would have changed the outcome of the Sale Hearing – *i.e.*, the Court still would have entered an order approving the sale to Barclays even if it had known about the $5 billion "buffer" producing a gain to Barclays on day one of the sale, the differences in the comp and cure estimates versus the amount actually paid (or expected to be paid) and/or the existence and terms of Lehman III. Of particular importance is the lack of any substantial evidence to support a finding that the Sale Order was procured by fraud, misrepresentation, or wrongdoing of any kind. The disclosure problems are real, but they are due to the "fog" of Lehman and an emergency of a magnitude unlike any that has ever occurred in any sale hearing. These failings are, as a result, both understandable and forgivable.

*A.      The Sale was Negotiated in Good Faith and at Arm's Length*

Movants suggest but fail to establish that certain former Lehman executives breached their fiduciary duties because of conflicted loyalties relating to their lucrative employment agreements with Barclays. LBHI Br. Supp. 60(b) Mot. ¶¶ 14, 18, notes 2-12, 26, 115. Throughout the trial, Movants continued to insinuate bad faith on the part of these executives, implying that they were acting in bad faith on behalf of Lehman due to their pending employment at Barclays. During their questioning of Ian Lowitt and Martin Kelly – the only such former Lehman executives that Movants called to testify at trial – however, Movants failed to establish that there was any sort of *quid pro quo* between any Lehman executive and Barclays or any other demonstrated breach of duty. *See* 4/28/10 Tr. 130:10-262:10, 286:13-287:15

---

[20] For example, Archibald Cox, then-Chairman of Barclays America, testified, "Barclays wanted the Court to be in the position to make the right decision" and at no point did he have "any concern that any of the information being provided to the Court was in any way inaccurate or incomplete." 4/30/10 Tr. 206:20-24, 207:18-21 (Cox).

52

**66847**

(Kelly); 4/29/10 Tr. 10:13-131:20, 165:7-179:23 (Lowitt). Numerous witnesses involved in the negotiations confirm that the sale was negotiated at arm's length and in good faith.

That is not to say that Mr. Kelly was a credible witness. The opposite is true. He appeared to be anything but candid and seemed to have been coached to a degree that the Court might well discount everything that he said. The Court believes that he engaged in a process of marking down asset values, but finds no basis for concluding that the valuation process was corrupted by his expectation of becoming a Barclays employee.

The testimony of several of Movants' own witnesses – Harvey Miller, Michael Ainslie, Bryan Marsal and Barry Ridings – supports the conclusion that all parties acted in good faith during the negotiation process. Miller Dep. Tr. 59:18-60:7 (no former Lehman executive acted in bad faith); 4/26/10 Tr. 139:5-9 (Ainsle) (no Lehman employee breached his duty of care or loyalty to Lehman during the negotiations); Marsal Dep. Tr. 76:9-16 (not aware of "any evidence" that any of the Lehman executives involved in negotiating the sale to Barclays breached his fiduciary duties to Lehman); Ridings Dep. Tr. 49:13-50:11 ("no reason to believe" that any former Lehman executive acted in bad faith). Moreover, Lehman's lead negotiator Bart McDade testified both at the Sale Hearing and at trial that the negotiations were in good faith and at arm's length. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 96:6-9 (McDade Proffer); 4/27/10 Tr. 37:14-22, 38:15-20 (McDade).

Also supporting the integrity of the negotiations was testimony regarding the extremely challenging and stressful circumstances under which the negotiations were conducted. Multiple witnesses to the negotiations testified that the negotiations were rigorous, with vigorous disagreements between Lehman and Barclays, and that the negotiations were conducted at arm's length. 8/23/10 Tr. 26:18-27:11, 31:1-4 (Shapiro); 8/27/10 Tr. 25:15-27:24, 40:25-42:6 (Klein);

66848

8/31/10 Tr. 14:18-15:5, 16:5-21, 17:12-20, 228:22-229:14 (Lewkow); 9/7/10 Tr. 21:18-22:2
(Leventhal).

Movants highlighted the fact that a number of the senior Lehman executives who were
negotiating the sale to Barclays on behalf of Lehman at the same time were negotiating their own
employment contracts with Barclays. LBHI Br. Supp. 60(b) Mot. ¶1, notes 2-12. However,
Barclays and Lehman disclosed publicly in the Bid Procedures Motion and at the Sale Hearing
that Barclays would retain the top executives from Lehman and pay them bonuses. BCI Ex. 11
(M Ex. 118) ¶ 19; BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 149:11-16 (Ridings). Employee
retention, especially at senior levels, was a necessary feature of the acquisition. Indeed, in order
to keep the business intact and to prevent the loss of key personnel, Barclays needed to include
competitive bonus commitments in its employment offers to top executives. 8/27/10 Tr. 15:11-
17 (Klein); 8/23/10 Tr. 50:16-25 (Shapiro); 8/31/10 Tr. 15:6-23 (Lewkow). The existence of
such incentives is not surprising, and, more importantly, has not been shown to have influenced
the behavior of these executives.

Barclays made no effort to keep secret the fact that it expected and planned for the sale
transaction to result in a day-one acquisition gain. BCI Ex. 110 (M Ex. 16); 6/22/10 Tr. 91:2-24
(Varley); 6/21/10 Tr. 141:16-142:5 (Diamond); 5/7/10 Tr. 146:21-147:2 (Ricci). Moreover,
Stephen King, who was head of the Portfolio Mortgage Trading Group at Barclays during
Lehman Week, testified that Lehman's trading assets were exceptionally difficult to value
because so many of them were illiquid. 8/25/10 Tr. 26:18-28:3, 32:24-34:9, 60:23-61:15, 66:24-
68:1 (King). In addition, the identity of Lehman's trading assets was constantly changing – many
of the assets in the repo collateral actually delivered to Barclays were different from those that

**66849**

had been pledged to the New York Fed. 8/25/10 Tr. 15:10-16:6, 23:20-24:17, 55:11-56:6, 153:1-154:1 (King).

At the Sale Hearing, certain parties in interest objected to the sale transaction on the basis that Barclays was receiving a "discount value" or "a fire-sale deal," and contended that there was insufficient evidence as to "whether the proposed purchase price represents a fair value for these assets." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 170:8-14, 174:6-8 (Golden), 227:5-14 (Angelich). Counsel for a group of creditors urged the Court to allow more time for possible competing offers. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 167:20-168:3, 171:16-172:2, 174:9-21 (Golden).

In response, counsel to LBHI explained to the Court that

the proceeds of the sale, the 250 million dollars, is going to the SIPC trustee, the one billion 290 million dollars is going to the estate. There is a creditors' committee. Those proceeds are safe. Hopefully, we're going to go into the more conventional procedures of Chapter 11. I don't want to use the melting ice cube. It's already half melted, Your Honor. The steps have had [sic] happened, the things that have happened since Wednesday, make it imperative that this sale be approved. In the interest of all of the stakeholders, including Mr. Golden's clients, they will benefit by this, Your Honor, because if the alternative happens, there will be very little to distribute to creditors, if anything.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 244:11-24 (Miller). The Sale Order (which Movants supported on appeal to the District Court)[21] expressly denied and overruled those creditor objections on the merits with prejudice. BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 2; see also BCI Ex. 17 (M Ex. 444) (SIPA Sale Order).

The Court finds that the estimates for comp and cure that the parties presented at the Sale Hearing were just that – good faith estimates, and not guarantees or representations that these were firm numbers. Barclays did not have the time and information needed for a comprehensive

---

[21] On December 12, 2008, LBHI filed a brief opposing a creditor's appeal of the Sale Order and invoked the terms of the Clarification Letter as a reason for denying the appeal and affirming the Sale Order "in all respects." BCI Ex. 33 (M Ex. 405) at 4, 9, 12, 18, 23, 26. The Trustee filed a brief adopting LBHI's brief. M Ex. 552 at 4, n. 1. *See also* 30-31, *supra,* for a discussion of the procedural history of the Sale Order.

66850

analysis to determine which contracts it would need to assume, and therefore it could not know how much it would have to pay in cure payments. 4/30/10 Tr. 72:1-12, 74:2-75:14 (Clackson); 4/28/10 Tr. 114:22-115:19 (Miller); 8/23/10 Tr. 44:6-45:15 (Shapiro); 8/31/10 Tr. 92:16-25, 93:9-12, 235:20-236:7 (Lewkow). Indeed, the comp and cure estimates necessarily were uncertain and contingent. 4/28/10 Tr. 32:8-19 (Miller) (describing the $1.5 billion figure for cure payments as "contingent"); Miller Dep. Tr. 81:5-14 (total amount that Barclays would end up having to pay in bonuses and severance payments uncertain and contingent).

As explained in the Introduction to this Opinion, the Court did not base its approval of the sale transaction on any specific number or on any perception of a "wash" or a balanced transaction. Just as the APA contained no total valuations and no representations or warranties as to values (and no "true up" to the extent that valuations might change over time), the Court made no findings of specific valuations, and could not have made any such findings given the character and description of the assets and the emergency nature of the hearing.

The circumstances presented during the Sale Hearing were truly extraordinary and unique. The Court approved the Sale because "the consequences of not approving a transaction could prove to be truly disastrous," and "[t]he harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:16-21 (Peck). That conclusion is as true today as it was at the time of the Sale Hearing.

B.    *Barclays Was the Sole Purchaser in a Position to Purchase the Assets as a Going Concern and Prevent a Liquidation that Would Have Caused a Disintegration of the Enterprise*

The reality is that Barclays was the only purchaser for Lehman's assets. The Court knew at the Sale Hearing facts that had been widely reported in the media in the months preceding the

56

66851

Filing Date – Lehman had been looking for a strategic buyer or investor for some time with no success. *See, e.g.,* BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 25:10-18 (Miller) ("For months now, Lehman Brothers has been pursuing strategic alternatives …. [T]he public, the financial markets knew that these assets were for sale"). During Lehman Week, Lazard also contacted various entities that had expressed interest in a transaction with Lehman "but not one of them, nor any other entity, had expressed the desire or ability to step into Barclays' shoes." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 145:5-13 (Ridings Proffer). The Committee refrained from objecting to the sale due to the "lack of a viable alternative." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 67:9-14 (Despins). Barclays was the one qualified buyer in a position to promptly complete a going concern acquisition – it is as simple as that.

Importantly, throughout the 34 days of trial, the Movants did not present any evidence that other potential bidders would have come forward had any of the information not disclosed to the Court been made public. *See generally* M Ex. 151; M Ex. 152; M Ex. 153; M Ex. 154; M Ex. 154B; M Ex. 155B; M Ex. 156B; M Exs. 821-825; 9/20/10 Tr. (Zmijewski); 9/21/10 Tr. (Zmijewski, Garvey, Schneider); 9/29/10 Tr. (Schwaba); 9/30/10 Tr. (Slattery); 10/04/10 Tr. (Olvany). What the evidence does demonstrate is that the disintegration of the enterprise and the liquidation that would have occurred had there had been no sale to Barclays would have resulted in greater economic harm and losses in the financial markets than actually were experienced in September 2008 and succeeding months of the financial crisis. *See, e.g.,* BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 64:19-65:4 (Leventhal); BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 60:1-61:13 (Miller), 67:9-14 (Despins), 93:6-94:20, 102:19-103:7 (McDade Proffer), 143:17-19, 144:18-19, 144:22-24, 146:4-14 (Ridings Proffer), 244:11-24 (Miller), 250:13-21 (Peck); BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 1; 4/26/2010 Tr. 242:23-243:6 (McDade); 6/25/2010 Tr. 61:4-20 (Despins);

66852

5/6/2010 Tr. 118:6-7 (Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-37:15, 65:10-15; 8/23/2010

Tr. 57:19-58:9 (Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-29:8

(Diamond); 6/22/2010 Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-25 (Pfleiderer). As Michael

Ainslie, member of the board of directors of LBHI, testified, in the absence of the sale to

Barclays, LBI's liquidation could result in an "open-ended negative series of claims" on the

estate. 4/26/10 Tr. 96:7-12 (Ainslie).

 Witnesses consistently testified that the Barclays Sale was the best available transaction

for the estate and was far better than an LBI liquidation. 4/26/2010 Tr. 243:3-11 (McDade);

4/28/2010 Tr. 22:20-24 (Miller); 6/25/2010 Tr. 61:4-20 (Despins); 5/6/2010 Tr. 118:6-12

(Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-36:20, 65:4-15; 8/23/2010 Tr. 57:19-58:9

(Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-25 (Diamond); 6/22/2010

Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-85:21 (Pfleiderer).

 The "most important[]" factor for the court in determining whether to approve a § 363

sale is whether the asset is decreasing in value. *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

Thus, a sale should be approved when the court is faced with the situation of a so-called "melting

ice cube," a sale that would prevent "further, unnecessary losses," the failure of other potential

buyers to appear despite "well-publicized efforts," and where the only alternative "is an

immediate liquidation that would yield far less for the estate" and creditors. *Ind. State Police

Pension Trust v. Chrysler LLC (In re Chrysler LLC)*[22], 576 F.3d 108, 118-19 (2d Cir. 2009).

---

[22] After the Second Circuit reaffirmed in a full opinion its earlier summary affirmance of the bankruptcy court's order authorizing a Section 363 sale of the assets of the former Chrysler LLC "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez," the Indiana State Pension Police Trust filed a petition for certiorari to the United States Supreme Court. *Chrysler*, 576 F.3d at 111. During the pendency of the cert petition, the sale of Chrysler's assets was consummated. On December 14, 2009, the Supreme Court issued a summary order granting certiorari, vacating the judgment of the Second Circuit, and remanding with instructions to dismiss the appeal as moot. *Ind. State Police Pension Trust v. Chrysler LLC*, 130 S. Ct. 1015 (2009) (vacating 576 F.3d 108 (2d Cir. 2009)); *see also In re Chrysler LLC*, 592 F.3d 370, 370 (2d Cir. 2010) (per curiam) (dismissing the appeal on remand). *In re Motors Liquidation Company*, 428 B.R. 43, 50 n.6 (S.D.N.Y. 2010) (describing procedural history).

A-1503

66853

With this legal standard from *Lionel* in mind, and having been presented with clear and

convincing evidence of the quickly dissipating assets remaining in the estate, the Court approved

the sale transaction:

> One could be a theoretical bankruptcy jurist and say transactions such as this should always be subject to more time so that parties can better assess the consequences of the transactions …. This is Friday. This case was filed on Monday. What we're doing is unheard of but imperative. I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:5-21 (Peck).

The evidence at trial supports the statements made during the Sale Hearing. Movants

offered no evidence to contradict the proffered Sale Hearing testimony of Mr. Ridings that "the

sale of LBI must be immediately consummated or there will be little or nothing to sell," that

"these assets have substantially greater value if they are sold as a going concern," and that

"[w]ithout Barclays, Lehman would be forced to sell [discrete] assets for a fraction of the value

that will be realized from this transaction." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 143:17-19,

144:18-19, 144:22-24 (Ridings Proffer).

Some 2 ½ years after the Sale Hearing and almost two years since the Sale Order was

affirmed on appeal, the Court also is mindful of the well-established public policy of upholding

the finality of sale orders issued by bankruptcy courts to encourage potential acquirers to make

bids on assets in bankruptcy. *See, e.g., In re Chung King, Inc.*, 753 F.2d 547, 549-50 (7th Cir.

1985) (finality policy necessary to encourage bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d

Cir. 2002) (citations omitted) (finality policy "particularly important" in the context of a

---

Notwithstanding this procedural history, the references to a "melting ice cube" in the *Chrysler* opinion provide a most persuasive rationale for expedited sale hearings.

A-1504

66854

bankruptcy sale order). Because the finality of bankruptcy sales is necessary to encourage serious bidders, the Court has limited discretion to vacate a sale order. *See Chung King,* 753 F.2d 547, 549-50 (7th Cir. 1985) (to overturn a confirmed sale, a court must find "a fundamental defect which would shock the conscience"); *accord, In re General Insecticide Co.,* 403 F.2d 629, 630-31 (2d Cir. 1968) (citations omitted) (strict standard for setting aside sale unless "tinged with fraud, error or similar defects" due to emphasis on finality in judicial sales).

In the Sale Order, the Court specifically held that Barclays was "entitled to all of the benefits and protections afforded by Bankruptcy Code Section 363(m)." BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 18. Section 363(m) affords purchasers of a debtor's assets an "assurance of finality" with respect to "who has rights to estate property." *In re Gucci,* 126 F.3d 380, 387 (2d Cir. 1997); *see also United States v. Salerno,* 932 F.2d 117, 123 (2d Cir. 1991) (conclusion to uphold terms of sale under Section 363(m) "furthers the policy of finality in bankruptcy sales"). Where, as here, (i) a significant amount of time has passed, (ii) the Sale Order has been affirmed on appeal, and (iii) the appellate court has rejected challenges to the Sale Order's core provisions, held that the sale was adequately noticed, and found that the purchaser acted in good faith, the Court should apply a strict "shocks the conscience" standard. Under this standard, Rule 60(b) relief is warranted only if the new evidence presented would have changed the outcome of the Sale Hearing.

Many Courts have denied Rule 60(b) relief without a reason of "such importance that it probably would have changed the outcome" of the case. *Teamsters,* 247 F.3d 370, 392 (2d Cir. 2001) (citations omitted) (no relief despite proof of perjury, because result would have been the same); *see also Fitzgerald v. Field,* No. 98-7574, U.S. App. LEXIS at *6 (2d Cir. 1999) (affirming rejection of Rule 60(b) fraud claim where the alleged fraud "could not have affected

66855

the outcome"); *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999) ("Rule 60(b)(1) affords a party relief from a material mistake that changed the outcome of the court's judgment").

Courts regularly have applied the "changed the outcome" test to claims under all subsections of Rule 60(b). *BOUSA, Inc. v. United States (In re Bulk Oil (USA) Inc.)*, No. 89-B-13380, 2007 U.S. Dist. LEXIS 27346, at *29-31 (S.D.N.Y. Apr. 11, 2007) (Rule 60(b)(1)); *Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (same); *In re Vitta*, 409 B.R. 6, 12 (Bankr. E.D.N.Y. 2009) (same); *Teamsters*, 247 F.3d at 392 (Rule 60(b)(2)); *Epps v. Howes*, 573 F. Supp. 2d 180, 184 (D. D.C. 2008) (same); *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161, 174 (Bankr. S.D.N.Y. 2004) (same); *Bettis v. Kelly*, No. 02 Civ. 104, 2004 U.S. Dist. LEXIS 1543 at *5-6 (S.D.N.Y. Aug. 9, 2004), *aff'd*, 137 F. App'x 381 (2d Cir. 2005) (Rule 60(b)(3)); *Creamer v. Laidlaw Transit, Inc.*, 76 F. App'x 273, 275 (10th Cir. 2003) (Rule 60(b)(6)). Based on this standard, and for the reasons stated, the Court finds that Movants are not entitled to relief on their Rule 60(b) claims.

## V.    The Expert Testimony Supports the Conclusion that Barclays Did Not Receive a Windfall

The decision not to grant relief under Rule 60(b) also is supported by an assessment and weighing of the expert testimony presented by the parties. The Court heard this testimony over an eight-day period and admitted into evidence the expert reports of eight witnesses. During this phase of the trial, Movants sought to prove that Barclays obtained a huge economic benefit due to the undisclosed discounting of the value of the acquired financial assets and that Barclays adopted "low-ball" numbers on its Acquisition Balance Sheet that by coincidence exactly matched the amounts ascribed to these assets by the negotiating teams for Lehman and Barclays. Movants raised questions about the credibility of the valuation judgments made by Barclays, but they have not succeeded in proving that these judgments were erroneous. Largely on the

66856

strength of the testimony of Professor Paul Pfleiderer, who was the final witness for Barclays and who testified for two days, Barclays was able to convincingly establish its defense to the allegation that it obtained a windfall in connection with the acquisition.

*A. Barclays' Valuation Expert*

Barclays called Professor Paul Pfleiderer as an expert witness whose testimony tied together all of the evidence relating to valuation in a most persuasive and comprehensive manner. He testified regarding a number of issues, notably whether the APA misstated the book value of the assets being acquired by Barclays, and the value of the repo collateral that was actually acquired by Barclays in the sale transaction. 10/6/10 Tr. 10:14-25 (Pfleiderer). Notwithstanding the efforts of the Movants to show that Professor Pfleiderer was being used as a mouthpiece for witnesses from the Product Control Group of Barclays and from Pricewaterhouse Coopers ("PWC") who did not appear at trial, the Court accepted Professor Pfleiderer as an expert in financial economics and valuation and found his testimony to be most helpful. 10/6/10 Tr. 14:21-25, 15:1 (Pfleiderer).[23]

Professor Pfleiderer has a Ph.D. in economics from Yale University and has been a professor of finance at Stanford Graduate School of Business for almost thirty years. 10/6/10 Tr. 6:20-25, 7:1-1 (Pfleiderer). Professor Pfleiderer primarily teaches finance courses devoted to valuation to graduate students in the MBA program. 10/6/10 Tr. 7:4-16 (Pfleiderer). He also currently teaches a corporate finance course at Stanford Law School. 10/6/10 Tr. 7:6-8 (Pfleiderer). As was true of his testimony as a valuation expert in the *Iridium* case, the Court again finds Professor Pfleiderer to be "an especially credible witness" and that Professor

---

[23] Barclays also called Anthony Leitner as an expert in the exchange-traded derivatives industry. Mr. Leitner's opinions do not relate to the value of the assets stated in the APA or the value of the repo collateral, but rather relate to the Disputed Assets, and specifically, whether Barclays was entitled to the margin and related property in connection with its acquisition of Lehman's exchange traded derivatives portfolio.

66857

Pfleiderer once again "responded to questions, both on direct examination and during cross examination, with great candor." *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* 373 B.R. 283, 337 (Bankr. S.D.N.Y. 2007).

Based upon his review of Lehman's financial records, Professor Pfleiderer concluded that the book value of the assets being acquired by Barclays was not understated in the APA by any significant amount, particularly not by $5 billion, and that the book value according to Lehman's financial records was approximately $70 billion or less. 10/6/10 Tr. 19:15-20, 49:7-13 (Pfleiderer). Professor Pfleiderer also concluded that the repo collateral was reasonably valued. 10/6/10 Tr. 19:22-25, 20:1-2 (Pfleiderer).

In testifying regarding the value of the repo collateral, Professor Pfleiderer explained that the repo collateral included many financial assets that were illiquid and difficult to value under normal circumstances, judgment is required in valuing such assets, reasonable people may have different opinions concerning such valuations and, therefore, there is not one reasonable valuation for such assets, but a range of reasonable valuations. 10/6/10 Tr. 93:10-94:25, 95:23-96:5, 123:22-124:7 (Pfleiderer); 10/7/10 Tr. 7:17-8:22 (Pfleiderer). Moreover, Professor Pfleiderer testified that it was even more difficult to value the repo collateral due to the market turmoil that existed during September 2008. 10/7/10 Tr. 6:21-7:3 (Pfleiderer).

Professor Pfleiderer indicated that in forming his opinion as to the reasonable valuation of the repo collateral he considered it important that the Barclays' personnel who conducted the valuation and made the difficult valuation judgments were active participants in the market with a feel for the specific market conditions that existed in late September 2008 and that independent PWC personnel reviewed the reasonableness of these judgments. 10/7/10 Tr. 88:20-89:13, 177:10-178:6 (Pfleiderer). Professor Pfleiderer further testified that he did not find anything to

**66858**

indicate that Barclays attempted to mislead in its valuation, and he was reassured by the

knowledge that PWC had extensively audited Barclays' valuation judgments. 10/7/10 Tr.

185:18-22 (Pfleiderer); 10/6/10 Tr. 120:16-121:3, 143:16-144:6, 146:9-147:1, 181:8-10, 182:10-

14, 193:16-21 (Pfleiderer); *see also* 10/7/10 Tr. 94:17-96:17 (Pfleiderer). He observed that the

process of an outside audit of the valuation, such as the audit conducted by PWC, generally will

produce a more reliable valuation. 10/7/10 Tr. 95:11-96:17 (Pfleiderer).

    Additionally, Professor Pfleiderer expressed the opinion that in a so-called "fire sale"

liquidation of the assets transferred to Barclays it is "almost inconceivable" that Lehman would

have realized as much consideration as it received for the assets from Barclays and that the

likelihood is that a "fire sale" liquidation would yield "significantly less" for such assets. 10/7/10

Tr. 186:21-187:9 (Pfleiderer). He also testified that Lehman "did better than what it would have

done if it would [have] had a liquidation" and that there was no doubt in his mind that this was

"the case with very, very strong probability." 10/6/10 Tr. 208:19-21 (Pfleiderer). Furthermore,

Professor Pfleiderer stated that Lehman "couldn't have done better; the estate could not have

done better by selling it to another bidder for more, because there wasn't another bidder."

10/6/10 Tr. 208:22-24 (Pfleiderer).

    The Court accepts Professor Pfleiderer's conclusions regarding the value of the assets

sold to Barclays and the valuation of the repo collateral. He was persuasive in pointing out that

these hard to value assets were being valued by persons who were intimately familiar with both

the assets and the relevant markets at a time of unusual market disruptions, and that such

valuations were independently audited by a third-party auditor and found to be reasonable. His

cogent and coherent testimony also supports the ultimate conclusion that Barclays did not

64

66859

receive an unfair advantage when it purchased the Broker-Dealer Business and further demonstrates that there is no cause to grant 60(b) relief.

B.     *Movants' Valuation Experts*

The Movants' called a total of six experts to testify with respect to valuation matters, all of whom are either employed by or affiliated with Navigant Economics (Chicago Partners), an "economic consulting firm that consults primarily in the litigation or dispute space," or its parent Navigant Consulting Inc. 9/21/10 Tr. 27:7-8, 12-14 (Garvey); 9/20/10 Tr. 8:15-17 (Zmijewski); 9/21/10 Tr. 147:6-10 (Schneider); M Ex. 154B (Corrected Expert Report of Joseph Schwaba) ¶ 1; 9/30/2010 Tr. 19:11-13 (Slattery); 10/4/10 Tr. 10:20-25 (Olvany). The Court accepted Professor Mark Zmijewski as an expert in accounting, financial analysis and valuation; John Garvey as an expert in accounting, auditing and financial analysis issues; John Schneider as an expert in the area of custodial services, particularly with respect to the policies and procedures followed by custodians in dealing with repurchase agreements; Joseph Schwaba as an expert in the valuation of municipal securities; Mark Slattery as an expert in the valuation of fixed-income securities; and John Olvany as an expert in the valuation of corporate securities. 9/20/10 Tr. 15:4-12 (Zmijewski); 9/21/10 Tr. 33:1-3, 40:1-20 (Garvey); 9/21/10 Tr. 151:8-13 (Schneider); 9/29/10 Tr. 53:13-16 (Schwaba); 9/30/10 Tr. 21:14-17 (Slattery); 10/4/10 Tr. 14:14-17 (Olvany).

Despite the individual and cumulative expertise of these multiple witnesses called by the Movants, they were not at all convincing at trial and uniformly appeared to be working in concert to achieve a desired outcome for the Movants. Movants' experts were not themselves market participants, and they performed their valuations specifically in connection with this litigation knowing that the Movants alleged that Barclays had undervalued the assets and were seeking a quantification of such undervaluation. 9/20/20 Tr. 108:7-109:3, 110:22-111:7, 111:21-

66860

112:9 (Zmijewski); M Ex. 151 (Expert Report of John P. Garvey) ¶6, App. 1; M Ex. 153A (App. II to John J. Schneider Expert Report, Curriculum Vitae); M Ex. 154A (App. I to Expert Report of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr. 75:8-18 (Schwaba); M Ex. 155A (App. I to Expert Report of Mark E. Slattery, CFA, Curriculum Vitae); 9/30/10 Tr. 59:13-15, 60:3-11 (Slattery); M Ex. 152A (App. I to Expert Report of John J. Olvany, Curriculum Vitae); 10/4/10 Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany). They were hired to reach a certain conclusion, and that is what they did.

However, counsel for Barclays was able to challenge the methods used and conclusions reached by certain of these witnesses. Cross-examination raised doubts as to their opinions.[24] Additionally, these experts did not express any views that the Acquisition Balance Sheet, which was audited by PWC, understated the value of the assets acquired by Barclays in the sale transaction. Mr. Garvey specifically testified that he was not giving an opinion with respect to whether Barclays' financials were materially misstated under applicable law, whether the Acquisition Balance Sheet was unreasonable or incorrect, or whether there were any material misstatements included in the Acquisition Balance Sheet. 9/21/10 Tr. 46:3-9, 84:17-25, 85:1-86:4 (Garvey).

C.    *Legal Standards Regarding the Reliability and Credibility of Expert Testimony*

A proponent of expert testimony must demonstrate that the proffered testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993);

---

[24] For example, Barclays' cross-examination of Mr. Slattery revealed that the summary spreadsheet prepared by Mr. Slattery in connection with his valuation of the Agency Residential Mortgage Backed Securities portfolio misleadingly demonstrated that in valuing the portfolio Mr. Slattery calculated the "bid" price by reducing the "mid" price by a "mid-to-bid" liquidity factor adjustment when for certain securities he actually started with a "bid" price and reverse-engineered, or "grossed up" the "bid" price to create the "mid" price. 9/30/10 Tr. 102:1-107:2, 111:7-112:3 (Slattery).

66861

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, *509 U.S. at 597*).

The *Daubert* factors apply not only to the admissibility of evidence, but also apply to weight and credibility determinations. *See e.g., Elliot v. Commodity Futures Trading Comm'n*, 202 F.3d 926, 934-35 (7th Cir. 2000) (affirming district court's decision to ignore unreliable testimony and finding that a "fact-finder should employ the reliability benchmark in situations … in which unreliable expert testimony somehow makes it in front of the fact-finder, and assign the unreliable testimony little if any weight"); *Libas, Ltd. v. U.S.*, 193 F.3d 1361, 1366 (Fed. Cir. 1999) (reliability of expert testimony applies to the weight accorded to that testimony as well as its admissibility).

To assess whether expert testimony meets the requisite standards the court should undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

An expert's opinion that is not "based on sufficient facts or data" nor "the product of reliable principles and methods properly applied," should be rejected. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) aff'd 99 F. App'x. 274 (2d Cir. 2004); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp.2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony where "the plaintiff's experts have ignored a large amount of information that calls many aspects of the [expert's theory] into question" and explaining that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect")

Expert opinion is unreliable and not based on sufficient facts and data when the expert "made no attempts to reconcile his view [] with a number of real world events" and "fail[s] to

66862

acknowledge and account for these events." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676, at *24, *33-35, *43 (S.D.N.Y. Feb. 23, 2004). "[F]ailure to look" at facts, "even for a reality check" means that an expert lacks sufficient facts and renders his opinion unreliable. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005).

D.     *The Expert Opinions Regarding Valuation Offered by the Movants are Not Persuasive*

The Court gives little weight to the testimony of Movants' experts. As discussed above, the expert witnesses proffered by the Movants, none of whom were market participants in September 2008, all prepared their valuations for the express purpose of this litigation. 9/20/20 Tr. 108:7-109:3, 110:22-111:7, 111:21-112:9 (Zmijewski); M Ex. 151 (Expert Report of John P. Garvey) ¶6, App. 1; M Ex. 153A (App. II to John J. Schneider Expert Report, Curriculum Vitae); M Ex. 154A (App. I to Expert Report of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr. 75:8-18 (Schwaba); M Ex. 155A (App. I to Expert Report of Mark E. Slattery, CFA, Curriculum Vitae); 9/30/10 Tr. 59:13-15, 60:3-11 (Slattery); M Ex. 152A (App. I to Expert Report of John J. Olvany, Curriculum Vitae); 10/4/10 Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany). They presented a mosaic of conclusions based upon their valuations of particular classes of assets acquired by Barclays. These witnesses engaged in a result-oriented exercise of looking retrospectively and critically at the judgments made by Barclays, on a CUSIP-by-CUSIP basis, as part of a concerted effort of trying to find a windfall. Experts who are valuing assets with such a litigation bias are not as compelling as those who actually had a "feel for this particular market in late September 2008." 10/7/10 Tr. 177:25-178:5 (Pfleiderer).

The Court agrees with Professor Pfleiderer's observation that a "de novo after the fact valuation" given in a litigation context is of limited merit in determining whether

68

66863

contemporaneous valuation judgments performed by Barclays were reasonable.  10/6/10 Tr. 89:1-9 (Pfleiderer).  This is particularly true in a setting such as this in which the after-the-fact judgments are seeking to upset the valuation determinations of market participants that were made during a period of unusually severe market volatility.

It was a time of such upheaval that the only thing that was certain was uncertainty.  Given the unparalleled circumstances of the financial markets in the fall of 2008 and heightened uncertainty regarding the reliability of valuation judgments, the Movants' experts were challenged with effectively calling into question the judgments made during this period by Barclays' personnel such as Stephen King, who seems to have been one of the masters of that valuation universe.  The Court finds that Movants' experts failed to prove that the assets were valued improperly and, based on the examination and cross-examination of the Movants' experts, the Court is left with the strong impression that their valuations are unreliable.

Theirs was a difficult task.  Among other things, they needed to disprove the reasonableness of the accounting judgments made by Barclays in its Acquisition Balance Sheet, but they were unable to do so at least in part because they do not assert that Barclays' audited financial statements are misleading.  9/21/10 Tr. 46:3-9, 84:17-25, 85:1-86:4 (Garvey).  Their decision not to challenge these financial statements is an indication that for the purposes of public disclosure Barclays' valuation judgments appear to be adequate (or at least not misleading).

The Court finds that the hindsight valuation performed by Movants' experts (i) does not take into consideration the judgments of those actively participating in the market in September 2008 and the real world events and unique circumstances of that market, (ii) is not based on

69

66864

sufficient facts and data and (iii) is not sufficiently reliable to support a finding that Barclays

received a windfall. *See Point Prods. A.G.,* 2004 U.S. Dist. LEXIS 2676, at *24, *43.

**VI.   Resolution of Claims to the Three Classes of Disputed Assets**

Barclays claims that the Clarification Letter unconditionally entitles it to the three classes

of Disputed Assets: (i) the 15c3-3 Assets, (ii) the Margin Assets, and (iii) the Clearance Box

Assets. In addressing issues relating to the Clarification Letter, the Court must first determine

whether the conduct of the parties in relying on both the Sale Order and the Clarification Letter,

as was expressly anticipated by the Sale Order, is a reasonable substitute for actual approval by

the Court. To the extent that the Clarification Letter is treated as an enforceable document, the

Court must interpret its plain language to determine which party is entitled to each of the three

classes of Disputed Assets. As explained below, the letter is enforceable and supports recovery

of the Clearance Box Assets but does not support Barclays' claims to an unconditional right to

the 15c3-3 Assets or to recovery of the Margin Assets.

*A.*   *The Court Did Not Approve the Clarification Letter as it Relates to the Disputed Assets*

The sale transaction evolved significantly throughout the week immediately preceding

the Sale Hearing. Even during the Sale Hearing, the Court was aware that certain details of the

transaction remained outstanding and would be subject to final documentation before closing[25]

but understood that the language of the Clarification Letter would not "materially" modify the

terms of the transaction approved by the Sale Order in a way that would adversely impact

Lehman's bankruptcy estates. *See* BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 25.[26] Absent such a

---

[25] At the Sale Hearing, the lawyers from Weil Gotshal representing LBHI and LBI explained that the transaction documentation was not yet complete. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife).

[26] Moreover, the Sale Order authorized the Debtor to enter into final documentation "provided that such additional documents do not materially change its terms." BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 3.

66865

material change, the Sale Order did not require the parties to present additional documentation to the Court for approval.[27]

Rather than contacting the Court to request a hearing concerning the form and content of the letter agreement that was being revised throughout the weekend,[28] the parties elected not to present the Clarification Letter to the Court for approval and simply filed the Clarification Letter as an exhibit to the notice of filing of the APA. *See* Case No. 08-13555, ECF No. 280 (Notice of Filing of Purchase Agreement, Ex. C). Given the content of the document and the inability to be sure about the materiality of the changes, this decision in retrospect appears expedient and probably in error. To the extent that Barclays intended to rely on the language of the Clarification Letter in asserting rights to the Disputed Assets, it would have been proper (and certainly better practice) to have sought the Court's explicit "blessing" of such a key transactional document. As a sophisticated party seeking to purchase assets from a bankruptcy estate, Barclays should have taken all appropriate steps to confirm that all transfers were indisputably authorized.

Barclays, however, insists that additional approval of the Clarification Letter was not necessary because it did not materially change the transaction described to the Court at the Sale Hearing and was, therefore, already "approved" by the Court pursuant to the Sale Order. *See, e.g.*, 10/21/10 Tr. 133:24-134:10 (Boies) ("[T]he Sale Order then went on to expressly approve the purchase agreement including the clarification letter …"); 10/21/10 Tr. 139:8-9 (Boies) (the Clarification Letter "is part of the Purchase Agreement. It is expressly approved in that Sale

---

[27] Nonetheless, at the Sale Hearing, the parties announced their intent to present the final documentation of the transaction to the Court for approval at a subsequent date. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife) ("And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here").

[28] The Court announced that it would be available to discuss the Clarification Letter during the weekend following the Sale Hearing.

66866

Order"). Barclays argues that although the portion of the Clarification Letter relating to the Disputed Assets was never presented for approval, it can be effectively "deemed" approved because the transfer of such assets was sufficiently contemplated by the Court at the time of the Sale Order. *See* Barclays Post-Trial Mem. ¶ 150 ("Whether the Clarification Letter is viewed as having been approved in its then-existing oral form or prospectively in its final written form, the Sale Order expressly approves the Clarification Letter ... "). According to Barclays, such assets were necessarily part of the transaction approved by the Sale Order because that order approved Barclays' acquisition of LBI's entire "Business." *See* Barclays Post-Trial Mem. ¶¶¶ 225, 242, 247.[29]

The Court repeatedly has rejected this circular aspect of Barclays' argument. *See* 10/21/10 Tr. 136:22-137:12 (Peck) ("Let me be clear about something . . . I never approved the clarification letter . . . I said that at the opening and I'm saying it again at the closing. . . No proceedings took place before this Court to approve the clarification letter *per se* ... I'm just letting you know that that's an aspect of your argument that I reject"). The Court believes that separate approval of the Clarification Letter should have been requested because provisions of the document relating to the Disputed Assets materially modified the transaction that was approved by the Court at the Sale Hearing. Approval of the transaction necessarily was premised on there being an alignment between the substance of the transaction as understood by the parties and the elements of the transaction that were disclosed at the Sale Hearing.

Given the many moving parts, the complexity of the acquisition, and the extreme time pressure, the Court knew that the Sale Order needed to be flexible enough to accommodate

---

[29] The APA broadly defined "Purchased Assets" to include "all of the assets of Seller ... used in connection with the Business (excluding the Excluded Assets) ...." BCI Ex. 1 (M Ex. 1) (APA) § 1.1. The "Business," in turn, was broadly defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller ...." BCI Ex. 1 (M Ex. 1) (APA) § 1.1.

66867

changes to the APA. This concept was reflected in the Sale Order, which contemplated final documentation materially consistent with its terms. But the Court was not aware at the time of the Sale Hearing that the transaction included the Disputed Assets nor did the Court know anything about the so-called asset scramble in which Barclays used the threat of walking from the deal to demand more assets. In fact, as to certain of the Disputed Assets, the Court had the exact opposite understanding and believed, for example, that all cash, including the Margin Assets, was excluded from the transaction.[30]

Although the Court approved Barclays' acquisition of LBI's "Business" as a whole, its authorization was not limitless. The transfer of such significant previously-undisclosed classes of assets from the LBI estate constitutes a "material adverse" modification of the transaction compared with previous disclosures to the Court, notwithstanding any ancillary benefits that may have been received pursuant to other portions of the Clarification Letter. *See* Barclays Post-Trial Mem. ¶ 157 ("But even if the Clarification Letter had added additional assets that were not part of the Purchased Assets in the APA (it did not), the Clarification Letter also made many changes favorable to the Movants, which must be considered in assessing whether the Clarification Letter had a material adverse effect on the estates").

B.    *Despite the Lack of Formal Court Approval, the Clarification Letter is Nonetheless Enforceable*

Although the provisions of the Clarification Letter relating to the Disputed Assets were never approved by the Court, the parties relied upon the letter as a whole and treated the letter as binding and enforceable. The Movants also actively defended the validity of the letter on appeal

---

[30] The cash-free nature of the sale constituted a critically important structural component of the sale approved by the Court. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 253:5-8 (Peck) ("I'm satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the debtor from Europe was cash that in practical terms we should be safe").

66868

before the District Court. *See* BCI Ex. 33 (M Ex. 405); M Ex. 552. The SIPA Trustee opposed

"vacating the Sale Orders because of the havoc such a result would cause in the SIPA proceeding

that he administers, in which many decisions have been made based on the entry of the Sale

Orders, and during which many billions of dollars of property have changed hands." M Ex. 552

at 1.

The conduct of the Movants confirms widespread reliance on the letter. For example, in

a joint submission with Barclays dated September 29, 2008, LBHI described the Clarification

Letter as "clarify[ing] the intention of the Parties with respect to certain provisions of the

Purchase Agreement, amend[ing] the Purchase Agreement in certain respects, and … binding …

the Parties. As more fully described in the Clarifying Letter, the Schedules contain lists of

securities and trading positions transferred under the Purchase Agreement." *See* BCI Ex. 19 ¶ 7.

In the Settlement Motion, the SIPA Trustee cited and relied upon the Clarification Letter. BCI

Ex. 29 ¶ 16 ("The Clarification Letter provided that the Replacement Transaction was

terminated, and that the securities that had actually been delivered were 'deemed to constitute

part of the Purchased Assets' under the Purchase Agreement"); BCI Ex. 50 (M Ex. 262)

(12/22/08 Tr.) 23:21-24 (Kobak) ("And again, I just want to make it clear that what this

settlement really accomplishes is completing the very transaction contemplated in the purchase

agreement as approved by this Court"). Even as late as August 6, 2009 (and just five weeks

before the filing of the 60(b) Motions), the SIPA Trustee stipulated that the Clarification Letter

was part of the approved APA: "On September 20, 2008, the Court entered the sale order (the

'Sale Order') approving the Asset Purchase Agreement, as modified, clarified, and/or amended by

the First Amendment, and a letter agreement, dated as of September 20, 2008, clarifying and

supplementing the Asset Purchase Agreement." BCI Ex. 377 at 2 (emphasis in original).

74

66869

Similarly, Barclays acted in reliance on the Clarification Letter and treated the letter as binding when it agreed to close the transaction based on the terms of the Clarification Letter. Barclays accepted the transfer of thousands of customer accounts, and offered employment, made bonus payments, and provided severance protection to thousands of former Lehman employees. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 98:10-12, 101:18-102:2 (McDade Proffer). Barclays assumed contracts and made related cure payments. BCI Ex. 1 (M Ex. 1) (APA) § 2.5. Operationally, Barclays integrated Lehman's North American business into its existing operations, and did so on the basis of the APA as modified by the Clarification Letter. *See* 6/21/10 Tr. 232:3-5 (Diamond).

In light of this reliance and the conduct of the parties in treating the Clarification Letter as a valid expression of their agreement, the Clarification Letter is enforceable notwithstanding the lack of formal bankruptcy court approval. Although the omission from the Sale Hearing of any meaningful discussion of the Disputed Assets may have deviated from the core principles of disclosure underlying Section 363 of the Bankruptcy Code, such a failure does not render the Clarification Letter unenforceable in this instance because the parties themselves have acted in reliance upon the Clarification Letter and have treated the document as enforceable. *See, e.g., Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (noting that Section 363 prohibits a debtor from selling estate property out of the ordinary course of business "until creditors and other interested parties are given notice of the proposed transaction and the opportunity for a hearing if they object"). By their conduct, including the decision not to seek further approval of the letter, they have acted as if the Sale Order embraces the Clarification Letter.

66870

Accordingly, despite the failure to obtain explicit approval of the Clarification Letter, the Court will regard the document as having been approved under the broad language of the Sale Order. Furthermore, even within the context of this litigation, both Barclays and the SIPA Trustee agree that it is appropriate to enforce the Clarification Letter according to its plain terms — the parties simply disagree as to the meaning of those plain terms. *See* SIPA Trustee Post-Trial Mem. ¶ 416 (The Court "need not reach the question of whether it approved the final version of the Clarification Letter … [i]t is only if the Court were to agree with Barclays' reading of the Clarification Letter that it must consider whether … it approved the transfers that Barclays now seeks"); Barclays Post-Trial Mem. ¶ 223 ("[A]s a matter of straightforward contractual interpretation, [Barclays] is entitled to each of the Disputed Assets"). In light of this uniform reliance on the Clarification Letter and conduct of the parties that recognizes the legally binding nature of its terms, the Court will interpret the Clarification Letter as an enforceable agreement to the same extent as if it had been separately approved after notice and hearing.

C.     *Barclays Does Not Have an Unconditional Right to the 15c3-3 Assets and Is Not Entitled to Margin Assets But Is Entitled to Transfer of the Clearance Box Assets*

The relevant agreements are governed by New York law and must be interpreted according to familiar principles of contractual construction. *See Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139, 146 (2d Cir. 2010) (principles of state law govern the interpretation of contractual provisions in bankruptcy). The Court must therefore endeavor to ascertain the intent of the parties "from the plain meaning of the language employed in the agreements." *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (citation omitted).

Where the Court finds the contractual language ambiguous, it may consider extrinsic evidence of the parties' intent. *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989)

**A-1521**

**66871**

(where a provision is ambiguous, "courts look to the … circumstances surrounding execution of the ambiguous term to ascertain the parties' intent"). Extrinsic evidence includes "the history and education of the parties, the nature of the contract, the purposes of the parties and all other relevant circumstances." *In re LaToya Jackson*, 434 B.R. 159, 166 (Bankr. S.D.N.Y. 2010) (quoting *In re Delta Airlines, Inc.*, 608 F.3d at 145-6).

Close inspection of the plain text of the Clarification Letter, as well as the extrinsic evidence surrounding its negotiation, execution, and implementation, reveals that there simply was no agreement to unconditionally transfer the 15c3-3 Assets or to transfer any of the Margin Assets to Barclays. Moreover, regardless of the language in the Clarification Letter, Lehman cash was excluded from the APA.

*i.    The 15c3-3 Assets*

The 15c3-3 Assets consist of (i) $769 million in securities segregated by LBI for its customers in compliance with SIPA and Rule 15c3-3[31] and (ii) $507 million in assets posted by LBI as margin with the Options Clearing Corporation (the "OCC") and listed as a debit item in LBI's reserve calculation for purposes of Rule 15c3-3.[32] Any transfer of these 15c3-3 Assets is thus governed by the two complementary regulatory regimes of SIPA and Rule 15c3-3. First, SIPA requires that broker-dealers such as LBI set aside securities and other assets sufficient to "satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(B). Second, Rule 15c3-3

---

[31] *See* 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3").

[32] According to Barclays, Rule 15c3-3 does not prohibit the transfer of the $507 million in margin deposits because these deposits were held outside of LBI's Rule 15c3-3 reserve account. *See* Letter (the "Barclays Letter") from Counsel to Barclays to the Court, copying Counsel to Movants and the SEC, dated December 20, 2010, responding to December 16, 2010 Letter from SEC to the Court (Case No. 08-13555, ECF No. 13517 and Case No. 08-01420, ECF No. 3987) (The Barclays Letter was not filed on the docket of any proceeding before this Court.) The SEC and SIPC plainly disagree. *See* SEC Post-Trial Mem. at 9 ("Transferring [the $507 million] Would Cause a Violation of the Rule If the Transfer Would Increase the Deficiency in the Reserve Bank Account …"); Case No. 08-01420, ECF No. 2989 (Statement of SIPC in Support of Trustee's Motion for Relief) at 13-15. The Court agrees with the SEC and SIPC. To the extent any deficit exists, it would be exacerbated by the transfer of the $507 million and, in so doing, violate Rule 15c3-3.

A-1522

66872

requires the maintenance of reserves of customer property to ensure full recovery for its customers in the event of its liquidation. Rule 15c3-3 accomplishes this objective primarily through two requirements: (i) the broker-dealer's reserve account should contain sufficient funds "at all times" to allow a firm to promptly return customer property and (ii) such assets may only be withdrawn if they constitute a surplus over the required minimum balance. 17 C.F.R. § 240.15c3-3(e)(1), (2); 17 C.F.R. § 240.15c3-3(g). To that end, Rule 15c3-3 provides a "Reserve Formula" to calculate the minimum required balance for a broker-dealer's reserve account. *See* SEC Post-Trial Mem. at 9-10.

The Clarification Letter respects the interplay between this regulatory regime and the 15c3-3 Assets. Specifically, it provides that Barclays shall be entitled to receive the 15c3-3 Assets only if "permitted by applicable law." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8 ("In connection therewith, Purchaser shall receive … (ii) *to the extent permitted by applicable law*, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value") (emphasis added). Thus, this provision is conditional and recognizes that in the event of a deficit in LBI's customer reserve accounts,[33] SIPA and Rule 15c3-3 may prevent the SIPA Trustee from transferring any property from these accounts.

Barclays argues that Rule 15c3-3 does not constitute "applicable law" as referred to in the Clarification Letter because it does not apply to a liquidating broker-dealer such as LBI. *See*

---

[33] The Trustee and Barclays have stipulated to defer consideration of the factual issue as to whether a deficit or excess exists with respect to LBI's customer reserve accounts, and no findings are being sought with respect to that issue. *See* Case No. 08-13555, ECF No. 13824 and Case No. 08-1420, ECF No. 4020 (Stipulation and Order Between the Trustee and Barclays Concerning Certain Claims Under Paragraph 8(ii) of the Clarification Letter Made in the Motion and Adversary Complaint Filed by the Trustee and the Motion to Enforce the Sale Order Filed by Barclays).

66873

Barclays Post-Trial Mem. ¶ 270. But the post-trial brief filed by the SEC contradicts Barclays' position. *See* SEC Post-Trial Mem. at 5-8. To carry out the requirements of SIPA, trustees of a liquidating broker-dealer such as LBI must continue to effect securities transactions, such as purchasing securities to satisfy customer claims for missing securities and closing out open securities contracts. 15 U.S.C. § 78fff-2(d), (e). To engage in these transactions, a liquidating broker-dealer must remain registered with the SEC and subject to relevant SEC Rules, including Rule 15c3-3. 15 U.S.C. § 78o(a)(1). Moreover, adopting Barclays' argument would undermine the policy objective underlying Rule 15c3-3. That objective is the retention of sufficient funds to make the customer whole in the event of an insolvency. Indeed, the customer protections intended by Rule 15c3-3 are perhaps most needed following the failure of a broker-dealer.

In the alternative, Barclays argues that the Clarification Letter, when properly construed, actually entitles Barclays, not the SIPA Trustee, to the 15c3-3 Assets. It argues that the phrase "to the extent permitted by applicable law" only limits Barclays' ability to receive those particular 15c3-3 Assets held in LBI's customer reserve accounts at the time of the execution of the Clarification Letter. In the event that applicable law prevents such a transfer, according to Barclays, then the Clarification Letter would still entitle Barclays to receive "securities of substantially the same nature and value." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(ii).

The Court declines to interpret this language in the manner proposed by Barclays. To do so would convert a conditional agreement into an unconditional one. Barclays attributes unwarranted significance to the phrase "securities of substantially the same nature and value." It appears that this phrase was used to account for the possibility that, while attempting to obtain SEC approval, there might be a change in the particular securities held in the accounts. *See* Messineo Dep. Tr. 16:7-20; 24:2-26:21 (phrase was added "to take account of the potential for

66874

there to be a change in the specific securities held in the customer reserve accounts between September 22 and the date when it became permissible to withdraw securities from the customer reserve accounts"). Barclays urges the Court to disregard this interpretation, arguing that Mr. Messineo's understanding of the plain text was merely his "unexpressed subjective intent," but more is involved here than drafter's intent. *See* Barclays Reply ¶ 109 ("[Messineo's] testimony about his 'understanding' is irrelevant to the Court's interpretation of the … phrase"); Barclays Post-Trial Mem. ¶ 273 ("The only extrinsic evidence the Trustee relies upon to support his interpretation of the 'or' clause is legally irrelevant because it is nothing more than unexpressed subjective intent"). The disputed phrase should be construed to elevate the rights of LBI's customers in order to avoid an interpretation that would conflict with governing law. *See, e.g., NLRB v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003) ("ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable") (quoting *Walsh v. Schlecht*, 429 U.S. 401, 408 (1976)); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970) ("[I]f an agreement is fairly capable of a construction that will make it valid and enforceable, that construction will be given it").

Barclays offers a self-interested construction of the language that would give it an unconditional right to $769 million in securities, effectively reading out of the letter the phrase "to the extent permitted by applicable law." The Court's conditional reading, on the other hand, reconciles the two phrases and thereby construes the language to give meaning to each term. *See, e.g., Goodheart Clothing Co., Inc., v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272-73 (2d Cir. 1992) ("[a] court should interpret a contract in a way that ascribes meaning, if possible,

66875

to all of its terms") (quoting *U. S. Naval Inst. v. Charter Commc'n, Inc.*, 875 F.2d 1044, 1049 (2d Cir. 1989)).

In addition to the text of the Clarification Letter, Barclays argues that counsel for LBI agreed to transfer the 15c3-3 Assets without conditions and without regard to regulatory approval, but the evidence of such an agreement is inconclusive at best. Barclays' witnesses alternatively testified as to a "grunt" or "nod" or "smile" that gave Barclays' counsel a "feeling" that such an agreement constituted "the economic substance of the negotiation." 8/24/10 Tr. 147:6-13 (Rosen).

Described in this manner, the "unexpressed subjective intent" may in fact have been the intent of counsel for Barclays. A grunt, nod, or smile is not the same as a meeting of the minds by means of unambiguous words. The chief Lehman negotiator on this point, lead bankruptcy counsel Harvey Miller, was clear in stating that he never agreed to an unconditional transfer of the 15c3-3 Assets to Barclays. *See* 4/28/10 Tr. 83:22-84:11 (Miller) ("absolutely no commitment"). Mr. Miller recalled that he participated in a tense discussion with representatives of Barclays in a hallway at Weil Gotshal's offices and informed Barclays that the 15c3-3 Assets could not be transferred without SEC consent. 4/28/10 Tr. 83:1-6 (Miller). Similarly, Mr. McDade, whose authorization would have been necessary to any such agreement, confirmed that he never agreed to grant Barclays an unconditional right to the 15c3-3 Assets. Mr. McDade testified that he understood that the transfer of the 15c3-3 Assets was "potentially questionable, given it needed regulatory authority to be able to be transferred over." 4/26/10 Tr. 198:4-11 (McDade).

Other extrinsic evidence confirms that Barclays knew the transfer of the 15c3-3 Assets hinged on regulatory approval. For one thing, the SEC communicated this point before LBI's

66876

liquidation. *See* M Ex. 437. As a result, the Barclays negotiating team was on notice that regulatory approval was needed to obtain the 15c3-3 Assets. *See* 8/27/10 Tr. 201:2-203:10 (Klein) (testifying that the he reviewed an internal Lehman e-mail indicating that the SEC had consented to the release of a portion of the reserved assets). Barclays itself confirmed knowing about this condition in internal conversations with its audit committee. *See* M Ex. 436 ("the release of [the 15c3-3] deposit is subject to SEC approval"). Several of Barclays' officers and representatives echoed this understanding, and recognition of the need for regulatory approval is reflected in efforts to ascertain whether a deficit existed for purposes of Rule 15c3-3 during the negotiation of the Clarification Letter. *See* 6/21/10 Tr. 252:18-25 (Diamond) (recalling that the agreement regarding the 15c3-3 Assets to be transferred to Barclays included only "the excess collateral"); 4/30/10 Tr. 227:1-12 (Hughes) (recalling that the 15c3-3 assets had to be "excess and capable of being delivered"); 4/28/10 Tr. 246:9-15 (Kelly) (recalling that during the sale negotiations the parties endeavored to "determine if there was excess or a surplus" in the Customer Reserve Accounts). These efforts would have been unnecessary if, as Barclays now asserts, it was entitled to $769 million in securities irrespective of Rule 15c3-3 and the existence of a deficit in LBI's Customer Reserve Account.

Alternatively, Barclays argues that even if the Clarification Letter conditions its receipt of the 15c3-3 Assets upon "applicable law," Section 8(f) of SIPA[34] authorizes the transfer. *See* Barclays Reply ¶ 90 ("whether the assets in the Reserve Account are considered LBI property or customer property, the SIPA Trustee was authorized to transfer that property to Barclays as part of the overall sale of the Business to Barclays"). This section of SIPA authorizes the satisfaction

---

[34] *See* 15 U.S.C. § 78fff-2(f) ("In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor").

66877

of customer obligations through the transfer of customer accounts to a solvent broker-dealer, but it is not applicable to the present dispute in which Barclays is seeking to compel the transfer of customer accounts for its own benefit. *See Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 887 (Bankr. S.D.N.Y. 2010) (explaining that Section 8(f) "is designed to facilitate a speedy transfer of accounts to give the customer prompt control over his assets"). Interpreting Section 8(f) to authorize the transfer of the 15c3-3 Assets to Barclays would be inconsistent with and would frustrate the section's underlying purpose. Such an interpretation also would be contrary to the broad principles underlying SIPA, namely its objective of giving priority treatment to customers of a liquidating broker-dealer. *See* 15 U.S.C. § 78fff-2(c) (customer claims receive priority on any property falling within SIPA's definition of "customer property").

Independent of the Clarification Letter, Barclays asserts that the APA gives Barclays a right to all assets "used in connection" with the "Business" including the 15c3-3 Assets. *See* BCI Ex. 1 (M Ex. 1) (APA) § 1.1 (Definition of "Purchased Assets"). Barclays states that these assets were "used in connection" with the "Business," namely the "capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant." *See* Barclays Post-Trial Mem. ¶ 247. Alternatively, Barclays argues that the 15c3-3 Assets are "deposits … associated with the Business." *See* BCI Ex. 1 (M Ex. 1) (APA) § 1.1. Thus, according to Barclays, the Clarification Letter merely used explicit language to confirm a transfer of the 15c3-3 Assets that is already the subject of plain language in the original APA.

The 15c3-3 Assets, however, were never considered part of the "Business" that Barclays acquired pursuant to the APA. They were not even discussed by the parties to the transaction

66878

until the Friday asset scramble. *See* 4/26/10 Tr. 194:3-195:15 (McDade). Furthermore, the 15c3-3 Assets naturally were unrelated to the "Business" because they are, by their very definition, creatures of a regulatory regime. Having been segregated by regulatory mandate, these assets could not be transferred without consideration of regulatory constraints. These assets were set aside to protect customers, were never available unconditionally as extra consideration for Barclays and were not part of the purchased "Business."

Accordingly, Barclays does not have an unconditional right to the 15c3-3 Assets, and its motion to recover these assets is denied without prejudice until such time as it may be determined whether any deficit exists in LBI's customer reserve accounts and whether the transfer of all or any portion these assets is permitted by applicable law.

### ii. *The Margin Assets*

The Margin Assets that are in dispute consist of a total of approximately $4 billion in cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain banks, and certain foreign futures brokers in connection with derivatives trading. This total includes nearly $2.3 billion in assets posted by LBI at the OCC, primarily in connection with LBI's options trading business, an additional $1.2 billion at foreign brokers or affiliates and approximately $400 million at domestic exchanges in connection with LBI's futures trading. The Margin Assets consist of LBI property used to support trading conducted by LBI on its own behalf and on behalf of its customers and affiliates.

The parties disagree as to whether these Margin Assets were purchased in connection with the acquisition or were excluded from the sale to Barclays. The APA's definition of Excluded Assets contains two separate sub-parts that independently encompass the Margin Assets. First, clause (b) of the definition of "Excluded Assets" excludes "all cash, cash

A-1529

66879

equivalents, bank deposits or similar cash items." BCI Ex. 1 (M Ex. 1) (APA) § 1.1. Second, clause (n) of the definition of "Excluded Assets" excludes "all assets primarily related to the IMD Business and derivatives contracts." BCI Ex. 1 (M Ex. 1) (APA) § 1.1.[35] These exclusions, as modified by the Clarification Letter, are at the heart of the dispute concerning the proper disposition of the Margin Assets.

The Court understood at the time of the Sale Hearing that the sale was supposed to exclude all cash. Counsel made this point with great clarity at the Sale Hearing and stated plainly that no cash was being transferred to Barclays. Most prominently, Ms. Fife told the Court "[t]here's no cash that's being transferred to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 53:20-25 (Fife). Mr. Miller was similarly unequivocal, informing the Court that "[Lehman is] not transferring any cash to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 242:11-16 (Miller). Even Barclays' team at the Sale Hearing recognized that cash was excluded from the deal. *See* 6/22/10 Tr. 210:11-13 (Cox) (testifying that he understood that "no Lehman cash was going from Lehman to Barclays").

The Court relied upon these representations regarding the exclusion of cash when it entered the Sale Order. In particular, this explicit exclusion became the rationale for resolving the concerns raised by LBIE and other objectors at the Sale Hearing relating to the risk that Barclays might end up taking billions of dollars that allegedly had been transferred to New York from London a few days prior to the bankruptcy. The representation that Barclays would not be

---

[35] Barclays insists that clause (n) of the definition of "Excluded Assets" does not encompass the Margin Assets because clause (n) applies only to margin relating to "over-the-counter" derivatives, as opposed to exchange-traded derivatives. *See* Barclays Post-Trial Mem. ¶ 248 ("paragraph (n) *does not deal with exchange-traded derivatives*; to the contrary, it deals with 'derivative contracts' ... which was used solely to describe over-the-counter derivatives, which were *indisputably* excluded from the deal") (emphasis in original). But the plain language of clause (n) does not differentiate between margin associated with either type of derivative. Moreover, the Clarification Letter carries forward the clause (n) exclusion of assets primarily related to derivatives contracts and further adds a separate exclusion for over-the-counter derivatives. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c) ("The following shall also be Excluded Assets ... over-the-counter derivatives").

A-1530

66880

acquiring any Lehman cash, thus, was a key inducement to entry of the Sale Order in the face of unresolved conflicting claims to cash held by or for the benefit of Lehman.  The "no cash to Barclays" statements are unambiguous and have only one meaning – no cash, and that also means no Margin Assets to Barclays.

Consequently, the Court rejects Barclays' argument that the Margin Assets necessarily must have been included in the transaction because of their connection to the "Business" acquired under the APA.  *See* Barclays Post-Trial Mem. ¶ 242 ("It is *undisputed* that LBI's ETD businesses were part of the 'Business' Barclays was acquiring …") (emphasis in original).  In other words, Barclays argues, the Margin Assets must have been Purchased Assets because the APA provided Barclays with all assets relating to the "Business," and clearing houses and exchanges require margin to support trading.  *See* 8/30/10 Tr. 9:11-15 (James); 8/24/10 Tr. 100:5-101:9 (Rosen).  But the fact that exchanges typically require margin deposits or that purchasers of other businesses involved in the trading of derivatives typically acquire such deposits does not bear one way or another on the question of whether the Margin Assets were included by the parties in this unique transaction.[36]  The evidence with respect to the acquisition by Barclays of the Broker-Dealer Business is overwhelming — the parties agreed to exclude cash.[37]

---

[36] For this reason, the Court is not persuaded by the testimony of Barclays' expert Anthony J. Leitner that "no rational purchaser" would agree to the transaction without the Margin Assets.  *See* BCI Ex. 340 at 49.  The likely conduct and decision making of a hypothetical "rational purchaser" is not persuasive when the parties to this particular transaction agreed to exclude the Margin Assets.

[37] Barclays offers the testimony of Liz James to show that in fact the parties agreed to transfer the Margin Assets to Barclays.  8/30/10 Tr. 20:7-9 (James) (testifying that there was "an actual discussion in which it was expressly discussed that margin would be transferred").  But Ms. James admitted to having had no role whatsoever in the negotiation or documentation of the sale documents that memorialize the agreement of the parties.  8/30/10 Tr. 60:14-22 (James).

A-1531

66881

The Clarification Letter carries forward the APA's exclusion of cash from the transaction: "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits, or similar cash items." BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c). The Clarification Letter further specified that although LBI's government securities trading operations were part of the "Business" sold to Barclays, the government securities themselves were excluded from the sale. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(b) ("For the avoidance of doubt, the 'Business' includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (*but not any securities of such nature held by seller* …)") (emphasis added).

Notwithstanding this language, Barclays asserts that the Clarification Letter should be read to capture the Margin Assets as a Purchased Asset.[38] Specifically, Barclays relies on the inclusion of a parenthetical — "(and any property that may be held to secure obligations under such derivatives)" — after the words "exchange-traded derivatives" in the definition of "Purchased Assets." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(C).

This parenthetical reference simply cannot override the exclusions of the APA or the representations made during the Sale Hearing. The evidence presented at trial also supports a conclusion that the parties to the Clarification Letter never agreed as to the language or significance of this parenthetical, and the words made their way into the document without there being a meeting of the minds or a mutual agreement to include them.

---

[38] Independent of the Clarification Letter, Barclays also claims that the Transfer and Assumption Agreement entered into between the Trustee and the OCC transferred the Margin Assets to Barclays. However, this ancillary agreement never was presented to the Court, and so cannot be dispositive as to the parameters of the deal that the Court approved. In any event, the evidence indicates that the Trustee understood this ancillary agreement merely to facilitate the transfer of customer assets to Barclays. *See* 5/4/10 Tr. 184:4-10; 185:2-24 (Kobak).

A-1532

66882

The negotiating history confirms that the parties did not intend this parenthetical statement to modify the APA's exclusion of all cash, including the Margin Assets, from the sale. Immediately following the Sale Hearing, an outside lawyer for Barclays with significant experience in derivatives, Cleary Gottlieb's Edward Rosen, received an e-mail alerting Barclays to the existence of the Margin Assets. BCI Ex. 242. Shortly thereafter, Barclays proposed new language for the definition in paragraph 1(d) of "Excluded Assets" that, with clarity and precision, would have transferred the Margin Assets to Barclays. BCI Ex. 249 ¶ 1(d) (proposed language carved out of the definition of Excluded Assets any "cash, cash equivalents, bank deposits, or similar cash items maintained ... by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI …"). In response, counsel for LBHI forwarded the proposed language to the SIPA Trustee on September 21, 2008 and highlighted Barclays' proposed cash margin carve-out as an unsettled issue subject to ongoing discussion. M Ex. 629. Early the next morning, counsel to LBHI circulated a revised proposed draft of the Clarification Letter striking Barclays' proposed language relating to the Margin Assets. See M Ex. 447 ¶¶ 1(c), 8.[39] As a result, the subsequent draft circulated at 6:03 a.m., approximately three hours before the execution of the Clarification Letter on September 22, 2008, continued to omit the stricken language. See M Ex. 448. Without any further discussion or notice to the SIPA Trustee, Mr. Rosen unilaterally inserted the now-disputed parenthetical phrase into the execution version of the Clarification Letter. 8/24/10 Tr. 215:2-14, 216:3-8 (Rosen).

The SIPA Trustee never consciously agreed to this new parenthetical. Notably, Mr. Rosen added the language within the parenthetical to the "Purchased Assets" subsection instead

---

[39] At trial, Barclays claimed that this deletion of the disputed language by counsel for LBHI was in fact unintentional. See 8/31/10 Tr. 209:12-210:2 (Lewkow). Barclays presented no evidence of any such mistake.

88

A-1533

66883

of the "Excluded Assets" subsection that had been the earlier focus of attention. Moreover, the words within the parenthetical do not include "cash" or "margin," in contrast with the previously-contested language that had touched directly on these subjects.[40] The SIPA Trustee never reviewed the inserted parenthetical provision before closing because the last draft had omitted the disputed language, and he was not informed of any last-minute revisions. 5/4/10 Tr. 197:4-22 (Kobak); 5/5/10 Tr. 58:8-17 (Kobak). In fact, for administrative reasons, the SIPA Trustee's representative executed the signature page for the Clarification Letter hours earlier and was not provided with a new signature page or agreement.

In light of this negotiating history, and being mindful of the stated exclusion of Lehman cash, the Court concludes that the best reading of the disputed language within the parenthetical is one that interprets the parenthetical phrase as applying only to customer property "held" by LBI for the benefit of customers, as opposed to margin that LBI may have "posted" in connection with its own trading positions. Various regulations and rules require customers to deposit collateral with their broker-dealer or, in the case of futures, their futures commission merchant, to support trading of futures and options contracts. *See, e.g.*, 17 C.F.R. § 30.7.

This collateral, which is deposited by customers with the broker-dealer or futures commission merchant and held for the benefit of customers, constitutes the "property that may be held to secure obligations" under exchange-traded derivatives. In fact, LBI held approximately $2 billion in customer property as margin for futures positions of customers, along with additional customer property held as margin for the options positions of customers. *See* BCI Ex. 353 ¶ 15, Ex. 2. The language within the parenthetical would authorize a transfer of these customer funds to Barclays (for the benefit of those customers) in connection with the transfer of

---

[40] Mr. Rosen testified that he designed the phrase so as to avoid scrutiny that could "embroil" Barclays in continued negotiations. 8/24/10 Tr. 203:5-20 (Rosen).

A-1534

66884

those customer accounts. This interpretation of the parenthetical is consistent with other provisions of the Clarification Letter that are intended to ensure the transfer of customer property to Barclays.[41] It also is consistent with the record of the Sale Hearing in which counsel emphasized that no Lehman cash was being transferred to Barclays.

### iii.    *The Clearance Box Assets*

The Clearance Box Assets are within the third category of Disputed Assets and consist of approximately $1.9 billion in unencumbered securities held in LBI's "clearance box" accounts at The Depository Trust & Clearing Corporation (with its clearing agency subsidiaries, "DTCC").[42] These assets facilitated securities trading by providing collateral to secure open trading positions. DTCC looked to this collateral as a means to manage risks associated with its daily clearing operations. In the event of a default by LBI, DTCC could look to the Clearance Box Assets to cover any potential liability arising from failed trades. From DTCC's perspective, therefore, any transfer of the Clearance Box Assets to Barclays threatened to leave it unprotected in the event of failed trades during the transition of securities trading operations to Barclays.

At the time of the Sale Hearing, the parties believed that they had reached an agreement that allayed DTCC's concerns. Under this agreement, as documented in the First Amendment, DTCC would consent to the transfer of the Clearance Box Assets and Barclays would provide DTCC with a $250 million guarantee along with a pledge of billions of dollars in residential

---

[41] For example, paragraph 8(i) of the Clarification Letter entitles Barclays to receive "for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer ..." BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(i). Similarly, paragraph 1(c) of the Clarification Letter clarifies that "property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer" would not be considered an Excluded Asset. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c).

[42] The vast majority of these assets were held in box number 074 at the DTCC, with the rest held in LBI clearance boxes at Euroclear and a Canadian depository. SIPA Trustee Post-Trial Mem. ¶ 279, n.38.

A-1535

66885

mortgage-backed securities as collateral.[43]  This understanding fell apart after the Sale Hearing when the residential mortgage-backed securities could no longer be made available to DTCC as collateral.  Extensive negotiations took place over the closing weekend to deal with this problem.

During the negotiations, DTCC insisted that Barclays fully guarantee any potential DTCC liability in exchange for the transfer of the Clearance Box Assets.  *See* 5/6/10 Tr. 19:16-19 (Montal).  Barclays, however, refused to provide an unlimited guarantee of LBI's trading obligations.  *See* 4/26/10 Tr. 233:13-20 (McDade) (Barclays' continued refusal to provide more than a $250 million guarantee threatened to derail the transaction over the weekend).

Ultimately, these negotiations culminated in Barclays entering into two separate agreements – the Clarification Letter and the DTCC Letter – that contain seemingly contradictory provisions purporting to govern the transfer of the Clearance Box Assets.  The Clarification Letter, on the one hand, provides that the Clearance Box Assets are Purchased Assets acquired by Barclays.  *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(B) ("Purchased Assets" include all "securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing … as specified on Schedule B"); Schedule B (identifying assets to be transferred, and more than 98% of the listed assets were in LBI's DTC clearance boxes).  The DTCC Letter, on the other hand, provides that the Clearance Box Assets are "Excluded Assets" under the APA and requires Barclays to provide a $250 million cash deposit as a limited guarantee to cover potential liability from failed trades.  *See* BCI Ex. 6 (M Ex. 449) ¶ 1 ("Barclays has indicated, and hereby agrees, that all of the accounts LBI maintained at the Clearing Agencies Subsidiaries (the "Accounts") constitute "Excluded Assets" within the

---

[43] The Court was advised of this agreement at the Sale Hearing.  *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 49:8-17 (Fife).  Although the Clearance Box Assets were not specifically mentioned at the Sale Hearing, the evidence suggests that they were included in the $47.4 billion worth of financial assets described by Ms. Fife at the hearing. *See* 5/3/10 Tr. 183:13-185:5 (Seery).

91

A-1536

66886

meaning of the APA"); BCI Ex. 6 (M Ex. 449) ¶ 2 ("To secure the Guaranty, Barclays shall wire transfer $250 million …").[44]

Notwithstanding these apparently contradictory terms, Barclays attempts to reconcile the two agreements by arguing that the DTCC Letter, read properly, does not limit its claim to the Clearance Box Assets because of the distinction between the "Accounts" and the assets within those accounts. *See* Barclays Post-Trial Mem. ¶ 228 ("[T]here is no conflict or inconsistency between the DTCC Letter and the Clarification Letter … While the DTCC Letter explains that Barclays was not acquiring *the LBI accounts themselves*, it did not purport in any way to modify the Purchase Agreement's grant of *the assets within those accounts* to Barclays") (emphasis in original).

Barclays' attempt to reconcile the contradictory provisions of the two agreements is strained and implausible. An agreement giving DTCC a right to the "Accounts" as Excluded Assets, while transferring the contents of those accounts, borders on the nonsensical and would not have accomplished any purpose. Such a distinction defies logic, as the DTCC would not benefit from maintaining accounts without the corresponding securities in those accounts. 5/4/10 Tr. 207:24-208:4 (Kobak).[45] The interpretation of the DTCC Letter urged by Barclays, while possible, would lead to a most unlikely reading of the language as part of a struggle to find consistency. *See, e.g., Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y. 2d 582, 589, 671 N.E.2d 534 (1996) ("[w]e should not adopt a construction of [a provision] which would frustrate one of the explicit central purposes of the agreement").

---

[44] The testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC, was credible and corroborated the plain text of the DTCC Letter. *See* 5/6/10 Tr. 20:20-21:13 (Montal) ("ultimately, [the negotiations] culminated into the discussion at around midnight in which we were told that they weren't taking anything").

[45] Moreover, such a reading is inconsistent with the other sections of the DTCC Letter that relate to the transfer of securities, not accounts. *See* BCI Ex. 6 (M Ex. 449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC ***to deliver securities*** …") (emphasis added).

92

A-1537

66887

However, the alternative interpretation of the DTCC Letter offered by Barclays does demonstrate an apparent ambiguity in the text of that letter, especially when the language used in the DTCC Letter is juxtaposed and compared with the obviously inconsistent language of the Clarification Letter. The two letters, read literally, naturally lead the reader to reach opposite conclusions. As a result of this ambiguity, the Court may consider extrinsic evidence of the parties' intent with respect to the provisions of the two agreements relating to the Clearance Box Assets. *See Roberts*, 893 F.2d at 24.

Extrinsic evidence relating to what was actually intended is not entirely consistent. The Court has considered the testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC. His credible testimony would support a finding that Barclays gave up any claim to the Clearance Box Assets. He recalls three separate telephone calls that occurred on September 21, 2008 between Barclays and the DTCC and remembers that on the last of these calls Barclays agreed to exclude the Clearance Box Assets from the transaction. 5/6/10 Trial Tr. (Montal) 10:22-11:4.

However, Mr. Montal's testimony must be balanced against other evidence indicating that the parties intended that Barclays would receive the Clearance Box Assets. The negotiating history reveals that the reference to Schedule B in the Clarification Letter was the result of the drafters' initial concern that language in the Clarification Letter was too narrow and would have failed to transfer all of the Clearance Box Assets to Barclays. *See* Barclays Post-Trial Mem. ¶ 237 ("…46 minutes after [circulating a revised draft of the Clarification Letter], Weil Gotshal circulated another draft Clarification Letter, which … broadened the language conveying the clearance box assets to Barclays"). The testimony of Barclays' lawyers and negotiators further

93

A-1538

66888

confirmed this intent to transfer the Clearance Box Assets to Barclays. *See* 5/3/10 Tr. 56:11-57:2 (Hughes); 8/24/10 Tr. 132:13-133:20 (Rosen).

Additionally, after the closing of the transaction, the parties engaged in conduct manifesting their intent to transfer the Clearance Box Assets to Barclays. For example, after the closing on September 22, 2008, Weil Gotshal and Lehman personnel worked with Barclays and its representatives to finalize the list of Clearance Box Assets in Schedule B. *See* BCI Ex. 309; BCI Ex. 742. After closing, the Movants, their representatives and advisors prepared numerous documents showing that the Purchased Assets acquired by Barclays included the Clearance Box Assets. *See* BCI Ex. 742; BCI Ex. 756.

Written extrinsic evidence from Sheldon Hirshon, DTCC's outside counsel, further confirms the intent of the parties to transfer the Clearance Box Assets to Barclays. An e-mail written by Mr. Hirshon recounts his understanding that, during the weekend of negotiations following the Sale Hearing, DTCC agreed to relinquish the Clearance Box Assets and accept only the $250 million limited guarantee. *See* BCI Ex. 376 ("DTCC accepted the revised deal" after "the resi's were pulled from the deal leaving only the Barclays guarantee"). Notably, Mr. Hirshon's e-mail does not indicate any expectation that the Clearance Box Assets would be provided to DTCC to mitigate potential exposure. This understanding of the parties' intent is consistent with the ultimate commercial reality of the transaction, as DTCC incurred losses in connection with failed trades arising from the bankruptcy in the amount of approximately $55 million, far less than the full $250 million protection provided by Barclays in its limited guarantee. *See* 5/6/10 Tr. 72:2-73:15 (Montal).

The Court concludes that the Clarification Letter, not the DTCC Letter, best reflects the agreement between Barclays and the SIPA Trustee with respect to the Clearance Box Assets.

94

66889

The plain text of the Clarification Letter clearly confirms the agreement to transfer the Clearance Box Assets to Barclays, and the SIPA Trustee is unable to explain away the plain meaning of the words used in this agreement. *See* SIPA Trustee Mot. ¶ 81; 5/5/10 Tr. 71:8-10 (Kobak) ("Q: Now you don't have any disagreement that the clarification letter lists [Clearance Box Assets] as a purchased asset, correct? A: No, I don't disagree with that").

The SIPA Trustee and Barclays simply agreed in the Clarification Letter that the Clearance Box Assets belong to Barclays. Importantly, that letter, along with the APA, constituted the principal documents memorializing the transaction. These documents necessarily delineated the assets that were being transferred to Barclays as part of that sale. In contrast, the DTCC Letter had a different principal purpose and was drafted as an implementing transitional document created to deal with the potential exposure of DTCC arising from the transfer of securities trading positions. Although the SIPA Trustee was a signatory to the DTCC Letter, the letter came into existence as a result of DTCC's request to address its potential liability.[46]

In his effort to reconcile the discrepancies between the two letter agreements in a manner favorable to his litigation position, the SIPA Trustee must argue that the true agreement between the parties with respect to the Clearance Box Assets is best manifested not by the central documents that define the transaction but by an ancillary side-agreement which was prepared to address concerns of DTCC. But given the relative stature of these two documents and the scope of each of them, the Court considers the Clarification Letter to be more compelling and comprehensive in describing with greater precision the universe of assets that the SIPA Trustee

---

[46] It appears that the most meaningful negotiations leading to the finalizing of the DTCC Letter occurred between Barclays and DTCC. *See* SIPA Trustee Post-Trial Mem. ¶ 414 ("Barclays was uniquely positioned to ensure that the two agreements did not conflict … [because n]o other party… *including the Trustee and his representatives* … was involved in negotiating and drafting both agreements") (emphasis added); BCI Ex. 479 (e-mail correspondence early Monday September 22, 2008 in connection with finalizing the DTCC Letter was exchanged between representatives of Barclays and DTCC, and not with the Trustee or his representatives).

A-1540

66890

agreed to transfer to Barclays pursuant to the transaction. Because these two contemporaneous documents are in conflict with one another as to the same subject matter, one of them must control the outcome.

The unambiguous text of the Clarification Letter contains more detail and is more specific with respect to the Clearance Box Assets than the DTCC Letter. Although each agreement purports to govern the transfer of the Clearance Box Assets, Schedule B to the Clarification Letter specifically identifies individual Clearance Box Assets, whereas the DTCC Letter has no similar itemized list of securities. In expressing a preference for the more specific of the two documents, the Court's conclusion affirms the well-established legal principle that where two agreements refer to the same subject matter, the more specific agreement controls. *See, e.g., Liberty Surplus Ins. Corp. v. Segal Co.*, 142 F. App'x. 511, 515 (2d Cir. 2005) (where there is tension between the provisions of two agreements, "it is axiomatic that particularized contract language takes precedence …") (quoting *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983)).

Notwithstanding the SIPA Trustee's arguments to the contrary, the Court's elevation of the Clarification Letter over the DTCC Letter with respect to the Clearance Box Assets neither "ignores" nor "nullifies" the DTCC Letter. *See* SIPA Trustee Post-Trial Mem. ¶¶ 410, 413. Rather, the Court recognizes that the DTCC Letter, even without the provisions regarding the Clearance Box Assets, provided a significant benefit to DTCC in the form of a $250 million limited guarantee to protect against potential exposure from failed trades and the grant of authority needed to close out pending transactions. Moreover, the DTCC Letter functioned in accordance with the intention of the parties and provided DTCC with the comfort that it needed to close securities transactions that were pending at the time of closing. *See* BCI Ex. 6 (M Ex.

96

66891

449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC to deliver securities from the DTC LBI Account …").

D.      *The SIPA Trustee is Not Entitled to Relief Under Rule 60(b) With Respect to the Transfer of the Clearance Box Assets to Barclays*

The SIPA Trustee requests conditional relief from the Sale Order[47] under Rule 60(b) in the event that the Court interprets the Clarification Letter to authorize transfer of the Disputed Assets to Barclays. *See* SIPA Trustee Post-Trial Mem. ¶ 445 ("To the extent that the Sale Orders can be read to authorize the transfers that Barclays now seeks, the Court should grant the Trustee relief under Rule 60(b) based on the non-disclosures to the Trustee"). In light of the conclusion reached that the Clarification Letter does not unconditionally entitle Barclays to the 15c3-3 Assets or grant rights to the Margin Assets, the Court does not need to rule on those aspects of the SIPA Trustee's contingent request for relief and will focus on the impact of the ruling that the Clearance Box Assets should be transferred to Barclays.

As fully set forth in detail in Section III of this Opinion, Federal Rule of Bankruptcy Procedure 9024 provides that Rule 60(b) shall apply in all cases under the Bankruptcy Code. Fed. R. Bankr. P. 9024. Rule 60(b), in turn, lists several grounds upon which a court may relieve a party from final judgment, including mistake, inadvertence, excusable neglect, and newly discovered evidence.

The SIPA Trustee alleges several independent grounds for relief under Rule 60(b) applicable to the Clearance Box Assets, including that the transfer of these assets "was never intended" nor disclosed to the Court or the SIPA Trustee, that the transfer results from "mistake

---

[47] The Trustee requests conditional relief from both the Sale Order and the SIPA Sale Order.

66892

or inadvertence," and that the transfer should be disfavored on grounds of "equity and justice." *See* SIPA Trustee Mot. ¶¶ 89, 98, 102, 107.

The SIPA Trustee is not entitled to relief under Rule 60(b) with respect to the Clearance Box Assets because his request is premised on the notion that the Court, the SIPA Trustee, and other relevant parties in interest did not know during the Sale Hearing and the closing weekend that the Clarification Letter contemplated the transfer of the Clearance Box Assets to Barclays. That proposition is incorrect. The agreement that existed between DTCC, Barclays, and the SIPA Trustee at the time of the Sale Hearing contemplated the very same kind of transfer at issue here. Although that particular agreement was never consummated, the subsequent agreement ultimately memorialized in the Clarification Letter is identical to its predecessor with respect to the Clearance Box Assets – under each agreement the Clearance Box Assets are transferred to Barclays. The public disclosure of this agreement distinguishes the SIPA Trustee's request for relief under Rule 60(b) from the request made by LBHI. Unlike the "newly-discovered" facts alleged by LBHI as grounds for relief under Rule 60(b), the provisions of the Clarification Letter transferring the Clearance Box Assets to Barclays were publicly available to all parties, including the SIPA Trustee.

The SIPA Trustee's request for Rule 60(b) relief also disregards the very agreement that he made to transfer the Clearance Box Assets to Barclays. For this reason, the SIPA Trustee's allegation that "he would not have authorized the signing of the Clarification Letter if he had known it might be read" to award the Clearance Box Assets to Barclays does not meet the standards for relief under Rule 60(b). The SIPA Trustee cannot plead ignorance of the facts. He must have known that the Clarification Letter authorized the transfer of the Clearance Box

A-1543

66893

Assets, because the plain text of the letter that he signed supports transferring the Clearance Box Assets to Barclays.

## VII.    Timeliness and Other Legal Issues Relating to 60(b) Relief

Barclays presented a number of defenses seeking to preclude relief under the 60(b) Motions as a matter of law, but there is no need to consider these arguments because of the decision to deny 60(b) relief on the merits. Specifically, Barclays has argued that (i) the release contained in the court-approved December 22, 2008 settlement between the SIPA Trustee, Barclays, and JPMorgan bars all Movants from bringing any claims relating to the repo collateral; (ii) Movants were unable to justify their one-year delay in bringing their claims; (iii) the doctrines of unclean hands and *in pari delicto* bar Movants' claims; (iv) the Court does not have jurisdiction to grant Movants' claims under the Mandate Rule; (v) Movants' claims are barred by the doctrines of equitable mootness, judicial estoppel, equitable estoppel and waiver; and (vi) the Takings Clause of the Constitution prohibits modification of the APA absent a state law basis for reformation of the agreement. Barclays Post-Trial Mem. ¶¶ 175-185, 187-195, 198-199, 200-222.

It is unnecessary to address any of these now-moot defenses because of the findings and conclusions stated in this Opinion. The Court reviewed these various defenses but did not need to consider them in deciding not to grant relief from the Sale Order. Furthermore, with respect to any timeliness arguments made by Barclays in connection with the Disputed Assets, timeliness is not an issue because Barclays brought its own motion to recover the Disputed Assets, and Barclays could have brought that motion at any time. *See* Barclays Mot.

For similar reasons, the arguments made by the Committee regarding the timeliness of its own claims have no bearing on the outcome of this litigation and also are moot. To excuse and

99

66894

explain its alleged delay in seeking Rule 60(b) relief, the Committee has written at great length about the many challenges that it faced in gathering and analyzing information about the sale. The Committee argues that it was forced by circumstances to "drink from a fire hose" and if it had known all of the facts surrounding the alleged $5 billion discounting of the financial assets, it would have opposed the sale to Barclays at the Sale Hearing. Committee Post-Trial Mem. ¶¶ 9-10. The Committee further asserts that it did not sit on its rights, but rather consistently pursued discovery of facts from Barclays and simply waited to bring the Committee Motion until after obtaining the facts necessary to support such a motion. Committee Post-Trial Mem. ¶¶ 15-16.

However, the question of what the Committee knew and when it was finally in a position to fully appreciate the significance of what it knew is irrelevant to the conclusions reached in this Opinion. What was or was not disclosed to the Committee, whether the Committee had reason to comprehend the facts that were provided to its advisors and in reports given to the Committee, and the timing of disclosure to the Committee are of no importance and play no role in the Court's thinking about the 60(b) issues. As discussed above and for the reasons stated in this Opinion, the Court finds that even if it had known all of the undisclosed facts at the time of the Sale Hearing the Court still would have approved the sale to Barclays. Consequently, all issues relating to timeliness of the Committee Motion simply do not matter. Even accepting as true all of the Committee's arguments regarding timeliness, 60(b) relief is not appropriate.

## VIII. Conclusion

With such vast sums involved, growing market turmoil, uncertainty as to true asset values, transactional complexity and precious little time for careful consideration of the critical events during Lehman Week, perhaps it was inevitable that the urgent, hastily-arranged sale to

A-1545

66895

Barclays would be followed by some combination of buyer's or seller's remorse and heavily-litigated, good-faith disputes regarding contract interpretation. The unique circumstances of that week produced both a sale of the Broker-Dealer Business at breathtaking speed and the present rigorous, slow-moving litigation.

For the reasons stated,[48] having reflected at length on the circumstances of the Sale Hearing and the evidence presented at trial, the Court concludes that the lapses in disclosure at the Sale Hearing did not affect the fairness or alter the outcome of the hearing and were not characterized by either the deliberate withholding of material information or willful misconduct. Although Movants have shown that the Court did not know everything about the transaction that it should have known, the Court was not deceived in a manner that should now be permitted to upset the integrity of the Sale Order. The sale process may have been imperfect, but it was still adequate under the exceptional circumstances of Lehman Week. Especially due to the procedural and substantive importance of maintaining the finality of orders approving the sale of assets under Section 363 of the Bankruptcy Code, based on the evidence justice does not require relief from the Sale Order under Rule 60(b).

With respect to the motion by Barclays to recover the Disputed Assets under provisions of the Clarification Letter, the Court has determined that the Clarification Letter is a binding and enforceable agreement even though it was not completed and executed until after entry of the Sale Order and the parties did not return to the bankruptcy court to obtain specific approval of the various changes to the transaction that are reflected in the Clarification Letter. Although it certainly would have been prudent and doubtless better practice to seek further approval from the Court in the form of a separate order authorizing the parties to enter into the Clarification Letter

---

[48] The text of this Opinion constitutes the Court's findings of facts and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 9014.

A-1546

66896

and approving the provisions of that letter, the failure to do so will be overlooked here because (i) the Sale Order anticipated that this letter was being drafted, (ii) the letter was filed on the docket on the same day that it was executed, (iii) no party in interest ever sought approval of the Clarification Letter or to obtain relief from its terms due to the lack of formal approval and (iv) the parties themselves uniformly have regarded the document as a binding and enforceable statement of their agreement to amend and clarify the APA and have continued to rely upon all of its provisions. While not expressly approved in so many words, the Clarification Letter is deemed approved by virtue of these facts.

    Interpreting relevant provisions of the Clarification Letter in light of evidence concerning the negotiating and drafting of this agreement and the record of the Sale Hearing, the Court denies Barclays' Motion to compel delivery of assets in relation to the 15c3-3 Assets based on the conditional language used in the Clarification Letter. Barclays' right, if any, to any of these assets depends upon a later determination of any deficit in the customer reserve accounts. The Barclays' Motion also is denied as to the Margin Assets related to exchange traded derivatives but is granted in relation to delivery of the Clearance Box Assets.

A-1547

66897

The parties shall submit within ten days separate proposed forms of order, agreed as to form and consistent with this Opinion as follows: (i) separate orders denying each of the 60(b) Motions, (ii) orders applicable to each of the Adversary Proceedings resolving those counts of the complaints that are impacted by denial of relief under the 60(b) Motions, and (iii) an order granting in part and denying in part the Barclays' Motion to recover Disputed Assets. The parties also may arrange a status conference to be held with the Court at a mutually convenient time to schedule any further proceedings that may be required in light of this Opinion and, if needed, to resolve any disagreements concerning the form of these proposed orders.

IT IS SO ORDERED.

Dated: New York, New York
February 22, 2011

_s/ James M. Peck_
Honorable James M. Peck
United States Bankruptcy Judge

A-1548

(Excerpts) The Trustee's Memorandum
Regarding the Proposed Orders Submitted by the
Trustee and Barclays Capital Inc., Filed
April 28, 2011

Record pages: 66951 and 66988.

A-1549

66951

William R. Maguire
Seth D. Rothman
Neil J. Oxford
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com
Attorneys for James W. Giddens. as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x
                    :

In re                       :

                    :

      LEHMAN BROTHERS INC.,      :     Case No. 08-01420 (JMP) (SIPA)

                    :

                 Debtor.   :
——————————————————————————x

## THE TRUSTEE'S MEMORANDUM REGARDING THE PROPOSED ORDERS
## SUBMITTED BY THE TRUSTEE AND BARCLAYS CAPITAL INC.

**A-1550**

66988

80. Barclays' proposed order acknowledges that Barclays is entitled "to $769 million in securities . . . only if and to the extent that there is determined to be sufficient assets in the estate to satisfy all customer claims," but would require the Trustee to "file with the Court and serve upon Barclays its most current calculation of the Rule 15c3-3 reserve requirement" and "continue to file its updated reserve calculations on a weekly basis thereafter." (Barclays' Proposed Order ¶ 4.)

81. The Trustee does not perform weekly reserve calculations and imposing an obligation on the estate to do so would serve no purpose and, as a practical matter, may be difficult or even impossible to comply with. Nor does Barclays need this information. The Trustee makes regular reports on the state of the estate. To the extent that the Trustee needs to make distributions from customer property, the Trustee must apply for court approval, at which time information related to those applications will become public.

82. Moreover, the proposed order specifically orders the Trustee to transfer any surplus to Barclays. The Trustee has never disputed that Barclays has a conditional right to the Rule 15c3-3 Assets, so Barclays' proposed language regarding its conditional entitlement to those assets is not only unnecessary, but procedurally improper. An order is only appropriate where there is a justiciable controversy between the parties, and federal courts may not enter advisory opinions absent an actual dispute. *See, e.g., Crawley v. U.S.*, No. 10-1024-cv, 2011 WL 1252278, at *1 (2d Cir. 2011) ("the exercise of federal jurisdiction under the Constitution 'depends on the existence of a case or controversy, and a federal court lacks the power to render advisory opinions"); *Nolan v. Holmes*, 334 F.3d 189, 203 (2d Cir. 2003) (where "there is no actual controversy between [the parties] on [an] issue, [the courts] have no jurisdiction to issue

35

67168

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7TH FLOOR • NEW YORK, NY 10022 • PH. 212.446.2300 • FAX 212.446.2350

June 3, 2011

Honorable James M. Peck
United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004-1408

> Re: **In re Lehman Brothers Holdings Inc.,** *et al.,* **Case No. 08-13555 (JMP)**
> **In re Lehman Brothers Inc., Case No. 08-01420 (JMP); Lehman Brothers**
> **Inc., v. Barclays Capital, Inc., Adv. No. 09-01732**

Dear Judge Peck:

We write to provide clarification and confirmation regarding some of the dollar amounts for Margin Assets that were discussed during the status conference held on May 9, 2011 to address the disagreements between Barclays and the Trustee regarding the Proposed Orders implementing the Court's February 22, 2011 Opinion.

During that status conference, it became apparent that there were some discrepancies between Barclays and the Trustee (and some uncertainty on the part of both parties) regarding the precise dollar amounts applicable to various categories of Margin Assets. We have worked with the Trustee to try to resolve those discrepancies, so that we could provide the Court with precise numbers that would allow for final Orders to be entered to implement any decisions the Court makes relating to the various disputes that were argued on May 9.

We have discussed these numbers with the Trustee, and both parties agree that the attached Margin Schedules 1 and 2 accurately reflect the total amount of the Margin Assets in the possession of Barclays and the Trustee, respectively, with the caveat that Barclays is relying on the Trustee's representations concerning the Margin Assets that the Trustee has received from third parties. Both parties also agree that Margin Schedules 1 and 2 accurately reflect the maturities of the relevant Margin Assets that were in the form of government securities.[1] Margin Schedule 1 shows that the total amount of the Margin Assets claimed by the Trustee that have already been delivered to Barclays is $2.054 billion ($1.880 billion in cash margin and $174 million in government securities with maturities longer than three months). Margin Schedule 2 shows that the total amount of the Margin Assets that the Trustee has represented are in the Trustee's possession is $1.124 billion, consisting of at least $45,176 in cash margin and at least $1.115 billion in government securities with maturities longer than three months (of which $795M have maturities longer than fifteen years). (The parties currently lack information

---

[1] For the reasons stated in his post-trial briefings, the Trustee does not believe that a breakdown of the Margin Assets based on their form, including their date of maturity, is relevant to the proposed orders.

1

A-1552

67169

BOIES, SCHILLER & FLEXNER LLP

regarding whether the remaining approximately $9 million was in the form of cash or government securities at the Closing).

In addition to the assets listed on Margin Schedules 1 and 2, Barclays has determined that there is a total of approximately $878.5 million (valued as of the Closing) in Margin Assets that, according to the Trustee's representations to Barclays of what the Trustee has received, are not in the Trustee's possession, but which have likewise not been transferred to Barclays. This includes between $620 million and $633.5 million in cash margin,[2] $10 million in government securities with maturities less than or equal to three months, and between $235 million and $248.5 million in government securities with maturities longer than three months (in all cases, using values as of the Closing). We understand that these assets remain in the possession of third party brokers or Lehman affiliates. It is our understanding that the Trustee at this time cannot fully verify Barclays' breakdown of the Margin Assets in the possession of third parties, but is willing to include language in the proposed orders to reflect the entitlement of the Trustee or Barclays, as applicable, under the Court's decision, to pursue the Margin Assets, in one or more forms, that are in the possession of third parties.

To the extent Barclays is awarded any of the Margin Assets that are not currently in its possession, Barclays believes it is entitled to delivery of those assets at their current values (as well as any distributions). Margin Schedule 3, attached hereto, is a schedule providing Barclays' best estimate of the current value of each of the categories of Margin Assets that are not currently in its possession. We understand that the Trustee has not independently determined the current value of these assets.

As shown in Margin Schedule 4, the total amount of the offset Barclays seeks (under section 550(e) and applicable law, as previously argued) for the OCC liabilities it assumed is $1.874 billion. For the reasons stated in his post-trial briefings, the Trustee does not agree that Barclays is entitled to any offset, nor that the offset can be calculated as reflected in Schedule 4.

We are hopeful that the Court will find this information useful for the upcoming June 6 hearing.

Sincerely,

Jonathan D. Schiller

---

[2] $87 million of this amount consists of Guaranty Funds held by CME at the time of Closing. The arguments with regard to "clearing funds" and "guaranty funds" put forth in Barclays' post-trial briefings and during the May 9 argument encompass both this $87 million in cash and $171,183,531.25 of the government securities in the Trustee's possession that were held by the OCC at the time of Closing.

2

A-1553

67170

## MARGIN SCHEDULE 1 –MARGIN ASSETS IN BARCLAYS' POSSESSION[3]

| | |
|---|---|
| **Total Margin Assets securing futures customers:** | **$2.814B** |
| Consisting of: | |
| Customer margin: | $2.154B[4] |
| Proprietary margin: | $660M |
| Consisting of: | |
| Proprietary cash margin: | $505M[5] |
| Government securities with maturities longer than 3 months: | $155M[6] |
| **Total Margin Assets securing non-OCC proprietary futures:** | **$0M** |
| **Total Margin Assets securing OCC options and futures:** | **$1.394B**[7] |
| Consisting of: | |
| Proprietary cash margin: | $1.375B |
| Government securities with maturities longer than 3 months: | $19M[8] |
| **TOTAL MARGIN ASSETS CLAIMED BY TRUSTEE AND IN BARCLAYS' POSSESSION:** | **$2.054B** |
| Consisting of | |
| Proprietary cash margin: | $1.880B |
| Government securities with maturities longer than 3 months: | $174M |

---

[3] These figures are all based on valuations as of the Closing.

[4] *See* BCI Ex. 729. The Trustee agrees that Barclays is entitled to this amount.

[5] *See* BCI Ex. 353, at Ex. 2; BCI Ex. 729; BCI Ex. M. 494; M. 495.

[6] *See* BCI Ex. 973; BCI Ex. 353, at Ex. 2.

[7] *See* BCI Ex. 646; BCI Ex. 147, at 9; BCI Exs. 330, 331.

[8] *See* BCI Exs. 330, 331, 680.

67171

## MARGIN SCHEDULE 2 –MARGIN ASSETS IN TRUSTEE'S POSSESSION[9]

| | |
|---|---|
| **Margin Assets securing proprietary futures:** | **$176M** |
| Includes: | |
| Proprietary cash securing proprietary futures: | $45,176 to $9.08M[10] |
| Government securities with maturities longer than 3 months: | $167M to $176M[11] |
| **Margin Assets securing OCC positions:** | **$948M**[12] |
| Consisting of: | |
| Proprietary cash securing OCC positions: | $0[13] |
| Government securities with maturities longer than 3 months: | $948M[14] |
| **TOTAL MARGIN ASSETS IN TRUSTEE'S POSSESSION:** | **$1.124B** |
| Includes: | |
| Proprietary cash margin: | $45,176 to $9.08M |
| Government securities with maturities longer than 3 months: | $1.115B to $1.124B |

---

[9] Again, these figures are all based on valuations as of the Closing.

[10] M. 494, BCI Ex. 973 (Macquarie Group ("Macquarie") Open Position Statements, 9/19/08, for accounts LEHH and LEHH2). The Macquarie statements show that the balance of LBI's house accounts as of 9/19/08 was approximately $195M, composed of $9M cash and $186M collateral (all USD values calculated using the conversion rate reflected on BCI Ex. 973). The Trustee has represented that he has received $171M from Macquarie and that Macquarie has held back approximately $31M. Macquarie has not advised the Trustee whether the $171M corresponds entirely to the liquidated government securities or a combination of cash and governments securities that were posted by LBI at Macquarie at the Closing. If the $171M includes all the LBI cash posted at Macquarie on 9/19/08, the "Proprietary cash securing proprietary futures" is the upper bound of $9.08M, else it is the lower bound of $45,176 reflected above. If the $171MM includes all the liquidated government securities posted by LBI at Macquarie as of 9/19/08, the "Government securities with maturities longer than 3 months" is the upper bound of $176M (including a $5M t-bill at Bank of Montreal), else it is any value between $167M and $176M depending on the combination of cash and liquidated governments securities Macquarie delivered to the Trustee.

[11] BCI Ex. 973.

[12] Of this amount, t-bonds valued as of Closing at $795M had maturities longer than 15 years. *See* note 14 *infra*.

[13] This excludes $80 million in undelivered proceeds from certain letters of credit deposited as margin in LBI's OCC accounts prior to the Closing that are the subject of a separate interpleader action.

[14] BCI Exs. 681-685, 688 (t-bills with face values of $42M, $41M bill, $14.5M, $25M,,$28M, and 3M, all with nearly 6 month maturities); BCI Exs. 686, 689, 691 (bonds with face values of $119.445M, $86.585M, $175M, and $26.26M, all with over 16 year maturities); BCI Ex. 690 (bond with face value of $55.56M with 17 year maturity); BCI Ex. 687, 692 (bonds with face values of $59.175M, $85.77M, and $34M, all with over 19 year maturities).

4

A-1555

67172

## MARGIN SCHEDULE 3 – BARCLAYS' CURRENT VALUATIONS FOR UNDELIVERED MARGIN ASSETS

| CATEGORY | CLOSING DATE VALUE | 3/31/11 VALUE |
|---|---|---|
| **Proprietary margin securing customer futures** | **$483 million** | **$474 million + distributions and accrued interest** |
| Proprietary cash securing customer futures | $388 million | $379 million + accrued interest |
| Government securities with maturities longer than 3 months | $95 million | $95 million + distributions and accrued interest on proceeds of matured securities |
| **Margin securing proprietary futures** | **$480 million** | **$508 million + distributions and accrued interest** |
| Proprietary cash securing proprietary futures | $154 million | $182 million + accrued interest |
| Government securities with maturities longer than 3 months | ≥ $280 million | ≥ $280 million + distributions and accrued interest on proceeds of matured securities |
| **Margin securing OCC positions** | **$948 million** | **$1.067 billion** |
| Proprietary cash securing OCC positions | $0 | $0 |
| Government securities with maturities longer than 3 months | $948 million | $1.067 billion |
| **TOTAL MARGIN CLAIMED BY TRUSTEE** | **$1.911 BILLION** | **$2.049 BILLION + distributions and accrued interest on non-OCC cash and securities** |
| Total proprietary cash margin claimed by Trustee | $542 million | $561 million + accrued interest on non-OCC cash |
| Total government securities with maturities longer than 3 months | ≥ $1.323 billion | ≥ $1.452 billion + distributions and accrued interest on proceeds of non-OCC matured securities |

A-1556

67173

## MARGIN SCHEDULE 4 – OFFSET FOR OCC LIABILITIES:

| | |
|---|---|
| **Net liabilities at OCC assumed by Barclays as of Closing:** | **$1.144 billion** |
| This includes: | |
| – net liabilities on options in LBI proprietary accounts: | $1.027 billion[15] |
| – net liabilities on affiliate options in LBI customer accounts: | $77 million[16] |
| – net liabilities on affiliate futures in LBI proprietary accounts: | $40 million[17] |
| **Post-closing losses on options in LBI's proprietary accounts:** | **$730 million[18]** |
| **TOTAL "OFFSET" SOUGHT BY BARCLAYS:** | **$1.874 billion** |

---

[15] *See* BCI Ex. 147 at 1-2.

[16] *See* BCI Ex. 147 at 1-2.

[17] *See* BCI Ex. 729 (showing "OCC loss" on futures of $40,311,065).

[18] *See* BCI Ex. 147, at p. 2; *see also* Barclays' Proposed Finding of Fact 34.9.2.

67184

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

        LEHMAN BROTHERS INC.,        Case No. 08-01420 (JMP) SIPA

                Debtor.

## ORDER RESOLVING THE TRUSTEE'S MOTION[1]

    **WHEREAS**, on September 15, 2009, James W. Giddens, as trustee ("Trustee") for the

SIPA liquidation of Lehman Brothers Inc. ("LBI") filed The Trustee's Motion for Relief

Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b)

("Trustee's Motion," ECF No. 1682);

    **WHEREAS**, on January 29, 2010, Barclays Capital Inc. ("Barclays") filed the motion of

Barclays Capital Inc. to Enforce The Sale Order And Secure Delivery Of All Undelivered

Assets, dated January 29, 2010 ("Barclays' Motion," ECF No. 2582);

    **WHEREAS**, this Order resolves the Trustee's Motion. The Court is entering a separate

order on this date that resolves Barclays' Motion;

    **NOW, THEREFORE**, upon the Trustee's Motion, and all related pleadings, filings, oral

arguments, conferences, submissions and Court rulings; the Court having held an evidentiary

hearing on the Trustee's Motion, and due deliberation having been had; for the reasons stated by

the Court in its Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule

60(b), The Trustee's Motion For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To

Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings, dated February

---

1.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b), The Trustee's Motion For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings, dated February 22, 2011 (ECF No. 4105).

A-1558

67185

22, 2011 (the "Court's Opinion," ECF No. 4105) and in its bench ruling of June 6, 2011, it is hereby

**ORDERED** that the Trustee's Motion is granted in part and denied in part as set forth below:

(a)  With respect to the Margin Assets,

    i.  to the extent the Trustee's Motion seeks relief pursuant to the Sale Orders, it is granted;

    ii.  to the extent that the Trustee's Motion seeks relief pursuant to Rule 60(b), it is denied as moot;

    iii.  the Trustee is awarded judgment against Barclays in the sum of Two Billion Fifty-four Million Dollars ($2,054,000,000.00) plus interest at the rate of five percent (5%) per annum from September 22, 2008 to the date that judgment is entered. Post-judgment interest shall accrue and be paid based upon the statutory post-judgment interest rate set forth in 28 U.S.C. § 1961.

(b)  With respect to the $769 million of securities referred to in paragraph 8(ii) of the Clarification Letter (the "15c3-3 Securities"),

    i.  to the extent the Trustee's Motion seeks relief pursuant to the Sale Orders, it is granted and consistent with the Trustee's position, Barclays has no present and unconditional right to the 15c3-3 Securities. To the extent there are remaining assets in the estate after the Trustee is able to pay all allowed customer claims in full in accordance with SIPA §§ 8(c), 16(4), 15 U.S.C. §§ 78fff-2(c), 78lll(4), Barclays is entitled to up to $769 million;

2

67186

        ii.    to the extent the Trustee's Motion seeks relief pursuant to Rule 60(b), it is

              denied as moot.

    (c)    With respect to the Clearance Box Assets, the Trustee's Motion is denied with

        prejudice; and it is further

**ORDERED** that the Court shall retain exclusive jurisdiction to enforce this Order; and it is further

**ORDERED** that this Order is a "final order" for the purposes of Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure; the ongoing litigation of a breach of contract claim brought by Lehman Brothers Holdings Inc. ("LBHI") against Barclays is a separate action, but to the extent Rule 54(b) of the Federal Rules of Civil Procedure could be deemed to apply, the Court finds there is no just reason for delaying the finality of this Order pending the resolution of that LBHI claim; and it is further

**ORDERED** that the Clerk shall enter judgment in accordance with this Order; and it is further

**ORDERED** that the automatic stay of proceedings to enforce a judgment under Rule 7062 of the Federal Rules of Bankruptcy Procedure shall be extended by an additional 30 days, to allow time for the Court to decide the joint motion of the Trustee and Barclays for approval of an agreement on the terms of a stay and security pending appeal; and it is further

**ORDERED**, that Barclays Bank PLC ("Barclays Bank"), having consented to be subject to the jurisdiction of this Court, shall be joined as an additional party to these proceedings, in order to reflect the agreement on stay and security matters entered into between the Trustee, Barclays and Barclays Bank, under which Barclays Bank assumes the obligation to satisfy the judgment of the Court with respect to the Margin Assets and any subsequent judgments obtained

3

67187

by the Trustee against Barclays in respect of the Margin Assets, and assumes the right to receive

payment from the Trustee with respect to the judgment of the Court on the Clearance Box Assets

and any subsequent judgments obtained by Barclays against the Trustee in respect of the

Clearance Box Assets; and it is further

      **ORDERED** that the time for filing a notice of appeal shall run from entry of the

judgment.

Dated:   New York, New York
        July 15, 2011

                        /s *James M. Peck*
                        Honorable James M. Peck
                        United States Bankruptcy Judge

67188

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

    LEHMAN BROTHERS INC.,    Case No. 08-01420 (JMP) SIPA

          Debtor.

## ORDER RESOLVING BARCLAYS' MOTION[1]

  **WHEREAS**, on September 15, 2009, James W. Giddens, as trustee ("Trustee") for the

SIPA liquidation of Lehman Brothers Inc. ("LBI") filed The Trustee's Motion for Relief

Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b)

("Trustee's Motion," ECF No. 1682);

  **WHEREAS**, on January 29, 2010, Barclays Capital Inc. ("Barclays") filed the motion of

Barclays Capital Inc. to Enforce The Sale Order And Secure Delivery Of All Undelivered

Assets, dated January 29, 2010 ("Barclays' Motion," ECF No. 2582);

  **WHEREAS**, this Order resolves Barclays' Motion. The Court is entering a separate

order on this date that resolves the Trustee's Motion;

  **NOW, THEREFORE**, upon Barclays' Motion, and all related pleadings, filings, oral

arguments, conferences, submissions and Court rulings; the Court having held an evidentiary

hearing on Barclays' Motion, and due deliberation having been had; for the reasons stated by the

Court in its Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule

60(b), The Trustee's Motion For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To

Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings, dated February

---

[1]. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's
Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b), The Trustee's Motion
For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication
Of Related Adversary Proceedings, dated February 22, 2011 (ECF No. 4105).

A-1562

67189

22, 2011 (the "Court's Opinion," ECF No. 4105) and in its bench ruling of June 6, 2011, it is

hereby

ORDERED that Barclays' Motion is granted in part and denied in part as set forth

below:

(a)     With respect to the Margin Assets, Barclays' Motion is denied with prejudice;

(b)     With respect to the $769 million of securities referred to in paragraph 8(ii) of the

Clarification Letter (the "15c3-3 Securities"), consistent with the Trustee's

position, Barclays has no present and unconditional right to the 15c3-3 Securities

and Barclays' Motion is, therefore, denied with prejudice because it seeks

immediate and unconditional delivery of those securities (or their equivalent). To

the extent there are remaining assets in the estate after the Trustee is able to pay

all allowed customer claims in full in accordance with SIPA §§ 8(c), 16(4), 15

U.S.C. §§ 78fff-2(c), 78lll(4), Barclays is entitled to up to $769 million.

(c)     With respect to the Clearance Box Assets, Barclays' Motion is granted.  In full

satisfaction of Barclays' claim, Barclays is awarded judgment against the Trustee

in the sum of One Billion One Hundred Million Dollars ($1,100,000,000.00) and

no other payment.  Post-judgment interest shall accrue and be paid based upon the

statutory post-judgment interest rate set forth in 28 U.S.C. § 1961; and it is further

ORDERED that the Court shall retain exclusive jurisdiction to enforce this Order; and it

is further

ORDERED that this Order is a "final order" for the purposes of Rules 8001 and 8002 of

the Federal Rules of Bankruptcy Procedure; the ongoing litigation of a breach of contract claim

brought by Lehman Brothers Holdings Inc. ("LBHI") against Barclays is a separate action, but to

2

A-1563

67190

the extent Rule 54(b) of the Federal Rules of Civil Procedure could be deemed to apply, the Court finds there is no just reason for delaying the finality of this Order pending the resolution of that LBHI claim; and it is further

**ORDERED** that the Clerk shall enter judgment in accordance with this Order; and it is further

**ORDERED** that the automatic stay of proceedings to enforce a judgment under Rule 7062 of the Federal Rules of Bankruptcy Procedure shall be extended by an additional 30 days, to allow time for the Court to decide the joint motion of the Trustee and Barclays for approval of an agreement on the terms of a stay and security pending appeal; and it is further

**ORDERED**, that Barclays Bank PLC ("Barclays Bank"), having consented to be subject to the jurisdiction of this Court, shall be joined as an additional party to these proceedings, in order to reflect the agreement on stay and security matters entered into between the Trustee, Barclays and Barclays Bank, under which Barclays Bank assumes the obligation to satisfy the judgment of the Court with respect to the Margin Assets and any subsequent judgments obtained by the Trustee against Barclays in respect of the Margin Assets, and assumes the right to receive payment from the Trustee with respect to the judgment of the Court on the Clearance Box Assets and any subsequent judgments obtained by Barclays against the Trustee in respect of the Clearance Box Assets; and it is further

**ORDERED** that the time for filing a notice of appeal shall run from entry of the judgment.

Dated:   New York, New York
         July 15, 2011

                                        /s James M. Peck
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge

3

67327

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re LEHMAN BROTHERS INC.                         Case No. 08-01420 (JMP)
                                                    SIPA
          Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN
BROTHERS INC.,

          Plaintiff,

v.                                                  Adversary No. 09-01732 (JMP)

BARCLAYS CAPITAL INC. and
BARCLAYS BANK PLC,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ORDER RESOLVING
### THE TRUSTEE'S AMENDED ADVERSARY COMPLAINT[1]

**WHEREAS**, on November 16, 2009, James W. Giddens, as trustee ("Trustee") for the

SIPA liquidation of Lehman Brothers Inc. ("LBI") filed an Adversary Complaint against

Barclays Capital Inc. ("Barclays") in Adv. Proc. No. 09-01732 (JMP) ("Adversary Complaint,"

ECF No. 1);

**WHEREAS**, on July 15, 2011, pursuant to the parties' stipulation, so-ordered on July 15,

2011 (attached hereto as Exhibit A), the Trustee filed an amended Adversary Complaint in Adv.

Proc. No. 09-01732 (JMP) ("Amended Adversary Complaint," ECF No. 11);

**NOW, THEREFORE**, upon the Amended Adversary Complaint and all related

pleadings, filings, oral arguments, conferences, submissions and Court rulings; the Court having

---

1.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's
    Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b), The Trustee's Motion
    For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication
    Of Related Adversary Proceedings, dated February 22, 2011 (Dkt. 08-01420, ECF No. 4105).

A-1565

67328

held an evidentiary hearing, and due deliberation having been had, for the reasons stated by the Court in its Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b), The Trustee's Motion For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings, dated February 22, 2011 (the "Court's Opinion," Dkt. 08-01420, ECF No. 4105) and in its bench ruling of June 6, 2011 it is hereby

**ORDERED** that the following Counts of the Amended Adversary Complaint are dismissed with prejudice: Count I (Declaratory Judgment under 28 U.S.C. § 2201 (DTCC Clearance Box Assets)), Count VI (Avoidance of Transfers and Return of Customer Property under SIPA), Count VIII (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities under § 548 of the Bankruptcy Code), Count IX (Fraudulent Conveyance under § 273 of the New York Debtor & Creditor Law, as made applicable by § 544(b) of the Bankruptcy Code), Count X (Recovery of the Excess of the Repo Securities under §§ 559 and 542 of the Bankruptcy Code), Count XI (Breach of Contract), Count XII (Conversion - Money Had and Received) and Count XIII (Aiding and Abetting Breach of Fiduciary Duty); and it is further

**ORDERED** that Count II (Declaratory Judgment under 28 U.S.C. § 2201 (OCC Margin and Clearing Funds)) and Count III (Declaratory Judgment under 28 U.S.C. § 2201 (Funds at Other Exchanges)) of the Amended Adversary Complaint are granted; and it is further

**ORDERED** that Count IV (Declaratory Judgment under 28 U.S.C. § 2201 ($769 Million In Rule 15c3-3 Securities Or Substantially Similar Securities)) of the Amended Adversary Complaint is granted in part and denied in part. Count IV is granted insofar as it alleges that Barclays has no present and unconditional right to the 15c3-3 Securities. Count IV is denied insofar as it can be read to allege that Barclays has no conditional right to the 15c3-3 Securities.

2

67329

To the extent there are remaining assets in the estate after the Trustee is able to pay all allowed customer claims in full in accordance with SIPA §§ 8(c), 16(4), 15 U.S.C. §§ 78fff-2(c), 78lll(4), Barclays is entitled to up to $769 million; and it is further

**ORDERED** that Count V (Avoidance of Transfers and Recovery of Property under §§ 549 and 550 of the Bankruptcy Code (avoiding transfers after commencement of case)), Count VII (Turnover of Property under § 542 of the Bankruptcy Code) and Count XIV (Disallowance of Claims under § 502 of the Bankruptcy Code) of the Amended Adversary Complaint are granted with respect to the Margin Assets, and denied and dismissed with prejudice with respect to the Clearance Box Assets and the repo collateral; and it is further

**ORDERED** that, with respect to the Amended Adversary Complaint, the Trustee is granted the relief set forth in the Court's Order Resolving the Trustee's Motion, including prejudgment interest on the value of the Margin Assets in Barclays' possession at the rate of five percent (5%) per annum from September 22, 2008 to the date that judgment is entered and any post-judgment interest that shall accrue at the rate set forth in 28 U.S.C. § 1961; and it is further

**ORDERED** that the Court shall retain exclusive jurisdiction to enforce this Order; and it is further

**ORDERED** that this Order is a "final order" for the purposes of Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure; the ongoing litigation of a breach of contract claim brought by Lehman Brothers Holdings Inc. ("LBHI") against Barclays is a separate action, but to the extent Rule 54(b) of the Federal Rules of Civil Procedure could be deemed to apply, the Court finds there is no just reason for delaying the finality of this Order pending the resolution of that LBHI claim; and it is further

A-1567

67330

**ORDERED** that the Clerk shall enter judgment in accordance with this Order; and it is further

**ORDERED** that the automatic stay of proceedings to enforce a judgment under Rule 7062 of the Federal Rules of Bankruptcy Procedure shall be extended by an additional 30 days, to allow time for the Court to decide the joint motion of the Trustee and Barclays for approval of an agreement on the terms of a stay and security pending appeal; and it is further

**ORDERED**, that Barclays Bank PLC ("Barclays Bank"), having consented to be subject to the jurisdiction of this Court, shall be joined as an additional party to these proceedings, in order to reflect the agreement on stay and security matters entered into between the Trustee, Barclays and Barclays Bank, under which Barclays Bank assumes the obligation to satisfy the judgment of the Court with respect to the Margin Assets and any subsequent judgments obtained by the Trustee against Barclays in respect of the Margin Assets, and assumes the right to receive payment from the Trustee with respect to the judgment of the Court on the Clearance Box Assets and any subsequent judgments obtained by Barclays against the Trustee in respect of the Clearance Box Assets; and it is further

**ORDERED** that the time for filing a notice of appeal shall run from entry of the judgment.

Dated:     New York, New York
         July 15, 2011

                                 _s/ James M. Peck_
                                 Honorable James M. Peck
                                 United States Bankruptcy Judge

A-1568

67331

**EXHIBIT A**

A-1569

67332

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re LEHMAN BROTHERS INC.                    Case No. 08-01420 (JMP)

    Debtor.                                   SIPA

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN
BROTHERS INC.,

    Plaintiff,

                              Adversary No. 09-01732 (JMP)

v.

BARCLAYS CAPITAL INC.,

    Defendant.

**STIPULATION AND ORDER**
**AMENDING THE TRUSTEE'S ADVERSARY COMPLAINT**

    **WHEREAS**, on November 16, 2009, James W. Giddens, as trustee ("Trustee") for the

SIPA liquidation of Lehman Brothers Inc. ("LBI") filed an Adversary Complaint against

Barclays Capital Inc. ("Barclays") in Adv. Proc. No. 09-01732 (JMP) ("Trustee's Adversary

Complaint," ECF No. 1);

    **WHEREAS**, the Asset Purchase Agreement, dated September 16, 2008 ("APA"), states:

"On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred

Employee an annual bonus ('08 Annual Bonuses') in respect of the 2008 Fiscal Year that, in the

aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of

amounts payable for incentive compensation (but not base salary) and reflected on the financial

schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of

Holdings and Purchaser." (Movants' Ex. 1 (APA) § 9.1(c));

67333

WHEREAS, a number of former LBI employees have filed priority or general creditor claims against the LBI estate seeking bonus amounts that allegedly accrued in their favor in respect of the 2008 fiscal year (the "Employee Claims");

WHEREAS, the Trustee has not determined the Employee Claims;

WHEREAS, the parties agree, based upon the terms set forth below, that the Trustee's Adversary Complaint is hereby amended to withdraw Count XI (Breach of Contract) to the extent it relates to Barclays' alleged failure to pay bonus amounts under the APA, and that this withdrawal is without prejudice to the Trustee's right to file a claim against Barclays for failure to pay bonus amounts under the APA in the event it is determined that there are valid Employee Claims.

IT IS HEREBY STIPULATED AND AGREED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:

1.    The Trustee's Adversary Complaint is hereby amended to withdraw Count XI (Breach of Contract) to the extent it relates to Barclays' alleged failure to pay bonus amounts under the APA as reflected in Exhibit A hereto, and such amendment is hereby effective immediately upon entry of this stipulated Order.

2.    The Trustee is directed to docket the Trustee's Amended Adversary Complaint with the Court.

3.    Nothing herein nor anything in the amendments to the Trustee's Adversary Complaint shall waive or have any preclusive effect whatsoever on the Trustee's right to file a claim against Barclays for failure to pay bonus amounts under the APA in the event it is determined that there are valid Employee Claims.

2

67334

4.      In the event it is determined that there are valid Employee Claims and as a result the Trustee brings a claim against Barclays for failure to pay bonus amounts under the APA, the recovery sought by the Trustee in any such claim shall be the allowed amount of the Employee Claims. If it is determined that there are no valid Employee Claims, the Trustee shall not file any claim against Barclays in connection with Barclays' alleged failure to pay bonus amounts under the APA.

5.      This stipulated Order shall not be construed as an admission by Barclays that it is responsible for any Employee Claims, whether determined to be valid or otherwise, and shall be without prejudice to Barclays' right to raise any defense or counterclaim with respect to any claim by the Trustee based on the Employee Claims that Barclays would have been entitled to raise in response to the Trustee's Adversary Complaint, but which was stayed pending resolution of the Rule 60(b) motions. In addition, this stipulated Order shall be without prejudice to Barclays' right to seek dismissal of any claim the Trustee may bring against Barclays based upon the Court's adjudication of Count II of Lehman Brothers Holdings Inc.'s complaint against Barclays.

By:  /s/ William R. Maguire
     William R. Maguire
     Seth D. Rothman
     Neil J. Oxford

Dated: July 12, 2011

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)

*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

By:  /s/ Jonathan D. Schiller
     Jonathan D. Schiller
     Hamish P.M. Hume
     Jack G. Stern

Dated: July 12, 2011

BOIES SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
(212) 446-2300

*Attorneys for Barclays Capital Inc.*

3

67335

**SO ORDERED:**

Dated: New York, New York
     July 15, 2011

                */s James M. Peck*
                HONORABLE JAMES M. PECK
                UNITED STATES BANKRUPTCY JUDGE

A-1573

67336

**EXHIBIT A**

A-1574

67337

William R. Maguire
Seth D. Rothman
Neil J. Oxford
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re LEHMAN BROTHERS INC.

     Debtor.

Case No. 08-01420 (JMP)
SIPA

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN
BROTHERS INC.,

     Plaintiff,

v.

BARCLAYS CAPITAL INC.,

     Defendant.

Adversary No. 09-01732(JMP)

**AMENDED ADVERSARY COMPLAINT**

67338

Plaintiff James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of Lehman Brothers Inc. ("LBI" or "Debtor"), as and for his Complaint against defendant Barclays Capital Inc. ("Barclays"), alleges as follows:

## NATURE OF THE ACTION

1.     By this action, the Trustee seeks among other things: (i) to recover approximately $2.9 billion in cash and securities that are in the possession of or were wrongfully transferred to Barclays, including approximately $1.3 billion in cash that was held by the Options and Clearing Corporation ("OCC") and approximately $1.6 billion in securities from LBI's clearance boxes at the Depository Trust & Clearing Corporation ("DTCC"); (ii) a judgment declaring that these assets, as well as certain other assets, having an aggregate value of approximately $6.7 billion (the "Disputed Assets"), were not sold to Barclays and therefore remain a part of the LBI estate; and (iii) to recover all other undisclosed benefits that Barclays obtained at the expense of the LBI estate.

2.     The Disputed Assets include:

> (a) approximately $2.4 billion in assets that were in LBI's clearance boxes, primarily at the DTCC, consisting of the approximately $1.6 billion that was wrongfully transferred to Barclays and approximately $800 million that remains in the boxes;

> (b) approximately $2.5 billion in assets at the OCC, consisting of the approximately $1.3 billion in cash that was wrongfully transferred to Barclays and approximately $1.2 billion in securities and letters of credit still held by the OCC;

> (c) as much as $1 billion in assets at other derivatives exchanges; and

> (d) $769 million of securities that LBI had maintained in a reserve account for the exclusive benefit of customers pursuant to SEC Rule 15c3-3 or securities of substantially the same nature and value.

2

A-1576

67339

3.      The Disputed Assets were not included in the transaction that was contemplated by the Asset Purchase Agreement, dated as of September 16, 2008 (the "APA") or presented to the Court on Friday, September 19, 2008 and early Saturday morning, September 20, 2008 (the "Sale Hearing").

4.      At the Sale Hearing, the Court was advised of the changes that the parties had agreed to make to the APA. As presented to, and approved by, the Court, the revised deal called for Barclays to acquire the Business (as defined in the APA), certain real estate properties, and $47.4 billion of additional assets in exchange for a payment of $250 million, the appraisal value of the real estate, and Barclays' assumption of $45.5 billion in liabilities and certain cure costs and employee-related obligations.

5.      Barclays has already obtained more than $47.4 billion in assets as a result of the sale and has failed to assume the full extent of the cure cost obligations described to the Court. Yet Barclays claims that the so-called "Clarification Letter" and, with respect to the assets at the OCC, a Transfer and Assumption Agreement (the "TAA Letter"), entitle it to as much as $6.7 billion in additional LBI assets.

6.      Barclays is not entitled to the Disputed Assets. As a matter of contractual interpretation, the Clarification Letter does not convey the Disputed Assets to Barclays. Moreover, the Court never approved the Clarification Letter or the TAA Letter, and never authorized the transfer of the Disputed Assets to Barclays.

7.      With respect to the clearance box assets mentioned in paragraph 2(a) above, Barclays, the Trustee and the DTCC entered into a separate letter agreement that expressly specified that the clearance box assets at DTCC were "Excluded Assets" within the meaning of the APA. With respect to the assets at the OCC and other derivatives exchanges mentioned in

3

67340

paragraphs 2(b) and (c) above, the Clarification Letter does not include these assets as "Purchased Assets." Finally, with respect to the securities mentioned in paragraph 2(d) above, the Clarification Letter clearly provides that the $769 million of securities would be transferred to Barclays "to the extent permitted by applicable law," which means that they could be transferred only if, among other things, there was a sufficient excess in LBI's Rule 15c3-3 reserve account.

8.  The Clarification Letter and the TAA Letter must be read to give effect to the purpose of the transaction, which was to protect customers and their property and to maximize the value of the estate. The Trustee, along with SIPC and various regulatory authorities, supported the sale because, at a time of great financial tumult in the United States markets, the sale was supposed to protect LBI's customers. Among other things, the sale would deliver their accounts to solvent broker-dealers, preserve their right of recovery, and ensure that the Trustee had sufficient assets remaining in the LBI estate to satisfy customer claims.

9.  The Disputed Assets are of vital importance to the LBI estate. Their loss would not only strip the LBI estate of assets that should be used to repay customers, but would award Barclays an unintended windfall. Accordingly, the Trustee seeks to recover the cash and securities wrongfully transferred to Barclays and obtain a declaration that the Disputed Assets were not sold to Barclays and remain a part of the LBI estate.

## JURISDICTION AND VENUE

10.  The Trustee brings this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

11.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157, 1334 and 2201. This is a core proceeding arising under 28 U.S.C. § 157.

4

67341

12.     The Court has personal jurisdiction over Barclays pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure. In addition, Barclays consented to the jurisdiction of this Court in the Asset Purchase Agreement.

13.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. In addition, Barclays has consented to venue and agreed that any and all proceedings relating to the Asset Purchase Agreement be maintained exclusively in this Court.

## PARTIES

14.     Plaintiff James W. Giddens is the Trustee for the SIPA liquidation of LBI.

15.     Defendant Barclays is a Connecticut corporation with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

**The Asset Purchase Agreement**

16.     LBI had long been prominent within the securities industry as a brokerage and clearing firm, SIPC member and SEC-registered broker-dealer. LBI was a subsidiary of Lehman Brothers Holdings, Inc. ("LBHI") and formed part of a worldwide Lehman Brothers business that included affiliated entities in North America, Europe and Asia.

17.     On September 15, 2008, LBHI filed a voluntary petition under chapter 11 of the Bankruptcy Code. The liquidation proceeding pertaining to LBI did not commence that day in the hope of preserving the value of the business as a going concern, and thereby maximizing the opportunity for an orderly cessation of LBI's activities as a broker-dealer and an orderly disposition of LBI customer accounts.

18.     On September 16, 2008, LBHI, LBI and LB 745 LLC entered into the APA, which provided for the sale of certain assets related to the LBI business. (LBHI Docket No. 280.)

67342

19.     Pursuant to the APA, Barclays was to pay approximately $1.7 billion for certain "Purchased Assets," and to assume other obligations and expenses. (APA § 3.1.)

20.     The Purchased Assets included, among other enumerated assets, certain proprietary securities having a book value of approximately $70 billion (the "Long Positions"), approximately $700 million in cash, the Lehman worldwide headquarters located at 745 Seventh Avenue, New York, New York, and two New Jersey data centers. (*Id.* § 1.1.) The APA did not include any mention of the Disputed Assets.

21.     As consideration for the Purchased Assets, Barclays agreed to, among other things: (i) pay a cash amount consisting of the sum of $250 million plus the appraised value of the real estate (together, the "Cash Amount"), and (ii) assume certain liabilities, including short positions and repurchase agreements relating to enumerated types of securities positions (the "Short Positions"). (*Id.* §§ 2.3(i), 3.1.) The Cash Amount was expected to be approximately $1.7 billion, and the book value of the Short Positions was approximately $69 billion. (*Id.*)

22.     Barclays also agreed to assume certain contract cure costs. (*Id.* § 2.5.)

23.     In summary, the APA describes a transaction that would provide Barclays with the LBI broker-dealer business and tens of thousands of customer accounts, but would not provide Barclays with an immediate net gain or the estate with any net loss.

**The September 17 Hearing**

24.     On September 17, 2008, the LBHI debtors moved the Court to (a) schedule a sale hearing, (b) establish sales procedures, (c) approve a break-up fee, and (d) approve the sale of the Purchased Assets. (LBHI Docket No. 60.)

25.     The Court was told that time was of the essence and that the assets to be sold were deteriorating in value. (September 17, 2008 Hearing Tr. at 21:2-22:2.) This was at a time of extraordinary distress in the financial markets, and the parties feared that if they could not close

6

67343

the sale quickly, there would be no LBI business left to sell. (*Id.* at 26:1-9, 29:1-12.) At no time during this hearing was reference made to any of the Disputed Assets. On the basis of these and similar representations, the Court scheduled the Sale Hearing on shortened notice for Friday, September 19, 2008. (*Id.* at 74:2-6.)

**The Trustee's Appointment**

26.     On September 19, 2008, the Honorable Gerard E. Lynch of the United States District Court for the Southern District of New York entered the Order Commencing Liquidation pursuant to the provisions of SIPA. Among other things, the LBI Liquidation Order appointed the Trustee and removed the case to this Court. (Case No. 08-CIV-8119 (GEL), Docket No. 3 (S.D.N.Y.).)

27.     At the hearing before Judge Lynch, Kenneth Caputo of SIPC asked the Court to take immediate action to protect public customers and protect fair and orderly markets, noting that the LBI Liquidation Order permitted the Trustee to effect pending transactions so that public customers could get access to their funds and those accounts could be transferred in the orderly course of business. (September 19, 2008 Hearing Tr. at 4:17-5:1.) Mr. Caputo also explained that the proposed sale would permit customer accounts to be moved to acquiring broker-dealer entities, which would afford customers immediate access to their accounts and provide again for fair and orderly markets. (*Id.* at 5:5-8.)

**The Sale Hearing**

### The Court Is Informed That The Deal Has Changed

28.     Later that day, the Sale Hearing commenced. At the hearing, the Court was informed that the deal had changed since the execution of the APA. Instead of the approximately $70 billion in Long Positions and $69 billion in Short Positions set forth in the

7

A-1581

67344

APA, Barclays would be purchasing $47.4 billion in assets and assuming $45.5 billion in liabilities relating to those assets.

29.     Counsel for LBHI explained:

> So, originally, we were selling assets that had a value of seventy --
> approximately seventy billion dollars.  And today, Your Honor,
> we're only selling assets that have a value of 47.4 billion dollars.
> Barclays is assuming liabilities, however, of 45.5 billion dollars in
> connection with those assets. . . .  Barclays is still agreeing to pay
> the cure amounts on any leases that it assumes or that we assume
> and assign to it.  Barclays is also agreeing to the same employee
> compensation agreements.  And it is also agreeing to pay the 250
> million dollars of goodwill to LBI.

(Sale Hearing Tr. at 47:1-15.)

30.     There was no mention of any of the Disputed Assets.  Nor was there any disclosure that Barclays was (a) seeking certain repo securities that by themselves were worth more than the $47.4 billion that was described to the Court, (b) assuming liabilities that were overstated, or (c) intending that the sale would include a mismatch of assets over liabilities in favor of Barclays to provide Barclays an immediate gain at the expense of the estate.

**The Disclosure of Material Changes**

31.     The Court was informed that the parties were drafting a letter agreement to reflect the changes to the deal and clarify certain ambiguities in the APA.  (Sale Hearing Tr. at 48:7-13, 54:8-10.)  The Court was told that all of the material changes to the deal had been disclosed, and counsel agreed with the Court's admonition that even a $500 million change would be material. (*Id.* at 54:18-23.)  This was intended to assure the Court that the letter agreement would not deviate in material ways from what had been described at the Sale Hearing.

32.     Nobody suggested that Barclays would seek to obtain a transfer of any additional assets from the LBI estate.  Indeed, the draft version of the Clarification Letter that existed at the time of the Sale Hearing made no reference to any of the Disputed Assets, and the Court was told

8

67345

that the sale would leave approximately $20 billion of assets in the LBI estate. (*Id.* at 55:23-56:3.)

### Cash Is Excluded from the Sale

33.    The Court was also told that cash was being excluded from the deal. Counsel for LBHI explained that the deal originally "required the debtors to transfer 700 million dollars in cash to Barclays. And that is no longer the case. There's no cash that's being transferred to Barclays." (Sale Hearing Tr. at 53:21-25.)

34.    This change addressed an objection lodged by Lehman Brothers Inc. (Europe) ("LBIE"), which was concerned that its funds might be swept up in any cash transfer to Barclays. (*See id.* at 205:17-208:5.)

35.    Counsel for both Barclays and LBHI assured the Court that this possibility had been avoided by removing the cash from the deal. Counsel for Barclays stated that "Barclays is making this transaction possible to claims by subsidiary creditors ... [by] los[ing] the 700 million dollars in cash it was originally going to receive." (*Id.* at 200:7-12.) Counsel for LBHI reiterated that "we're not transferring any cash to Barclays, that's out of the agreement." (*Id.* at 242:11-16.)

36.    On the basis of these representations, the Court noted, "I'm satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the debtor from Europe was cash that in practical terms we should be safe." (*Id.* at 253:5-8.)

37.    The Disputed Assets include approximately $1.3 billion in cash that was at the OCC. This cash was improperly transferred to Barclays, and Barclays' claim to it is directly contrary to the representations to the Court that cash was excluded from the sale.

9

A-1583

67346

**The Court Approves A Sale That Will Protect Customers**

38.    The Sale Hearing continued into the early hours of Saturday morning, September 20, 2008.  The Court heard from a number of individuals, including Mr. Caputo of SIPC and the Trustee, both of whom spoke in support of the transaction.  Mr. Caputo urged the sale to close "[a]s soon as possible" to "provide certainty to parties and counterparties so that they can take the actions that they deem necessary to protect their clients" and to "provide[ ] certainty to the hundreds of thousands of customers [of LBI]."  (*Id.* at 73:20-24.)

39.    The Trustee had not been involved in the negotiation of the APA, and was provided with only limited information regarding the economics of the sale and the financial condition of LBI.  Based on the information provided to him, the Trustee believed the sale to Barclays to be in the best interests of LBI customers.  Among other things, the Trustee believed that the deal would facilitate the transfer of customer accounts to solvent broker-dealers with minimal disruption to the customers' ability to access their accounts and that there would be sufficient customer property in the reserve account or otherwise segregated or available at depositories to support the transfer of the great bulk of customer accounts and satisfy any remaining customer claims.  The Trustee emphasized that the "first role of a SIPC proceeding is to maintain orderly markets and to try to preserve normalcy for customer accounts."  (*Id.* at 76:18-21.)

40.    There were also representatives of the SEC, the Federal Reserve Bank of New York, and the CFTC who appeared in support of the sale.  The Court incorporated into the record comments that these regulators had made at the September 17 hearing.  (*Id.* at 157:21-25.)

41.    At the conclusion of the hearing, the Court approved the sale as it had been presented.  The Court stated, "I understand this deal, not in every aspect but certainly in broad outline.  I have notice."  (*Id.* at 84:18-19.)  The Court also noted that "[t]he essential terms of the

10

67347

transaction, with modifications, have been understood at least for the last few days." (*Id.* at 85:7-8.)

42.      The Court observed that there was no better alternative transaction because, among other things, "[o]nly Barclays can deliver the customer accounts to safe harbors." (*Id.* at 249:3-11.) In particular, the Court concluded that "the customer property, which is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale." (*Id.*)

43.      The Court further remarked that the adverse consequences of not approving the sale could be "truly disastrous," noting that "those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." (*Id.* at 250:13-21.)

**The Sale Orders**

44.      In the early morning hours of September 20, 2008, the Court entered a Sale Order in the LBHI proceeding. (LBHI Docket No. 258.) The LBHI Sale Order defines the "Purchase Agreement" as "that certain Asset Purchase Agreement, dated September 16, 2008, . . . collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008." (LBHI Sale Order at 1.)

45.      The LBHI Sale Order finds that "[t]he Debtors' estates will suffer immediate and irreparable harm if the relief in the Motion [seeking approval of the sale] is not granted on an expedited basis consistent with the provisions set forth herein and the Purchase Agreement, particularly given the wasting nature of the Purchased Assets." (*Id.* ¶ D.) The LBHI Sale Order

A-1585

67348

further finds that "the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest." (*Id.* ¶ H.)

46.     The LBHI Sale Order approves "[t]he Purchase Agreement and all of the terms and conditions thereto." (*Id.* at ¶ 3.) It authorizes and directs the Debtors to "(1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement." (*Id.*)

47.     The LBHI Sale Order provides that "[t]he Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is agreed to between the Committee, the Debtors and the Purchaser." (*Id.* at ¶ 25.) The LBHI Sale Order further provides that in the event of an inconsistency between the "Purchase Agreement (including all ancillary documents executed in connection therewith)" and the Order, the "Order shall govern." (*Id.* at ¶ 27.)

48.     The Court also entered a concurrent order in the SIPA liquidation of LBI, authorizing the Trustee to consummate the sale transaction on behalf of LBI. (SIPA Liquidation Docket No. 3.)

12

67349

**The Clarification Letter**

49.    Over the weekend of September 20 and 21, 2008, the parties reworked the Clarification Letter.  This was done in harried and extraordinary circumstances.  Numerous issues arose that had to be resolved, and many of the individuals involved had already been working around the clock for days.  Indeed, as the Court has commented:  "things were happening very, very quickly.  Very skillful lawyers and businesspeople put together an extraordinary transaction in virtually no time.  And it's conceivable that mistakes were made."  (June 24, 2009 Hearing Tr. at 47:17-20.)

50.    Having just been appointed the day before, the Trustee was not involved in the drafting process or in the negotiations concerning the Clarification Letter.  The Trustee first received a draft of the Clarification Letter on Sunday evening and received additional drafts later that night and on early morning Monday, only hours before the deal was to be closed.  Based on the representations made to the Court, the Trustee believed that the Clarification Letter would simply give effect to the deal that had been described at the Sale Hearing.

51.    The Clarification Letter was executed in the early hours of Monday morning, September 22, 2008.  Later that day, it was filed with the Court as an exhibit to the notice of filing of the "Purchase Agreement."  (LBHI Docket No. 280.)

52.    In relevant part, the Clarification Letter amends the definition of "Purchased Assets" in the Asset Purchase Agreement and replaces the "Long Positions" and the cash that previously was to be transferred to Barclays with:

> (A) the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A . . . .
>
> (B) such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B . . . .

13

67350

(C) exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements.

(Clarification Letter ¶ 1(a)(ii).)

53. The Clarification Letter also provides for the transfer, "to the extent permitted by applicable law," of "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." (*Id.* ¶ 8(ii).)

54. Although the Clarification Letter amends the definition of "Purchased Assets" and mentions certain assets, such as the clearance box assets and the 15c3-3 securities, the Trustee did not believe that it effected any fundamental change in the sale or granted Barclays assets above the $47.4 billion in assets disclosed to the Court.

**Barclays' Agreement To Exclude The Clearance Box Assets At The DTCC**

55. Barclays claims that the addition of paragraph (B), above, entitles it to approximately $2.4 billion in additional assets. While the draft of the Clarification Letter that the Trustee's advisors obtained on Sunday night indicated a transfer of certain assets in LBI's clearance boxes at the DTCC, in the face of serious concerns raised by the DTCC, Barclays expressly agreed to exclude those assets from the sale.

56. The DTCC is a privately-owned company that, through various subsidiaries, provides clearing, settlement and information services to the domestic and global securities industry. In the week before the Sale Hearing, the DTCC grew concerned about LBI's ability to satisfy its liabilities to the DTCC in connection with its open trading positions. On September 17, 2008, the DTCC informed LBHI and Barclays that Barclays "would be required to assume the liabilities associated with the accounts maintained by LBI at the DTCC and its subsidiaries . . . in their entirety and irrespective of whether the assets or liabilities in a particular account

14

67351

were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI."

(LBHI Sale Order ¶ E.)

57.    Barclays ultimately refused to assume LBI's liabilities to the DTCC beyond a

limited $250 million amount (in effect funded solely by LBI). This left the DTCC exposed to

losses that might be incurred in clearing hundreds of billions of dollars of open LBI trades.

Barclays' proposal to acquire LBI's assets at the DTCC increased the DTCC's potential

exposure by threatening to deprive it of an important source of collateral.

58.    As the DTCC's concerns threatened to derail the entire transaction, Barclays

agreed that it would exclude the assets at the DTCC from the sale. The parties recorded this

agreement in the DTCC Letter, which the DTCC drafted between late Sunday night and Monday

morning.

59.    On early Monday morning, September 22, 2008, the DTCC, Barclays, and the

Trustee executed the DTCC Letter. To satisfy the DTCC's concern regarding LBI's ability to

honor its liabilities to the DTCC arising from the winding down and closing out of the LBI

accounts, the DTCC Letter specifically defines LBI's accounts as "Excluded Assets" under the

APA.

60.    The DTCC Letter provides:

> Winding Down of Accounts. Barclays has indicated, and hereby
> agrees, that all of the accounts of LBI maintained at the Clearing
> Agencies Subsidiaries (the "Accounts") constitute "Excluded
> Assets" within the meaning of the APA. Accordingly, pursuant to
> the authority granted to the Trustee in the Orders, the Trustee
> hereby instructs the Clearing Agency Subsidiaries to close out the
> pending transactions in the Accounts of the Clearing Agency
> Subsidiaries and to use the proceeds in accordance with the Rules
> and Procedures of the Clearing Agency Subsidiaries.   Such
> liquidation transactions shall be transferred to, and closed out by,
> the relevant Clearing Agency Subsidiary, in the same manner as it

15

67352

closes out positions of Participants/Members for whom it has ceased to act.

As part of this closeout process, the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC to deliver securities from the DTC LBI Account to NSCC's account, in order to reduce or eliminate LBI's outstanding delivery obligations to NSCC.

(DTCC Letter ¶ 1 (SIPA Liquidation Docket No. 1684).)

**The Transfers of DTCC Securities**

61.     On Friday, September 19, 2008, LBI transferred approximately $1.1 billion in securities from its DTCC box to Barclays. Barclays did not purchase these securities as part of the sale and is not entitled to them.

62.     On September 29 and September 30, 2008, the Trustee transferred approximately $500 million in securities to Barclays. To the extent these securities were, as Barclays has now claimed, clearance box securities listed on Schedule B to the Clarification Letter, they were Excluded Assets pursuant to the DTCC Letter, should not have been transferred to Barclays, and need to be returned to the LBI estate.

**The Rule 15c3-3 Securities**

63.     SEC Rule 15c3-3 requires broker-dealers such as LBI to maintain separately one or more cash reserve accounts containing the net amount of money the broker-dealer owes its customers. This statutory minimum requirement is calculated weekly, and has to be segregated in the form of cash or qualified securities in a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (the "Reserve Account").

64.     With respect to custody of customer fully paid and excess margin securities, the rule provides that the broker-dealer may not pledge, hypothecate, or use such securities to support borrowing by the broker-dealer, but must maintain them free of liens at good control

16

67353

locations, available for prompt return to the customer. To the extent that the broker-dealer is not

in compliance with custody requirements, the Reserve Account deposit must be correspondingly

increased.

65.     Although Barclays claims that paragraph 8(ii) of the Clarification Letter grants it

an absolute right to $769 million in securities, the transfer of securities contemplated by this

provision was to be made only "to the extent permitted by applicable law." In the first instance,

this meant that there had to be a sufficient excess in LBI's Rule 15c3-3 Reserve Account above

the amount that was required to be reserved for the protection of customers.

66.     LBI attempted to calculate its 15c3-3 requirement over the weekend of September

20 and 21, 2008, but due to various difficulties, including a large number of fails and stock

record breaks, it could not reliably determine whether there was a surplus or a deficit in the

Reserve Account as of September 19, 2008. In fact, there was a deficit in the Reserve Account

as of that date.

67.     The release of the $769 million in securities also required regulatory approval,

which Barclays never obtained. The SEC refused to approve the release of LBI's 15c3-3 assets

because of questions regarding whether there was an excess in the Reserve Account.

68.     The transfer of the $769 million in securities was never intended to be

unconditional and the conditions for this transfer were not met. As a result, Barclays never

obtained the right to the $769 million in securities that it seeks under the Clarification Letter.

Moreover, to the extent the transfer of these securities would transfer assets to Barclays beyond

the $47.4 billion in assets that were disclosed to the Court, that transfer was never disclosed to,

or approved by, the Court. Thus, even if the Clarification Letter could be read to grant Barclays

an unconditional right to these securities in violation of the rules required to protect customers, to

17

67354

the extent that such a transfer exceeded the $47.4 billion in assets that were disclosed, that transfer would be avoidable.

**Margin And Clearing Funds**

69.     Barclays also claims approximately $2.5 billion in margin and clearing funds at the OCC and has demanded as much as $1 billion in funds at other exchanges. Barclays claims entitlement to these assets by virtue of the addition of the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" to the Clarification Letter's paragraph 1(a)(ii)(C), quoted above.

70.     The parenthetical on which Barclays relies does not mention margin or clearing funds, let alone the approximately $2.5 billion in margin and funds that was at the OCC or as much as $1 billion in funds at other exchanges. Barclays' reading of this parenthetical is also inconsistent with the intent of the parties as reflected in the course of their negotiations and the drafting history of the Clarification Letter.

71.     The approximately $2.5 billion in assets at the OCC was never a part of any business deal between LBI and Barclays. Thus, neither the APA nor the Clarification Letter makes any mention of any margin or clearing funds at the OCC or at any other derivatives exchange. At some point, there was a specific clause in a draft of the Clarification Letter that would have transferred to Barclays LBI's "margin" and "guaranty fund deposit" maintained in relation to customer property at any clearing agency. But this provision was deleted from the Clarification Letter and never reappeared.

**The Transfer And Assumption Agreement**

72.     Over the course of the weekend following the Sale Hearing, the Trustee, Barclays and the OCC executed the TAA Letter. Specifically, the TAA Letter provides:

18

67355

> Lehman hereby sells, assigns, transfers, and sets over to Barclays
> . . . all of Lehman's rights, title, interests, powers, privileges,
> remedies, obligations, and duties in, to, under, and in respect of
> [LBI's accounts at the OCC], as of the Effective Date including
> with respect to: (i) the Clearing Fund Deposit; (ii) all margin
> deposits held by OCC with respect to the Account; (iii) all
> settlement obligations with regards to transactions in cleared
> contracts; and (iv) all rights and obligations in respect of exercises
> of <u>option contracts</u> and assignments of such exercises.

(TAA Letter ¶ 1(a) (emphasis in original) (SIPA Liquidation Docket No. 1684).)

73.     The purpose of the TAA Letter was to protect the OCC from losses associated

with winding down LBI's open option positions, without having to take the step of precipitously

liquidating all of LBI's open positions at the OCC. The TAA Letter was not intended to

materially change the deal from the purchase of $47.4 billion in assets that had been represented

to the Court.

74.     To the extent that Barclays claims that the TAA Letter transfers to it

approximately $2.5 billion in margin and clearing funds, the TAA Letter effects a material

adverse change to the terms of the Purchase Agreement. There was no disclosure to the Trustee,

the Court, or anyone of the magnitude of the sums involved.

75.     The Court never approved this material change. The TAA Letter was never filed

with the Court or presented to the Court for approval, and while the LBHI Sale Order authorized

additional agreements to implement the Purchase Agreement, it did not authorize any such

agreement to materially change its terms.

76.     Moreover, the property at the OCC included approximately $1.3 billion in cash,

which had been excluded from the sale. Nonetheless, Barclays took possession of this

approximately $1.3 billion in cash and has recorded it as a gain on its balance sheet. As these

funds were not part of the sale, and were in fact specifically excluded, they need to be returned to

the LBI estate.

A-1593

67356

**The Repo Discount**

77.     The Clarification Letter defines as a "Purchased Asset" the securities owned by LBI and transferred to Barclays under a repurchase agreement (the "Repo"). These securities were meant to be specified on Schedule A to the Clarification Letter.

78.     The Repo between LBI and Barclays contemplated that LBI would pledge certain collateral to secure a loan of approximately $45 billion. The difference between the amount pledged and the amount of the loan reflected a discount or a "haircut" of approximately $5 to $7 billion in the value of LBI's collateral.

79.     At the September 17, 2008 hearing, the Repo between LBI and Barclays was described to the Court as a means to continue short term financing so that LBI could continue trading through the week.

80.     On September 19, 2008, LBI was placed into liquidation, an event of default under the Repo Agreement. Barclays issued a Notice of Default that afternoon.

81.     The Clarification Letter purports to terminate the Repo retroactively and to provide Barclays with all of the Repo collateral, which was valued at approximately $50 billion to $52 billion and therefore included approximately $5 billion to $7 billion in excess collateral. This excess value was not disclosed to the Court, which was told simply that Barclays was purchasing $47.4 billion in assets.

82.     Moreover, in exchange for the Repo collateral, Barclays forgave a $45 billion loan, yet the Court was told that the liabilities that Barclays was assuming in connection with the purchased assets amounted to $45.5 billion. Thus, Barclays received an additional undisclosed benefit by overstating the consideration relating to the Repo securities by $0.5 billion.

20

67357

**Cure Costs**

83. Under the APA, Barclays also agreed to assume certain contract cure costs. On a September 16, 2008 financial schedule, the parties estimated that these cure costs would be approximately $2.25 billion. This number was not based on actual expectations, but was artificially inflated to make it appear that Barclays was assuming a greater liability than it actually was. By the time of the Sale Hearing, this number had been revised, and counsel told the Court that the cure costs would be approximately $1.5 billion. (Sale Hearing Tr. at 100:1-4.) On information and belief, as of February 2009, Barclays had paid approximately $240 million in cure costs.

84. The parties represented to the Court that Barclays would be assuming cure costs as part of the consideration it was giving for the assets purchased in the sale. Barclays' failure to pay the expected amounts for these obligations and costs tilted the sale in its favor and caused Barclays to receive a windfall at the expense of the estate.

### COUNT I

#### (Declaratory Judgment under 28 U.S.C. § 2201
DTCC Clearance Box Assets)

85. The Trustee repeats and realleges paragraphs 1 - 84 as if fully set forth herein.

86. The Trustee and Barclays are parties to the Clarification Letter and the DTCC Letter. The parties dispute the meaning and enforceability of these agreements, particularly as to whether the agreements transfer the DTCC clearance box assets to Barclays or exclude them from the sale.

87. An actual controversy exists that is ripe and justiciable. A declaratory judgment will clarify the legal relationship between the parties.

21

67358

88.     The clearance box assets demanded by Barclays are not a part of the sale.  As Barclays agreed in the DTCC Letter, the DTCC clearance box assets are deemed to be Excluded Assets.

89.     Additionally, the Court never approved the transfer of approximately $2.4 billion in DTCC clearance box assets to Barclays.  This transfer was not referred to in the APA and was not disclosed to the Court at the Sale Hearing.  The Court was told that Barclays was acquiring $47.4 billion in financial assets, and there was no disclosure of any additional transfers of financial assets from the LBI estate.

90.     While the LBHI Sale Order refers to "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008," the Clarification Letter was supposed to be consistent with what the Court was told at the Sale Hearing.  Barclays is estopped from asserting positions that are fundamentally and materially inconsistent with what the Court, customers, and creditors were told.

91.     Indeed, if the parties had wanted to provide for the transfer of any additional assets to Barclays above and beyond the $47.4 billion that the Court approved, then they needed to return to the Court for approval.  The parties, however, never pursued this option and the Clarification Letter was never submitted to the Court as part of a formal motion for approval.

92.     The Trustee is entitled to a declaratory judgment that the DTCC clearance box assets were not transferred to Barclays and remain the property of the LBI estate.  The Trustee is also entitled to the return of the approximately $1.6 billion in DTCC clearance box assets already transferred to Barclays.

22

A-1596

67359

## COUNT II

### (Declaratory Judgment under 28 U.S.C. § 2201
### OCC Margin and Clearing Funds)

93.     The Trustee repeats and realleges paragraphs 1 - 92 as if fully set forth herein.

94.     The Trustee and Barclays are parties to the Clarification Letter and the TAA Letter. The parties dispute the meaning and enforceability of these agreements, particularly as to whether these agreements operate to transfer to Barclays approximately $2.5 billion in OCC margin and clearing funds.

95.     There is an actual controversy that is ripe and justiciable. A declaratory judgment will clarify the legal relationship between the parties.

96.     The OCC margin and clearing funds were not part of the sale. The LBI negotiators never contemplated that Barclays would acquire billions of dollars in margin and clearing funds held at the OCC. The approximately $1.3 billion in cash at the OCC and hundreds of millions of dollars of cash equivalents were subject to the parties' undertaking that cash was excluded from the sale. Moreover, LBI had included approximately $507 million of its funds at the OCC as a debit item in LBI's computation of the reserve it needed to maintain for the protection of customer property pursuant to Rule 15c3-3. Transferring such assets would have caused a deficiency in LBI's Reserve Account for the protection of customer property in violation of the Rule.

97.     The TAA Letter was never submitted or disclosed to the Court. The Court authorized the execution of additional agreements only if they did not have a material effect on the debtors' estates and were agreed to between the debtors, Barclays, and the Creditors' Committee. To the extent that the Clarification Letter or the TAA Letter purport to transfer

23

67360

approximately $2.5 billion in OCC assets to Barclays, those transfers were not authorized by the Court or by the Sale Order.

     98.     The Trustee is entitled to a declaratory judgment that the OCC margin and clearing funds were not transferred to Barclays and remain the property of the LBI estate. The Trustee is also entitled to the return of the approximately $1.3 billion in cash that has already been transferred to Barclays.

### COUNT III

#### (Declaratory Judgment under 28 U.S.C. § 2201
#### Funds at Other Exchanges)

     99.     The Trustee repeats and realleges paragraphs 1 - 98 as if fully set forth herein.

     100.     The Trustee and Barclays are parties to the Clarification Letter. The parties dispute the meaning and enforceability of the Clarification Letter, especially as to the parenthetical phrase "(and any property that may be held to secure obligations under such derivatives)."

     101.     There is an actual controversy that is ripe and justiciable. A declaratory judgment will clarify the legal relationship between the parties.

     102.     The as much as $1 billion in funds at other exchanges that is demanded by Barclays was not a part of the sale and was not transferred by the Clarification Letter. To the extent that the Clarification Letter purports to transfer as much as $1 billion in funds at other exchanges, it was not approved by the Court or by the Sale Order.

     103.     The Trustee is entitled to a declaratory judgment that the margin and clearing funds at foreign exchanges were not transferred to Barclays and remain the property of the LBI estate.

24

67361

## COUNT IV

### (Declaratory Judgment under 28 U.S.C. § 2201
### $769 Million In Rule 15c3-3 Securities
### Or Substantially Similar Securities)

104.    The Trustee repeats and realleges paragraphs 1 - 103 as if fully set forth herein.

105.    The Trustee and Barclays are parties to the Clarification Letter. The parties

dispute the meaning and enforceability of the Clarification Letter, particularly with respect to

whether paragraph 8 of the Clarification Letter transfers to Barclays $769 million in securities.

106.    There is an actual controversy that is ripe and justiciable. A declaratory judgment

will clarify the legal relationship between the parties.

107.    The transfer of $769 million in securities demanded by Barclays was not a part of

the sale. The transfer of these securities was not and is not permissible by law.

108.    To the extent the Clarification Letter purports to transfer the $769 million in

securities to Barclays, it was not approved by the Court or by the Sale Order.

109.    The Trustee is entitled to a declaratory judgment that the $769 million in

securities was not transferred to Barclays and remains the property of the LBI estate.

## COUNT V

### (Avoidance of Transfers and Recovery of Property
### under §§ 549 and 550 of the Bankruptcy Code)

110.    The Trustee repeats and realleges paragraphs 1- 109 as if fully set forth herein.

111.    Section 549 of the Bankruptcy Code permits the Trustee to avoid transfers of

estate property that occurred after the commencement of the case and which were not authorized

under the Code or by the Court. Section 550 of the Code authorizes the Trustee to recover, for

the benefit of the estate, the property transferred to Barclays or, if the Court so orders it, the

value of the property transferred to Barclays.

25

67362

112.    The Disputed Assets are property of the LBI estate and their purported transfer to

Barclays was not authorized by the Court. The Trustee is therefore entitled to avoid these

transfers.

113.    To the extent that the Disputed Assets have already been transferred to Barclays,

the Trustee is entitled to recover those assets or, if the Court so orders it, their value.

114.    The Trustee is also entitled to avoid and obtain the return of any transfer of value

from the LBI estate that the Court did not authorize. This includes, without limitation, the

undisclosed discount on the Repo securities of approximately $5 billion to $7 billion, and the

undisclosed benefits that Barclays received on the liabilities that it assumed.

### COUNT VI

### (Avoidance of Transfers and
### Return of Customer Property under SIPA)

115.    The Trustee repeats and realleges paragraphs 1- 114 as if fully set forth herein.

116.    The Disputed Assets constitute customer property within the meaning of SIPA.

The transfers of the Disputed Assets are voidable or void under sections 544, 547, 548 and 549

of title 11.

117.    To the extent that customer property is not sufficient to satisfy customer claims in

full, the Trustee is entitled to avoid the transfers to Barclays under the provisions of SIPA, 15

U.S.C. § 78fff-2(c)(3).

### COUNT VII

### (Turnover of Property under § 542 of the Bankruptcy Code)

118.    The Trustee repeats and realleges paragraphs 1- 117 as if fully set forth herein.

119.    Barclays is in possession of property belonging to the LBI estate, consisting of

approximately $1.3 billion in cash that was held by the OCC, approximately $1.6 billion in

A-1600

67363

securities from the DTCC clearance box, and $5 billion to $7 billion in excess Repo collateral. This is property the Trustee may use or sell within the meaning of section 542 of the Bankruptcy Code.

120.    Section 542 of the Bankruptcy Code requires Barclays to deliver to the Trustee the approximately $1.3 billion in cash that was held by the OCC, the approximately $1.6 billion in securities from the DTCC clearance box, and the $5 billion to $7 billion in excess Repo collateral (or cash or securities of equivalent value).

## COUNT VIII

### (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities under § 548 of the Bankruptcy Code )

121.    The Trustee repeats and realleges paragraphs 1- 120 as if fully set forth herein.

122.    On the morning of September 19, 2008, LBI transferred approximately $1.1 billion in DTCC clearance box securities to Barclays. This transfer occurred within hours of the commencement of the SIPA liquidation proceeding.

123.    This transfer of approximately $1.1 billion in securities from the DTCC clearance box was made at a time when LBI was insolvent. LBI did not receive reasonably equivalent value in exchange for the transfer of these assets.

124.    The Trustee is entitled to avoid the transfer of the approximately $1.1 billion in DTCC clearance box securities as a fraudulent transfer under section 548 of the Bankruptcy Code.

## COUNT IX

### (Fraudulent Conveyance under § 273 of the New York Debtor & Creditor Law, as made applicable by § 544(b) of the Bankruptcy Code)

125.    The Trustee repeats and realleges paragraphs 1- 124 as if set forth fully herein.

27

67364

126.    The transfers of property to Barclays, consisting of approximately $1.3 billion in

cash at the OCC and approximately $1.6 billion in securities from the DTCC clearance box were

made at a time when LBI was insolvent.

127.    LBI received less than fair consideration in exchange for the transfer of these

assets.

128.    The Trustee is entitled to avoid these transfers as fraudulent conveyances under

section 273 of the New York Debtor & Creditor Law, as made applicable by section 544(b) of

the Bankruptcy Code.

## COUNT X

### (Recovery of the Excess Value of the Repo Securities under §§ 559 and 542 of the Bankruptcy Code)

129.    The Trustee repeats and realleges paragraphs 1- 128 as if fully set forth herein.

130.    Section 559 of the Bankruptcy Code requires that excess collateral on a repo

default be returned to the debtor's estate.  Section 559 states in relevant part:

> In the event that a repo participant or financial participant
> liquidates one or more repurchase agreements with a debtor . . .
> any excess of the market prices received on liquidation of such
> assets (or if any such assets are not disposed of on the date of
> liquidation of such repurchase agreements, at the prices available
> at the time of liquidation of such repurchase agreements from a
> generally recognized source or the most recent closing bid
> quotation from such a source) over the sum of the stated
> repurchase prices and all expenses in connection with the
> liquidation of such repurchase agreements shall be deemed
> property of the estate, subject to the available rights of set-off.

131.    After LBI's liquidation proceeding commenced, Barclays liquidated the Repo by

sending a Notice of Termination to LBI.  Thus, the "excess of the market prices" of the assets

subject to the Repo over the "stated repurchase prices" for those same securities is property of

the LBI estate.

28

67365

132.    Under section 542 of the Bankruptcy Code, Barclays is obligated to return to the Trustee the excess value that it realized on the Repo -- an amount of approximately $5 billion to $7 billion.

## COUNT XI

### (Breach of Contract)

133.    The Trustee repeats and realleges paragraphs 1 - 132 as if fully set forth herein.

134.    The APA required Barclays to assume liabilities and permitted Barclays to acquire assets as described above.

135.    Barclays breached the terms of the APA by taking assets in excess of what the APA permitted and by failing to pay the liabilities it assumed.

136.    The Trustee is entitled to judgment in an amount to be determined, together with interest, costs, attorneys' fees (under Section 4.6(b) of the APA), and such further and different relief as the Court finds just and proper.

## COUNT XII

### (Conversion – Money Had and Received)

137.    The Trustee repeats and realleges paragraphs 1 - 136 as if fully set forth herein.

138.    Barclays is in wrongful possession of property belonging to the LBI estate.

139.    This property consists of $1.3 billion in funds from LBI's margin account at the OCC and $1.6 billion in securities from LBI's clearance boxes at the DTCC.

140.    These amounts were wrongfully transferred to and retained by Barclays.

141.    The Trustee is entitled to judgment in an amount not less than $2.9 billion, together with interests, costs and such other and different relief as the Court may find just and proper.

29

A-1603

67366

## COUNT XIII

### (Aiding and Abetting Breach of Fiduciary Duty)

142.    The Trustee repeats and realleges paragraphs 1 - 141 as if fully set forth herein.

143.    The officers of Lehman Brothers owed fiduciary duties of loyalty, care, and candor to LBI. In connection with the sale of LBI assets to Barclays, these officers owed a duty to LBI to exercise their best efforts and judgment solely in the interests of LBI, and not in the interests of Barclays or in their own pecuniary interests. These officers also had a duty to disclose to the Lehman Boards, Lehman's senior management, and Lehman's lawyers all information germane to the sale of LBI's assets.

144.    The LBI officers breached their duty of loyalty, care, and candor to LBI by, among other things, assisting Barclays in obtaining an undisclosed mismatch of assets and liabilities in favor of Barclays at the expense of the LBI estate and otherwise failing to negotiate or obtain the best deal possible for LBI. The LBI officers further breached their fiduciary duty to LBI by not disclosing to the Lehman Boards, Lehman's senior management, or Lehman's lawyers all information that was germane to the sale.

145.    Barclays induced and participated in the Lehman officers' breaches of their fiduciary duties by procuring a sale involving a mismatch of assets and liabilities that Barclays knew was undisclosed and was at the expense of the estate.

146.    The Trustee is entitled to judgment against Barclays for aiding and abetting the breach of fiduciary duty committed by the Lehman officers.

## COUNT XIV

### (Disallowance of Claims under § 502(d) of the Bankruptcy Code)

147.    The Trustee repeats and realleges paragraphs 1- 146 as if set forth fully herein.

30

**A-1604**

67367

148.    Barclays is the transferee of transfers by LBI which are voidable and recoverable from Barclays under the Bankruptcy Code or applicable state law.

149.    Under section 502(d) of the Bankruptcy Code, any claims held by Barclays against LBI must be disallowed unless Barclays turns over the voided transfers or their value to the Trustee.

**RESERVATION OF RIGHTS**

150.    The Trustee believes that additional claims in favor of the LBI estate and against Barclays may exist. The Trustee reserves any and all rights to bring such claims to the extent authorized by the Court or by applicable law.

**PRAYER FOR RELIEF**

Wherefore, the Trustee requests that the Court enter:

(a) judgment, pursuant to 28 U.S.C. § 2201, declaring that the Disputed Assets were not transferred to Barclays in the sale and remain the property of the LBI estate, together with attorneys' fees pursuant to 28 U.S.C. § 2202;

(b) alternatively, an order, pursuant to Bankruptcy Code §§ 542, 548, 549 and 550, voiding the transfers of the Disputed Assets to Barclays and directing Barclays to turn over to the Trustee any Disputed Assets in its possession or which may come into its possession;

(c) an order, pursuant to Bankruptcy Code §§ 548, 549 and 550, 15 U.S.C. § 78fff-2(c)(3), and N.Y. Debtor & Creditor Law § 273, made applicable by Bankruptcy Code § 544(b), permitting the Trustee to recover and requiring Barclays to turn over to the Trustee the assets that were already transferred to Barclays, consisting of approximately $1.6 billion in DTCC clearance box securities and $1.3 billion in cash that was at the OCC;

(d) an order, pursuant to Bankruptcy Code §§ 542, 549 and 550, avoiding and permitting the Trustee to recover any unauthorized transfer of value from the LBI estate,

67368

including, without limitation, the approximately $5 billion to $7 billion in excess value on the Repo securities, the $0.5 billion discount that Barclays received on the liabilities relating to those securities, and the windfall that Barclays realized with respect to the contractual cure costs;

(e) an order, pursuant to Bankruptcy Code §§ 542 and 559, requiring Barclays to turn over to the Trustee the excess $5 billion to $7 billion of estate property it retained as a result of liquidating the Repo;

(f) judgment on Counts XI-XIII in an amount to be determined, together with interest, costs, and attorneys' fees, as allowable;

(g) an order, pursuant to Bankruptcy Code § 502(d), disallowing any claims held by Barclays against the LBI estate, unless the transfers or their value are turned over to the Trustee;

(h) an order directing an accounting of all assets that Barclays has received or to which it claims entitlement in connection with the sale and all liabilities that Barclays assumed in connection with the sale; and

(i) such further and different relief as the Court finds just and proper.

A-1606

67369

Dated: New York, New York
     July 15, 2011

HUGHES HUBBARD & REED LLP

By: /s/ William R. Maguire
           William R. Maguire

Seth D. Rothman
Neil J. Oxford
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
1775 I Street, N.W., Suite 600
Washington, D.C. 20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

*Attorneys for James W. Giddens*
*as Trustee for the SIPA Liquidation*
*of Lehman Brothers Inc.*

A-1607

67370

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re LEHMAN BROTHERS INC.

    Debtor.

Case No. 08-01420 (JMP)
SIPA

-------------------------------------------------------------

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN
BROTHERS INC.,

    Plaintiff,

v.

BARCLAYS CAPITAL INC. and
BARCLAYS BANK PLC,

    Defendants.

Adversary No. 09-01732 (JMP)

-------------------------------------------------------------

## JUDGMENT FOR THE TRUSTEE[1]

The Court has ordered that:

In respect of the Margin Assets, James W. Giddens, as trustee ("Trustee") for the SIPA

liquidation of Lehman Brothers Inc. ("LBI") is awarded judgment against Barclays Capital Inc.

("Barclays") in the sum of Two Billion Fifty Four Million Dollars ($2,054,000,000.00) plus

prejudgment interest at the rate of five percent (5%) per annum from September 22, 2008 to the

date this Judgment is entered in the amount of Two Hundred Eighty Eight Million Six Hundred

Eighty Five Thousand Four Hundred Seventy Nine Dollars and Forty Five Cents

($288,685,479.45) for a total amount of Two Billion Three Hundred Forty Two Million Six

Hundred Eighty Five Thousand Four Hundred Seventy Nine Dollars and Forty Five Cents

($2,342,685,479.45). Post-judgment interest shall accrue and be paid based upon the statutory

---

1.   Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's
    Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b), The Trustee's Motion

A-1608

67371

post-judgment interest rate set forth in 28 U.S.C. § 1961. This judgment shall be enforceable against Barclays Bank PLC as agreed upon by Barclays and the Trustee.

All other matters having been resolved with respect to the Trustee's Motion for Relief Pursuant To The Sale Orders Or, Alternatively, For Certain Limited Relief Under Rule 60(b) (LBI Dkt. 08-01420, ECF No. 1682, the "Trustee's Motion") and the Trustee's Amended Adversary Complaint (Adv. Dkt. 09-01732, ECF. No. 11, the "Amended Adversary Complaint") as set forth in this Court's orders entered with respect to the Trustee's Motion and the Amended Adversary Complaint on this same date, this Judgment constitutes, and this Court hereby enters, final judgment pursuant to Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure.

No costs are allowed.

Dated:     New York, New York
           July 15, 2011

                                        /s James M. Peck
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge

---

For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings, dated February 22, 2011 (Dkt. 08-01420, ECF No. 4105).

2

67429

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re LEHMAN BROTHERS INC.

     Debtor.

Case No. 08-01420 (JMP)
SIPA

.......................................................................

JAMES W. GIDDENS, as TRUSTEE for the
SIPA LIQUIDATION of LEHMAN
BROTHERS INC.,

     Plaintiff,

v.

Adversary No. 09-01732 (JMP)

BARCLAYS CAPITAL INC. and
BARCLAYS BANK PLC,

     Defendants.

## JUDGMENT FOR BARCLAYS CAPITAL INC.[1]

The Court has ordered that:

In respect of the Clearance Box Assets, Barclays Capital Inc. ("Barclays") is awarded

judgment against James W. Giddens, as trustee ("Trustee") for the SIPA liquidation of Lehman

Brothers Inc. in the sum of One Billion One Hundred Million Dollars ($1,100,000,000.00). Post-

judgment interest shall accrue and be paid based upon the statutory post-judgment interest rate

set forth in 28 U.S.C. § 1961.

All other matters having been resolved with respect to Barclays' Motion To Enforce The

Sale Order And Secure Delivery Of All Undelivered Assets (Docket 08-01420, ECF No. 2582,

"Barclays' Motion") as set forth in this Court's order entered with respect to Barclays' Motion

---

1.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's
Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(b). The Trustee's Motion
For Relief Under The SIPA Sale Order, Barclays' Cross-Motion To Enforce The Sale Orders And Adjudication
Of Related Adversary Proceedings, dated February 22, 2011 (Docket 08-01420, ECF No. 4105).

A-1610

67430

on this same date, this Judgment constitutes, and this Court hereby enters, final judgment

pursuant to Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure.

No costs are allowed.

Dated:   New York, New York
         July 15, 2011

/s James M. Peck

Honorable James M. Peck
United States Bankruptcy Judge